[No. S018180. Jan. 28, 1994.]

JENNIFER HILL et al., Plaintiffs and Respondents, v.
NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, Defendant and
Appellant;
BOARD OF TRUSTEES OF LELAND STANFORD JUNIOR
UNIVERSITY, Intervener and Respondent.

## COUNSEL

Pillsbury, Madison & Sutro, C. Douglas Floyd, Craig E. Stewart, Swanson, Midgley, Gangwere, Clarke & Kitchin, George H. Gangwere, John J. Kitchin, Archer & Hanson, Richard J. Archer and Kristina Hanson for Defendant and Appellant.

Covington & Burling, Gregg H. Levy, Jeffrey Pash, Jeffrey S. Harleston, Paul, Hastings, Janofsky & Walker, Robert F. Walker, Mary C. Dollarhide, Schachter, Kristoff, Orenstein & Berkowitz, Victor Schachter and Thomas E. Geidt as Amici Curiae on behalf of Defendant and Appellant.

Margaret C. Crosby, Alan L. Schlosser, Edward M. Chen, Keker & Brockett, Keker, Brockett & Van Nest, Robert A. Van Nest, Susan J. Harriman, Michael J. Proctor and Karin Kramer for Plaintiffs and Respondents.

Joseph R. Grodin, John M. True III, Saperstein, Mayeda, Larkin & Goldstein and Brad Seligman as Amici Curiae on behalf of Plaintiffs and Respondents.

Debra L. Zumwalt, Susan K. Hoerger, Michael Roster, Howard, Rice, Nemerovski, Canady, Robertson, Falk & Rabkin, Jerome B. Falk, Jr., and Steven L. Mayer for Intervener and Respondent.

## OPINION

**LUCAS, C. J.**—The National Collegiate Athletic Association (NCAA) sponsors and regulates intercollegiate athletic competition throughout the United States. Under the NCAA's drug testing program, randomly selected college student athletes competing in postseason championships and football bowl games are required to provide samples of their urine under closely monitored conditions. Urine samples are chemically analyzed for proscribed substances. Athletes testing "positive" are subject to disqualification.

Plaintiffs, who were student athletes attending Stanford University (Stanford) at the time of trial, sued the NCAA, contending its drug testing program violated their right to privacy secured by article I, section 1 of the California Constitution. Stanford intervened in the suit and adopted plaintiffs' position. Finding the NCAA's program to be an invasion of plaintiffs' right to privacy, the superior court permanently enjoined its enforcement against plaintiffs and other Stanford athletes. The Court of Appeal upheld the injunction.

By its nature, sports competition demands highly disciplined physical activity conducted in accordance with a special set of social norms. Unlike the general population, student athletes undergo frequent physical examinations, reveal their bodily and medical conditions to coaches and trainers, and often dress and undress in same-sex locker rooms. In so doing, they normally and reasonably forgo a measure of their privacy in exchange for the personal and professional benefits of extracurricular athletics.

A student athlete's already diminished expectation of privacy is outweighed by the NCAA's legitimate regulatory objectives in conducting testing for proscribed drugs. As a sponsor and regulator of sporting events, the NCAA has self-evident interests in ensuring fair and vigorous competition, as well as protecting the health and safety of student athletes. These interests justify a set of drug testing rules reasonably calculated to achieve drug-free athletic competition. The NCAA's rules contain elements designed to accomplish this purpose, including: (1) advance notice to athletes of testing procedures and written consent to testing; (2) random selection of athletes actually engaged in competition; (3) monitored collection of a sample of a selected athlete's urine in order to avoid substitution or contamination; and (4) chain of custody, limited disclosure, and other procedures designed to safeguard the confidentiality of the testing process and its outcome. As formulated, the NCAA's regulations do not offend the legitimate privacy interests of student athletes.

For these reasons, as more fully discussed below, the NCAA's drug testing program does not violate plaintiffs' state constitutional right to privacy. We will therefore reverse the judgment of the Court of Appeal and direct entry of final judgment in favor of the NCAA.

### Statement of Facts and Proceedings Below

Plaintiffs' action for injunctive relief was tried to the court. We summarize the facts as revealed by the uncontradicted evidence in the record and the findings of the trial court.

The NCAA, a private association of more than 1,000 colleges and universities, was created to foster and regulate intercollegiate athletic competition. NCAA rules are made by member institutions, acting collectively and democratically at national conventions. Member institutions and college athletes are required to abide by NCAA rules as a condition to participation in NCAA-sponsored events.

### 1. *Events Leading to the NCAA's Adoption of Drug Testing*

In 1973, the NCAA enacted a rule prohibiting student athlete drug use. Ten years later, at the Pan American Games in Caracas, Venezuela, several college student athletes tested positive for prohibited drugs. Others withdrew from competition when faced with the prospect of testing. In response to the incident, the United States Olympic Committee (USOC) developed a drug testing program modeled after the program of the International Olympic Committee, which had been established in the early 1970's. Following the lead of the USOC, the NCAA began to study drug use among student athletes.

The NCAA commissioned Michigan State University to conduct a nationwide survey of college athlete drug use. The results revealed substantial use of a variety of drugs—8 percent of the athletes surveyed reported using amphetamines, 36 percent marijuana or hashish, 17 percent cocaine, and 4 percent steroids. Nine percent of football players reported using steroids at some time; six percent reported using steroids within the preceding twelve months.

In January 1984, the members of the NCAA's Pacific 10 Conference, including Stanford, introduced a resolution calling on the NCAA to adopt a mandatory drug testing program. The resolution recited that "the use of controlled substances and allegedly performance-enhancing drugs represents a danger to the health of students and a threat to the integrity of amateur sport."

Acting on the Pacific 10 Conference resolution, the NCAA created a special committee to study drug use and testing. The committee recommended a comprehensive drug testing program based on the Olympic model, concluding in part: "The NCAA has a legitimate interest in maintaining the integrity of intercollegiate athletics, including insuring fair competition and protecting the health and safety of all participating student athletes. The use of 'performance-enhancing' drugs by individual student-athletes is a violation of the ethic of fair competition, [and] poses a potential health and safety hazard to those utilizing such drugs and a potential safety hazard to those

competing with such individuals. The most effective method of ensuring that student-athletes are not utilizing 'performance enhancing' drugs is through a consistent, national drug testing program."

At the NCAA's 1985 convention, the drug use and testing committee's proposal was referred back for further study and refinement. At the 1986 convention, the committee's revised proposal was adopted by an overwhelming vote of the member institutions. The NCAA's drug testing program has continued, with certain amendments, through the time of this appeal.

### 2. *The NCAA Drug Testing Program*

The NCAA prohibits student athlete use of chemical substances in several categories, including: (1) psychomotor and nervous system stimulants; (2) anabolic steroids; (3) alcohol and beta blockers (in rifle events only); (4) diuretics; and (5) street drugs. At the time of trial, sympathomimetic amines (a class of substances included in many medications) were also included in the NCAA's list of banned drugs. The NCAA has amended its rules to delete sympathomimetic amines from its list of proscribed substances.

Student athletes seeking to participate in NCAA-sponsored competition are required to sign a three-part statement and consent form. New forms must be executed at the beginning of each year of competition. The first part of the form affirms that the signator meets NCAA eligibility regulations and that he or she has duly reported any known violations of those regulations.

The second part of the form, entitled Buckley Amendment Consent, authorizes limited disclosure of the form, the results of NCAA drug tests, academic transcripts, financial aid records, and other information pertaining to NCAA eligibility, to authorized representatives of the athlete's institution and conference, as well as to the NCAA. The items of information to be disclosed are identified in the statement as "education records" pursuant to the federal Educational Rights and Privacy Act of 1974. (20 U.S.C. § 1232(g).)

The final part of the form is a "Drug-Testing Consent" including the following provisions:

"By signing this part of the form, you certify that you agree to be tested for drugs.

"You agree to allow the NCAA, during this academic year, before, during or after you participate in any NCAA championship or in any postseason

football game certified by the NCAA, to test you for the banned drugs listed in Executive Regulation 1-7(b) in the NCAA Manual.

"You reviewed the procedures for NCAA drug testing that are described in the NCAA Drug-Testing Program brochure.

"You understand that if you test positive (the NCAA finds traces of any of the banned drugs in your body), you will be ineligible to participate in postseason competition for at least 90 days.

"If you test positive and lose eligibility for 90 days, and then test positive again after your eligibility is restored, you will lose postseason eligibility in all sports for the current and next academic year.

"You understand that this consent and the results of your drug tests, if any, will only be disclosed in accordance with the Buckley Amendment consent."

The Drug Testing Consent contains dated signature spaces for the student athlete and, if the student athlete is a minor, a parent. Failure to sign the three-part form, including the Drug Testing Consent, renders the student athlete ineligible to participate in NCAA-sponsored competition.

Drug testing is conducted at NCAA athletic events by urinalysis. All student athletes in championship events or postseason bowl games are potentially subject to testing. Particular athletes are chosen for testing according to plans that may include random selection or other selection criteria such as playing time, team position, place of finish, or suspicion of drug use.

Upon written notice following his or her participation in an athletic event, the selected athlete must report promptly to a collection station. The athlete may choose to be accompanied by a witness-observer. At the collection station, the athlete picks a plastic-sealed beaker with a personal code number. In the presence of an NCAA official monitor of the same sex as the athlete, the athlete supplies a urine specimen of 100-200 milliliters. The specimen is identified, documented, and divided into two samples labeled A and B. Both samples are delivered to one of three certified testing laboratories. Chain of custody procedures provide for signed receipts and acknowledgments at each transfer point.

At the laboratory, a portion of sample A is tested by gas chromatography/mass spectometry—the most scientifically accurate method of analysis available. Positive findings, signifying use of proscribed drugs, are confirmed by

testing another portion of sample A, and then reviewed by the laboratory director and reported to the NCAA by code number. The NCAA decodes the reports and relays positive findings to the athletic director of the college or university involved by telephone and overnight letter marked "confidential." The institution is required to notify the athlete of the positive finding. Within 24 hours of notice of a positive finding, sample B of the athlete's urine is tested.A positive finding may be appealed to a designated NCAA committee.

A positive test finding results in loss of postseason eligibility. Refusal by a student athlete to follow NCAA-mandated drug testing procedures yields the same consequence—the offending athlete is barred from competition.[1]

### 3. Effects of the Drug Testing Program

In considering whether the NCAA's drug testing program violated plaintiffs' state constitutional right to privacy, the trial court and the Court of Appeal required the NCAA to demonstrate that its drug testing program advanced a "compelling state interest" by proving each of the following: (1) the program furthered its stated purposes, i.e., to safeguard the integrity of athletic competition and to protect the health and safety of student athletes; (2) the utility of the program manifestly outweighed any resulting impairment of the privacy right; and (3) there were no alternatives to drug testing less offensive to privacy interests.

Much of the trial was devoted to a debate among scientists, physicians, and sports professionals regarding the merits of the NCAA's list of proscribed drugs and the general efficacy of its drug testing program. There were sharp differences in professional opinions on a wide range of subjects, including what substances should be banned, as well as the attitudes and behaviors of athletes and coaches toward certain drugs (e.g., steroids) that some may regard as enhancing athletic performance. The trial court's findings, sustained by the Court of Appeal, heavily favored plaintiffs' side of the professional debate.

The trial court found in part that the NCAA drug testing program invades the privacy interests of student athletes by requiring them: (1) to disclose

---

[1]Since the trial in this case, the NCAA has expanded its drug testing program and made more serious the consequences of a positive finding. At its 1990 convention, the NCAA approved a mandatory, year-round testing program, although the program was restricted to the testing of NCAA Division I football players through August 1992. Under the new program, first-time offenders lose an entire year's eligibility. Those testing positive a second time for "street drugs" lose another year of eligibility. And those caught using steroids twice are banned from intercollegiate athletics for life. (Note, *Drug Testing and the Student Athlete: Meeting the Constitutional Challenge* (1990) 76 Iowa L.Rev. 107, 116-117.)

medications they may be using and other information about their physical and medical conditions; (2) to urinate in the presence of a monitor; and (3) to provide a urine sample that reveals chemical and other substances in their bodies.

The court further found that college athletes do not use drugs any more frequently than college students as a general class. It observed that in 1986-1987, the first year of the NCAA's drug testing program, 34 of the 3,511 athletes tested for drugs were declared ineligible because of proscribed drug use. Of the 34 athletes declared ineligible, 31 were engaged in football, 1 was in track and field, and 2 were in basketball. Of the football players, 25 had tested positive for use of steroids. The track and field athlete tested positive for steroids, the two basketball players for cocaine.

From its findings, the court concluded there was no "compelling need" for drug testing to protect the health of college athletes or the integrity of athletic competition. According to the court, the NCAA program was "over-broad" because it banned "useful" over-the-counter medications and pre-scription drugs "designed to improve the health of the athlete." The court observed the NCAA had not been completely consistent in its professed concern for the health of athletes as shown by its failure to require measles vaccinations of athletes despite previous measles outbreaks at postseason competition or to provide counselling or rehabilitation services for drug-using athletes. The court added that Stanford "believes it is wrong to single out athletes for drug testing" and "favors drug education for its students."

The trial court also found the NCAA had failed to produce evidence that certain banned substances, e.g., amphetamines, diuretics, marijuana, and heroin, actually enhance athletic performance. It did find, however, that marijuana clearly impairs athletic performance and that cocaine may do so. Addressing the alleged perception that use of certain drugs may enhance performance, the court found that drugs are generally not perceived by college athletes and coaches to enhance performance or to be "a major problem." With respect to steroid use, the "perception," according to the court, is that steroids "might only help certain types of positions in football."

On the issue of public perception of drug use, the court offered its general view that "the NCAA drug testing program is probably doing more harm than good," and further determined the NCAA had failed to show that drug education and testing based on reasonable suspicion were inadequate to the task of controlling drug use by athletes.

From its conclusions, the trial court determined that the NCAA's drug testing program violated the state constitutional privacy rights of Stanford

student athletes. It permanently enjoined any testing of those athletes wherever it might be conducted, whether inside or outside of California.[2]

On appeal, the Court of Appeal upheld the trial court's factual findings and sustained its legal determinations regarding the NCAA's drug testing program, including its holding that the NCAA had failed to establish a "compelling state interest" in support of the program. The trial court's judgment, including the permanent injunction, was affirmed. We granted review.

*Discussion*

Article I, section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, *and privacy*." (Italics added.)

The phrase "and privacy" was added to California Constitution, article I, section 1 by an initiative adopted by the voters on November 7, 1972 (the Privacy Initiative or Amendment).

To resolve the dispute between the parties, we address three questions of first impression in this court: (1) Does the Privacy Initiative govern the conduct of private, nongovernmental entities such as the NCAA; and (2) if it does, what legal standard is to be applied in assessing alleged invasions of privacy; and (3) under that standard, is the NCAA's drug testing program a violation of the state constitutional privacy right?

1. *Application of the California Constitutional Right to Privacy to Nongovernmental Entities*

Neither plaintiffs nor Stanford assert that the NCAA is an agency or instrumentality of government or a vehicle for state action. Case law generally confirms the status of the NCAA as a private organization, comprised of American colleges and universities, and democratically governed by its own

---

[2]The injunction provides as follows: "[I]t is hereby ordered that the National Collegiate Athletic Association is permanently enjoined from enforcing its requirement that Stanford [University] obtain signed drug testing consent forms from its athlet[es] or requiring Stanford athletes to sign such forms as a condition for participating in NCAA activities. NCAA may not declare any athlete ineligible or take punitive action against such athlete for failure to comply with or participate in the NCAA drug testing program or in any way discriminate against Stanford or its athletes by virtue of their refusal of this order."

membership. (*National Collegiate Athletic Assn.* v. *Tarkanian* (1988) 488 U.S. 179, 197 [102 L.Ed.2d 469, 488, 109 S.Ct. 454] [NCAA is private actor that "enjoy[s] no governmental powers"]; *Arlosoroff* v. *National Collegiate Athletic Ass'n* (4th Cir. 1984) 746 F.2d 1019, 1021 [NCAA is "a voluntary association of public and private institutions"]; *O'Halloran* v. *University of Washington* (W.D.Wash. 1988) 679 F.Supp. 997, 1001, revd. on other grounds, 856 F.2d 1375 [NCAA is private entity].)

■ In its opening attack on the judgment, the NCAA asserts that its private status is dispositive of this action because the Privacy Initiative does not embody a right of action against nongovernmental entities. We disagree.

Article I, section 1 of the California Constitution is an enumeration of the "inalienable rights" of all Californians. "Privacy" is declared to be among those rights. Typical of broad constitutional declarations of rights, the section does not define "privacy" or explain its relationship to other rights or interests. Nor does it specify how or against whom the right of privacy is to be safeguarded. Mere use of the word "privacy" is not definitive in this regard—at the time of the Privacy Initiative there were two distinct and well-established legal sources of privacy rights—the federal Constitution (applicable only to government action) and common law and statutory provisions (applicable as well against nongovernmental entities). (See discussion in pt. 2, *post.*)

■ The Privacy Initiative is to be interpreted and applied in a manner consistent with the probable intent of the body enacting it: the voters of the State of California. (*Legislature* v. *Eu* (1991) 54 Cal.3d 492, 505 [286 Cal.Rptr. 283, 816 P.2d 1309]; *In re Lance W.* (1985) 37 Cal.3d 873, 889 [210 Cal.Rptr. 631, 694 P.2d 744].) When, as here, the language of an initiative measure does not point to a definitive resolution of a question of interpretation, " 'it is appropriate to consider indicia of the voters' intent other than the language of the provision itself.' . . . Such indicia include the analysis and arguments contained in the official ballot pamphlet." (*Legislature* v. *Eu, supra,* 54 Cal.3d at p. 504, quoting in part *Kennedy Wholesale, Inc.* v. *State Bd. of Equalization* (1991) 53 Cal.3d 245, 250 [279 Cal.Rptr. 325, 806 P.2d 1360]; see also *Amador Valley Joint High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 245-246 [149 Cal.Rptr. 239, 583 P.2d 1281].)

■ The official ballot pamphlet section dealing with Proposition 11, the Privacy Initiative, contains arguments for and against the measure as well as rebuttals. The argument in favor of Proposition 11 is replete with references to information-amassing practices of both "government" and

"business." (Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972) p. 26 [hereafter Ballot Argument].) The authors of the argument, then-Assemblyman Kenneth Cory and then-Senator George Moscone, emphasized the capacity of both governmental and nongovernmental agencies to gather, keep, and disseminate sensitive personal information without checking its accuracy or restricting its use to mutually agreed or otherwise legitimate purposes.

As the argument in favor of Proposition 11 observes: "At present there are no effective restraints on the information activities of government *and business*. This amendment creates a legal and enforceable right of privacy for every Californian. [¶] *The right of privacy . . . prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us.* [¶] . . . The proliferation of government *and business* records over which we have no control limits our ability to control our personal lives. . . . [¶] Even more dangerous is the loss of control over the accuracy of government *and business* records on individuals. . . . Even if the existence of this information is known, few government agencies *or private businesses* permit individuals to review their files and correct errors. [¶] . . . *Each time we apply for a credit card or a life insurance policy, file a tax return, interview for a job[,] or get a drivers' license, a dossier is opened and an informational profile is sketched.*" (Ballot Argument, *supra*, at pp. 26-27, italics omitted and added.)

The rebuttal to the argument in favor of Proposition 11 and the argument against Proposition 11, both of which were written by then-Senator James Whetmore, do not contest the privacy measure's potential impact on "business" as well as "government." Rather, they challenge only the need for additional privacy safeguards, observing: "To say there are at present no effective restraints on the information activities of government *and business* is simply untrue." (Ballot Argument, *supra*, at p. 27, italics added.) Opponents further argued that the receipt of personal information is essential to effectuate the *private* party relationships and transactions referred to by proponents of the measure, e.g., credit cards, life insurance policies, and employment interviews. (*Ibid.*)

The repeated emphasis in the competing ballot arguments on private party relationships and transactions, as well as individual encounters with government, underscores the efforts of the Privacy Initiative's framers to create enforceable privacy rights against *both* government agencies *and* private entities. As we have recognized: "[T]he overbroad collection and retention of unnecessary personal information by government *and business interests*"

was one of the principal " 'mischiefs' " at which the Privacy Initiative was directed. (*White* v. *Davis* (1975) 13 Cal.3d 757, 775 [120 Cal.Rptr. 94, 533 P.2d 222], italics added.)

Although none of our decisions has squarely addressed the question whether our state constitutional right to privacy may be enforced against private parties (we had no occasion to decide the issue in *Schmidt* v. *Superior Court* (1989) 48 Cal.3d 370, 389, fn. 14 [256 Cal.Rptr. 750, 769 P.2d 932]), the Courts of Appeal have consistently answered in the affirmative. (See, e.g., *Wilkinson* v. *Times Mirror Corp.* (1989) 215 Cal.App.3d 1034, 1040-1044 [264 Cal.Rptr. 194] [hereafter *Wilkinson*]; *Miller* v. *National Broadcasting Co.* (1986) 187 Cal.App.3d 1463, 1489-1493 [232 Cal.Rptr. 668, 69 A.L.R.4th 1027]; *Cutter* v. *Brownbridge* (1986) 183 Cal.App.3d 836, 841-843 [228 Cal.Rptr. 545]; *Kinsey* v. *Macur* (1980) 107 Cal.App.3d 265 [165 Cal.Rptr. 608]; *Porten* v. *University of San Francisco* (1976) 64 Cal.App.3d 825, 829-830 [134 Cal.Rptr. 839] [hereafter *Porten*]; see also *Chico Fem. Women's Health Cr.* v. *Butte Glen Med. S.* (E.D.Cal. 1983) 557 F.Supp. 1190, 1201-1203.)

In *Porten*, *supra*, 64 Cal.App.3d 825, a college student sought damages from the University of San Francisco, a private institution, alleging it had, without his permission or any good reason, disclosed his academic transcript from another school to a state government agency. The Court of Appeal held the student had stated a cause of action against the university for violation of his state constitutional right to privacy by alleging the unauthorized and improper use of personal and confidential academic information for a purpose not in keeping with its creation or retention. Relying on the references in the ballot argument we have quoted, the court noted that "business" as well as government was the focus of the Privacy Initiative and concluded: "The constitutional provision is self-executing; hence, it confers a judicial right of action on all Californians. [Citations.] Privacy is protected not merely against state action; it is considered an inalienable right which may not be violated by anyone." (*Id.* at pp. 829-830.)

Similarly, in *Wilkinson*, *supra*, 215 Cal.App.3d 1034, the court reviewed prior cases in support of its holding that the California constitutional right to privacy afforded protection against a private employer that required drug testing as part of pre-employment physical examinations. Emphasizing that the concerns underlying the Privacy Initiative extended to the conduct of both governmental and nongovernmental entities, the court observed: "Common experience with the ever-increasing use of computers in contemporary society confirms that the [Privacy Initiative] was needed and intended to safeguard individual privacy from intrusion by both private and governmental action. That common experience makes it only too evident that personal

privacy is threatened by the information-gathering capabilities and activities not just of government, but of private business as well. If the right of privacy is to exist as more than a memory or a dream, the power of both public and private institutions to collect and preserve data about individual citizens must be subject to constitutional control. Any expectations of privacy would indeed be illusory if only the government's collection and retention of data were restricted." (*Id.* at p. 1043.)

In its day-to-day operations, the NCAA is in a position to generate, retain, and use personal information about student athletes and others. In this respect, it is no different from a credit card purveyor, an insurance company, or a private employer (the private entity examples used in the ballot arguments) in its capacity to affect the privacy interests of those with whom it deals.[3]

The NCAA nonetheless urges us to impose a state action prerequisite to suits under the Privacy Initiative because it adds "privacy" to the declaration of rights portion of our state Constitution. The NCAA correctly observes that our decisions construing *other* provisions in the declaration of rights impose a state action requirement (e.g., *People* v. *Zelinski* (1979) 24 Cal.3d 357, 365 [155 Cal.Rptr. 575, 594 P.2d 1000] [search and seizure]; *Garfinkle* v. *Superior Court* (1978) 21 Cal.3d 268, 281-282 [146 Cal.Rptr. 208, 578 P.2d 925], app. dism. (1978) 439 U.S. 949 [58 L.Ed.2d 340, 99 S.Ct. 343] [due process]; *Kruger* v. *Wells Fargo Bank* (1974) 11 Cal.3d 352, 366 [113 Cal.Rptr. 449, 521 P.2d 441, 65 A.L.R.3d 1266] [same]). But those decisions were not premised on the *mere location* of the respective provisions in the constitutional text, but on their distinct language and histories. As we recognized in *Kruger, supra,* what the "drafters" of our Constitution's due process clause "intended by that enactment" remains the pivotal factor in determining whose activity is subjected to regulation. (11 Cal.3d at p. 366.) Similarly, what the voters intended in enacting the Privacy Initiative must determine the propriety of any state action requirement in this case. As we have seen, the ballot arguments contain persuasive evidence of drafter and voter intent to recognize a right of action for invasion of privacy against private as well as government entities. (*White* v. *Davis, supra,* 13 Cal.3d at pp. 773-776.)

Finally, the NCAA advocates a narrow reading of the history of the Privacy Initiative, calling the reference to "business" in the ballot arguments

---

[3]The NCAA does not assert that its nonprofit status or any other aspect of its organization or operations entitles it to any immunity from laws or regulations generally applicable to businesses. We have been directed to no authority that would support such an assertion. (Contra, see *NCAA* v. *Board of Regents of Univ. of Okla.* (1984) 468 U.S. 85 [82 L.Ed.2d 70, 104 S.Ct. 2948] [NCAA subject to antitrust laws].)

"nothing more than a general description of increasing strains on privacy in society generally." To the contrary, the repeated ballot argument references to "business" as an equal source of invasions of privacy, when coupled with examples of specific "business" entities that regularly obtain and use personal information, reveal an attempt by the framers of the Privacy Initiative to make their case to voters based on the conduct and practices of entities in the private as well as the public sector. Reading this language, a reasonable voter would most likely have concluded he or she was casting a ballot to safeguard his or her personal privacy against private as well as government entities.[4] After the case was so presented, the voters were persuaded. To remove by judicial construction a significant part of what the voters desired would amount to an electoral "bait and switch."

In summary, the Privacy Initiative in article I, section 1 of the California Constitution creates a right of action against private as well as government entities. The legal concept of "privacy" as embodied in the initiative is susceptible of such an interpretation; the ballot arguments strongly support it. Our holding in this regard is necessarily confined to the Privacy Initiative. We intimate nothing about the existence of rights of action or permissible defendants in legal proceedings that may be brought either under other clauses in article I, section 1 or other parts of our state Constitution.

2. *Standards for Determining Invasion of Privacy Under Article I, Section 1*

In evaluating the NCAA's drug testing program, the trial court and the Court of Appeal assumed that private entities were subject to the same legal standards as government agencies with respect to claims of invasion of privacy. Borrowing from a few of our cases involving the conduct of government in its dealings with individual citizens, the lower courts imposed on the NCAA the burden of proving both: (1) a "compelling state interest" in support of drug testing; and (2) the absence of any alternative means of accomplishing that interest. (See *Long Beach City Emp.* v. *City of Long Beach* (1986) 41 Cal.3d 937, 948 [227 Cal.Rptr. 90, 719 P.2d 660]; *White* v. *Davis, supra,* 13 Cal.3d at p. 775.) Because the NCAA failed to shoulder the purported burden, it was enjoined from carrying out its drug testing program.

The text of the Privacy Initiative does not define "privacy." The Ballot Argument in favor includes broad references to a "right to be left alone,"

---

[4]See *Luedtke* v. *Nabors Alaska Drilling, Inc.* (Alaska 1989) 768 P.2d 1123, 1130 [79 A.L.R.4th 75] ["history surrounding the 1972 adoption of the privacy amendment by the voters of California evinces a clear intent that the clause applies to private as well as governmental action"].

calling it a "fundamental and compelling interest," and purporting to include within its dimensions no less than "our homes, our families, our thoughts, our emotions, our expressions, our personalities, our freedom of communion, and our freedom to associate with the people we choose." (Ballot Argument, *supra*, at p. 27.) Regrettably, such vague and all-encompassing terms afford little guidance in developing a workable legal definition of the state constitutional right to privacy.

The principal focus of the Privacy Initiative is readily discernible. The Ballot Argument warns of unnecessary information gathering, use, and dissemination by public and private entities—images of "government snooping," computer stored and generated "dossiers" and " 'cradle-to-grave' profiles on every American" dominate the framers' appeal to the voters. (Ballot Argument, *supra*, at p. 26.) The evil addressed is government and business conduct in "collecting and stockpiling unnecessary information . . . and misusing information gathered for one purpose in order to serve other purposes or to embarrass . . . ." (*Id.* at p. 27.) "The [Privacy Initiative's] primary purpose is to afford individuals some measure of protection against this most modern threat to personal privacy." (*White* v. *Davis*, *supra*, 13 Cal.3d at p. 774.)

Although the argument in favor does contain a cryptic reference to a "compelling public need" for abridgement of privacy, the reference occurs in the context of informational privacy rights against government. The argument states in part: "The right of privacy is an important American heritage and essential to the fundamental rights guaranteed by the First, Third, Fourth, Fifth, and Ninth Amendments to the U.S. Constitution. This right should be abridged only when there is compelling *public* need. Some *information* may remain as designated *public* records but only when the availability of such *information* is clearly in the *public* interest." (Ballot Argument, *supra*, at p. 27, italics added.) Nothing in this passage compels the conclusion that the phrase "compelling public need" was intended to supply a single, all-encompassing legal test for privacy rights.

Even within the context of government information-gathering, the limited references in the ballot arguments to "compelling" necessity in the ballot arguments are not consistent. When pressed by the opponents of the Privacy Initiative, who maintained that the new right to privacy would place unwieldy burdens on government efforts to obtain information needed to police the welfare system, the framers equivocated, narrowing their description of the initiative's effect. In a rebuttal to the argument against the Privacy Initiative, Assemblyman Cory stated in part: "The right to privacy will not destroy welfare nor undermine any important government program. It is

limited by 'compelling public necessity' *and the public's need to know.* [*The Privacy Initiative*] *will not prevent the government from collecting any information it legitimately needs. It will only prevent misuse of this information for unauthorized purposes and preclude the collection of extraneous or frivolous information.*" (Ballot Argument, *supra*, at p. 28, italics added.)

The references to a public "need to know" and to information "legitimately need[ed]" by government serve to limit and narrow the prior reference to "compelling public interest." A mere "legitimate need" for information may be less than overwhelming. Similarly, a type of information may not be "extraneous" or "frivolous" in pursuit of a government task, but the government's claim of entitlement may not be "compelling." For example, if a perceived "need" merely represents greater efficiency or effectiveness in the performance of some public function, but its fulfillment is by no means indispensable to government existence or operation, it might not be regarded as "compelling." And yet, as the ballot arguments reveal, the framers of the Privacy Initiative preferred, at least in responding to the arguments of their opponents, a more flexible and pragmatic approach to the privacy right than the isolated term "compelling public interest" appears to demand.

As applied to private entities, a "compelling public interest" standard poses additional difficulties. Private entities pursue private ends and interests, not those of government. If every private organization had to establish a "compelling *public* interest" or "compelling *state* interest" to justify any activity that had an impact on individual privacy, it would fail to do so in most, if not all, conceivable cases. To use an example referred to in the ballot arguments, a private business extending credit or selling insurance may have a legitimate commercial need for obtaining personal information, but such a need is not thereby legally transformed into a "state interest," let alone a "compelling" one.

The Ballot Argument on the Privacy Initiative is useful in identifying the general evils that concerned its authors, but it does not provide clear or unequivocal support for a universal "compelling public interest" standard for privacy rights, regardless of context or circumstances.[5] Indeed, the argument offers little guidance in developing privacy standards. Rather, at bottom, it counsels careful evaluation in context of all asserted "legitimate" interests at stake in the resolution of privacy claims.

---

[5]Ballot arguments often embody the sound-bite rhetoric of competing political interests vying for popular support. However useful they may be in identifying the general evils sought to be remedied by an initiative measure, they are principally designed to win votes, not to present a thoughtful or precise explication of legal tests or standards. The ballot arguments here are no different—their diverse references to "public" and "business" entities reflect perceived abuses of information-gathering power by both, but do not yield a useful legal standard with which to gauge the scope or limits of the right to privacy.

Although confined to the single word "privacy," the language of the Privacy Initiative may be more helpful in developing a suitable legal standard. The term "privacy" was not coined by the authors of the Privacy Initiative. At the time the Privacy Initiative was considered and adopted by the voters, a right to privacy had been recognized and defined in several distinct branches of the law.

■ When an initiative contains terms that have been judicially construed, " ' " " 'the presumption is almost irresistible' " ' " that those terms have been used " ' " " 'in the precise and technical sense' " ' " in which they have been used by the courts. (*In re Harris* (1989) 49 Cal.3d 131, 136 [260 Cal.Rptr. 288, 775 P.2d 1057], quoting *People* v. *Weidert* (1985) 39 Cal.3d 836, 845-846 [218 Cal.Rptr. 57, 705 P.2d 380]; see also *In re Lance W., supra,* 37 Cal.3d at p. 890, fn. 11 ["The adopting body is presumed to be aware of existing laws and judicial construction thereof."]; *People* v. *Weidert, supra,* 39 Cal.3d at p. 844; *In re Jeanice D.* (1980) 28 Cal.3d 210, 216 [168 Cal.Rptr. 455, 617 P.2d 1087] [same effect].) Therefore, in order to discern the meaning of "privacy" as used in the Privacy Initiative, we must examine the various legal roots of the privacy concept.

### a. *Sources of the Right to Privacy*

The pre-initiative judicial construction of the right to privacy developed along two distinct lines: (1) a common law right, supplemented in some instances by statutes, protecting a diverse set of individual interests from interference by nongovernmental entities; and (2) a federal constitutional right, derived from various provisions of the Bill of Rights, that took distinct shape in United States Supreme Court decisions in the 1960's safeguarding the rights of individuals and private entities from government invasion.

### (1) *The common law right*

The origin of the common law right to privacy is often traced to a seminal law review article written at the end of the last century. Samuel D. Warren and Louis D. Brandeis observed a trend in tort law extending protection beyond property rights to what they described as "inviolate personality"— "the right of determining, ordinarily, to what extent [a person's] thoughts, sentiments, and emotions shall be communicated to others." (Warren & Brandeis, *The Right to Privacy* (1890) 4 Harv.L.Rev. 193, 205, 198.) Warren and Brandeis attempted to weave together various strands of tort law into a single thread—in Judge Thomas Cooley's phrase, a "right 'to be let alone.' " (*Id.* at p. 195.) Nearly 40 years later, Brandeis regarded the privacy right as broad-based and rooted in the federal Constitution. As he stated: "The

makers of our Constitution . . . conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men." (*Olmstead* v. *United States* (1928) 277 U.S. 438, 478 [72 L.Ed. 944, 956, 48 S.Ct. 564, 66 A.L.R. 376]; (dis. opn. of Brandeis, J.).)

The Privacy Initiative's debt to the legal tradition begun by Warren and Brandeis is revealed in ballot arguments: "The right of privacy is *the right to be left alone. . . .* It protects our homes, our families, our thoughts, our emotions, our expressions, our personalities, our freedom of communion, and our freedom to associate with the people we choose." (Ballot Argument, *supra*, at p. 27, italics added.)

Seventy years after Warren and Brandeis proposed a right to privacy, Dean William L. Prosser analyzed the case law development of the invasion of privacy tort, distilling four distinct kinds of activities violating the privacy protection and giving rise to tort liability: (1) intrusion into private matters; (2) public disclosure of private facts; (3) publicity placing a person in a false light; and (4) misappropriation of a person's name or likeness. (Prosser, *Privacy* (1960) 48 Cal.L.Rev. 381, 389.) Prosser's classification was adopted by the Restatement Second of Torts in sections 652A-652E. California common law has generally followed Prosser's classification of privacy interests as embodied in the Restatement. (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, §§ 580-594, pp. 674-693.)

■ The privacy tort seeks to vindicate multiple and different interests that range from freedom to act without observation in a home, hospital room, or other private place to the ability to control the commercial exploitation of a name or picture. (Rest.2d Torts, §§ 652B; 652C; see also *Miller* v. *National Broadcasting Co., supra,* 187 Cal.App.3d 1463 [television producer and camera crew entered home without permission to film unsuccessful efforts of paramedics to save the life of plaintiff's husband who had suffered heart attack]; *Noble* v. *Sears, Roebuck & Co.* (1973) 33 Cal.App.3d 654 [109 Cal.Rptr. 269, 73 A.L.R.3d 1164] [private investigator entered hospital room to interrogate patient]; Civil Code, § 3344 [right to recover damages for knowing use of a person's name, photograph, likeness, voice, or signature for commercial exploitation; statutory right cumulative to the common law].)

Each of the four categories of common law invasion of privacy identifies a distinct interest associated with an individual's control of the process or products of his or her personal life. To the extent there is a common denominator among them, it appears to be improper interference (usually by means of observation or communication) with aspects of life consigned to

the realm of the "personal and confidential" by strong and widely shared social norms.

"The [common law invasion of privacy] tort safeguards the interests of individuals in the maintenance of rules of civility. . . . [¶] . . . [In everyday life we experience privacy] as an inherently normative set of social practices that constitute a way of life, our way of life. . . . In the tort, 'privacy' is simply a label we use to identify one aspect of the many forms of respect by which we maintain a community. It is less important that the purity of the label be maintained, than that the forms of community life of which it is a part be preserved." (Post, *The Social Foundations of Privacy* (1989) 77 Cal.L.Rev. 957, 1008.)

Privacy rights also have psychological foundations emanating from personal needs to establish and maintain identity and self-esteem by controlling self-disclosure: "In a society in which multiple, often conflicting role performances are demanded of each individual, the original etymological meaning of the word 'person'—mask—has taken on new meaning. [People] fear exposure not only to those closest to them; much of the outrage underlying the asserted right to privacy is a reaction to exposure to persons known only through business or other secondary relationships. The claim is not so much one of total secrecy as it is of the right to *define* one's circle of intimacy—to choose who shall see beneath the quotidian mask. Loss of control over which 'face' one puts on may result in literal loss of self-identity [citations], and is humiliating beneath the gaze of those whose curiosity treats a human being as an object." (*Briscoe* v. *Reader's Digest Association, Inc.* (1971) 4 Cal.3d 529, 534 [93 Cal.Rptr. 866, 483 P.2d 34, 57 A.L.R.3d 1], fn. omitted.)

The legally amorphous character of a tort based on social custom and psychological well-being did not escape either common law judges or American Law Institute commentators. The common law right of privacy contains several important limiting principles that have prevented its becoming an all-encompassing and always litigable assertion of individual right. ■ Initially, not every kind of conduct that strays from social custom or implicates personal feelings gives rise to a common law cause of action for invasion of privacy. The various branches of the privacy tort refer generally to conduct that is "highly offensive to a reasonable person," thereby emphasizing the importance of the *objective context* of the alleged invasion, including: (1) the likelihood of serious harm, particularly to the emotional sensibilities of the victim; and (2) the presence or absence of countervailing interests based on competing social norms which may render the defendant's

conduct inoffensive; e.g., a legitimate public interest in exposing and prosecuting serious crime that might justify publication of otherwise private information or behavior.[6]

Moreover, the plaintiff in an invasion of privacy case must have conducted himself or herself in a manner consistent with an actual expectation of privacy, i.e., he or she must not have manifested by his or her conduct a voluntary consent to the invasive actions of defendant. If voluntary consent is present, a defendant's conduct will rarely be deemed "highly offensive to a reasonable person" so as to justify tort liability. (Rest.2d Torts, § 652B, com. c [no liability for public observation of plaintiff "since he is not then in seclusion, and his appearance is public and open to the public eye"]; *Gill* v. *Hearst Publishing Co.* (1953) 40 Cal.2d 224, 230 [253 P.2d 441] [plaintiffs waived any right to privacy by a "pose voluntarily assumed in a public market place"]; *Aisenson* v. *American Broadcasting Co.* (1990) 220 Cal.App.3d 146, 162 [269 Cal.Rptr. 379] ["One factor relevant to whether an intrusion is 'highly offensive to a reasonable person' is the extent to which the person whose privacy is at issue voluntarily entered into the public sphere."]; *Melvin* v. *Reid* (1931) 112 Cal.App. 285, 290 [297 P. 91] [no right to privacy in matters publicized with consent: "There can be no privacy in that which is already public."]; see also *Kapellas* v. *Kofman* (1969) 1 Cal.3d 20, 36-37 [81 Cal.Rptr. 360, 459 P.2d 912].) The maxim of the law "volenti non fit injuria" (no wrong is done to one who consents) applies as well to the invasion of privacy tort. (Rest.2d Torts, § 892A, com. a; see also Civ. Code, § 3515.)

In determining the " 'offensiveness' " of an invasion of a privacy interest, common law courts consider, among other things, "the degree of the intrusion, the context, conduct and circumstances surrounding the intrusion as well as the intruder's motives and objectives, the setting into which he intrudes, and the expectations of those whose privacy is invaded." (*Miller* v. *National Broadcasting Co., supra*, 187 Cal.App.3d at pp. 1483-1484.)

Thus, the common law right of privacy is neither absolute nor globally vague, but is carefully confined to specific sets of interests that must inevitably be weighed in the balance against competing interests before the right is judicially recognized. A plaintiff's expectation of privacy in a specific context must be objectively reasonable under the circumstances,

---

[6]See, e.g., Restatement Second of Torts, sections 652B, comment d (intrusion into private affairs must be of a kind highly offensive to reasonable person), 652C, comment d (appropriation of commercial or other value of name or likeness is essential—mere incidental use not actionable), 652D, comment c (publicity given to private life must be highly offensive to reasonable person), 652E, comment c (false light publicity must be highly offensive to reasonable person).

especially in light of the competing social interests involved. As one commentator has summarized: "Through a careful balancing of interests, the courts developed specific [common law] causes of action which protected somewhat well-defined aspects of personal privacy. Although privacy was clearly identified as an interest worthy of some legal protection, courts generally did not give privacy a privileged place or undue weight in the balancing process." (Kelso, *California's Constitutional Right to Privacy* (1992) 19 Pepperdine L.Rev. 327, 376 [hereafter Kelso].)

Our reference to the common law as background to the California constitutional right to privacy is not intended to suggest that the constitutional right is circumscribed by the common law tort. The ballot arguments do not reveal any such limitation. To the contrary, common law invasion of privacy by public disclosure of private facts requires that the actionable disclosure be widely published and not confined to a few persons or limited circumstances. (Rest.2d Torts, § 652D, com. a.) In contrast, the ballot arguments describe a privacy right that "prevents government and business interests from collecting and stockpiling unnecessary information about us and or misusing information gathered for one purpose in order to serve other purposes or to embarrass us." (Ballot Argument, *supra*, at p. 27.) Obviously, sensitive personal information may be misused even if its disclosure is limited.[7]

By referring to the common law, we seek merely to draw upon the one hundred years of legal experience surrounding the term "privacy" in identifying legally protected privacy interests and in describing the process by which such interests are compared and weighed against other values. That experience suggests that the common law's insistence on objectively reasonable expectations of privacy based on widely shared social norms, serious violations of those expectations, and thorough consideration of competing interests, is an invaluable guide in constitutional privacy litigation.

---

[7]Particularly when professional or fiduciary relationships premised on confidentiality are at issue (such as doctor and patient or psychotherapist and client), the state constitutional right to privacy may be invaded by a less-than-public dissemination of information. (See, e.g., *Urbaniak* v. *Newton* (1991) 226 Cal.App.3d 1128, 1138 [277 Cal.Rptr. 354] [complaint stated cause of action against physicians for nonpublic disclosure of positive status for human immunodeficiency virus.].)

Moreover, the common law right of privacy "may not be violated by word of mouth only" and can be infringed only by " 'printings, writings, pictures or other permanent publications . . . .' " (*Grimes* v. *Carter* (1966) 241 Cal.App.2d 694, 698, 699 [50 Cal.Rptr. 808, 19 A.L.R.3d 1310]; see also *Gautier* v. *General Tel. Co.* (1965) 234 Cal.App.2d 302, 309 [44 Cal.Rptr. 404]; *Melvin* v. *Reid, supra*, 112 Cal.App. at p. 290.) Although the Privacy Initiative reveals no voter intent to extend the common law to create a cause of action for mere gossip, in an age of oral mass media (e.g., radio), widespread oral disclosure may tread upon our state constitutional right to privacy as readily as written dissemination. (*H & M Associates* v. *El Centro* (1980) 109 Cal.App.3d 399, 412 [167 Cal.Rptr. 392].)

## (2) *The federal constitutional right*

The ballot arguments refer to the right to privacy as "an important American heritage and essential to the fundamental rights guaranteed by the First, Third, Fourth, and Ninth Amendments to the U.S. Constitution," thereby invoking the federal constitutional right to privacy as recognized in decisions of the United States Supreme Court. (Ballot Argument, *supra*, at p. 27.)

The Privacy Initiative was placed before the voters following a two-thirds vote of each house of the Legislature. (Cal. Const., art. XVIII, § 1.) Testimony before the Assembly Constitution Committee, together with staff reports and analyses prepared for that committee and the Senate Constitution Committee, makes explicit reference to the federal constitutional right to privacy, particularly as it developed beginning with *Griswold* v. *Connecticut* (1965) 381 U.S. 479 [14 L.Ed.2d 510, 85 S.Ct. 1678]. (Kelso, *supra*, 19 Pepperdine L.Rev. at pp. 468, 473, 475, 477 [reproducing legislative history of Privacy Initiative].)

In *Griswold*, the Supreme Court invalidated a state statute prohibiting the use of contraceptive devices and the giving of medical advice regarding their use. Although the federal Constitution contains no explicit reference to a "privacy" right, the court found implicit in the Bill of Rights provisions cited in the ballot argument—the First, Third, Fourth, and Ninth Amendments— "zones of privacy" emanating from what it called the "penumbras" of the specific constitutional guarantees. The court located within those "zones of privacy" personal decisions made by married persons regarding the use of birth control devices. (*Griswold* v. *Connecticut, supra*, 381 U.S. at p. 484 [14 L.Ed.2d at pp. 514-515].)

Concurring justices in *Griswold* sought to place the interest in marital privacy violated by the anticontraception law on other, less "penumbral", constitutional grounds. (381 U.S. 479: " 'tradition and [collective] conscience of our people' " regarding fundamental rights manifested in Due Process Clause and Ninth Amendment (*id.*, at p. 493 [14 L.Ed.2d at p. 520]) (conc. opn. of Goldberg, J.); "basic values 'implicit in the concept of ordered liberty' " in Fourteenth Amendment (*id.*, at p. 500 [14 L.Ed.2d at pp. 524-525]) (conc. opn. of Harlan, J.); due process denied because no "end" of government could support state law at issue (*id.*, at p. 507 [14 L.Ed.2d at pp. 528-529]) (conc. opn. of White, J.).) The concurring justices' approach has been preferred to the more amorphous "penumbral" privacy analysis in at least one recent case. (*Cruzan* v. *Missouri* (1990) 497 U.S. 261, 279, fn. 7 [111 L.Ed.2d 224, 242, 110 S.Ct. 2841] [right to refuse medical treatment

analyzed as Fourteenth Amendment liberty interest rather than part of right to privacy].)

The Supreme Court has included within the post-*Griswold* implicit right to privacy "certain rights of freedom of choice in marital, sexual, and reproductive matters," but has not recognized a general right to engage in sexual activities done in private. ██ ██ (3 Rotunda & Nowak, Treatise on Constitutional Law (2d ed. 1992) § 18.26, p. 298; cf., e.g., *Roe* v. *Wade* (1973) 410 U.S. 113 [35 L.Ed.2d 147, 93 S.Ct. 705] and *Planned Parenthood of Southeastern Pennsylvania* v. *Casey* (1992) 505 U.S. __ [120 L.Ed.2d 674, 112 S.Ct. 2791] [abortion laws struck down in part and upheld in part]; *Webster* v. *Reproductive Health Services* (1989) 492 U.S. 490 [106 L.Ed.2d 410, 109 S.Ct. 3040] [same] with *Bowers* v. *Hardwick* (1986) 478 U.S. 186 [92 L.Ed.2d 140, 106 S.Ct. 2841] [consensual homosexual sodomy law upheld].)[8]

██ The Fourth Amendment's search and seizure clause is sometimes referred to as a "privacy" provision. (See, e.g., *Treasury Employees* v. *Von Raab* (1989) 489 U.S. 656, 672 [103 L.Ed.2d 685, 706, 109 S.Ct. 1384].) The Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable. (*Skinner* v. *Railway Labor Executives' Assn.* (1989) 489 U.S. 602, 619 [103 L.Ed.2d 639, 661, 109 S.Ct. 1402].) ██ ██ ██ Under the Fourth Amendment and the parallel search and seizure clause of the California Constitution (art. I, § 13), the reasonableness of particular searches and seizures is determined by a general balancing test "weighing the gravity of the governmental interest or public concern served and the degree to which the [challenged government conduct] advances that concern against the intrusiveness of the interference with individual liberty."

---

[8]Like other rights contained in or derived from provisions of the Bill of Rights, the federal constitutional right to privacy applies only against state action. (*Pittsley* v. *Warish* (1st Cir. 1991) 927 F.2d 3 [violation of right to familial associational privacy requires state action directly aimed at parent-child relationship]; *Miami Herald Pub. Co.* v. *Ferre* (S.D.Fla. 1985) 636 F.Supp. 970, 975-976 [right to privacy secured only against state action]; *Houghton* v. *New Jersey Mfgrs. Ins. Co.* (E.D.Pa. 1985) 615 F.Supp. 299, 306 [same]; see also *Lugar* v. *Edmonson Oil Co.* (1982) 457 U.S. 922, 936-937 [73 L.Ed.2d 482, 495-496, 102 S.Ct. 2744] [Fourteenth Amendment generally imports state action element]; Nowak et al., Constitutional Law (2d ed. 1983) p. 497 ["The safeguards against deprivations of individual rights which are contained in the text of the Constitution specifically apply only to the activities of either the state or federal governments. Similarly, the Bill of Rights by its terms and necessary implications has been viewed only to limit the freedom of the government when dealing with individuals. Finally, the amendments to the Constitution which protect individual liberties [with the exception of the Thirteenth] specifically address themselves to actions taken by the United States or a state."].)

(*Ingersoll* v. *Palmer* (1987) 43 Cal.3d 1321, 1338 [241 Cal.Rptr. 42, 743 P.2d 1299].)[9]

Collectively, the federal cases "sometimes characterized as protecting 'privacy' have in fact involved at least two different kinds of interests. One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." (*Whalen* v. *Roe* (1977) 429 U.S. 589, 598-600 [51 L.Ed.2d 64, 73, 97 S.Ct. 869] [hereafter *Whalen*], fns. omitted.) The former interest is informational or data-based; the latter involves issues of personal freedom of action and autonomy in individual encounters with government. The distinction between the two interests is not sharply drawn—disclosure of information, e.g., information about one's financial affairs, may have an impact on personal decisions and relationships between individuals and government. (*Plante* v. *Gonzalez* (5th Cir. 1978) 575 F.2d 1119, 1130, cert. den. (1979) 439 U.S. 1129 [59 L.Ed.2d 90, 99 S.Ct. 1047].)

The diversity of federal constitutional "privacy" interests has left the federal right to privacy, especially in its comprehensive "penumbral" sense, without any coherent legal definition or standard. In privacy cases involving informational interests, the federal courts have generally applied balancing tests that avoid rigid "compelling interest" or "strict scrutiny" formulations. (See, e.g., *Whalen, supra,* 429 U.S. 589 [upholding state statute requiring drug prescriptions to be reported to a state government agency]; *Nixon* v. *Administrator of General Services* (1977) 433 U.S. 425, 457-458 [53 L.Ed.2d 867, 899-901, 97 S.Ct. 2777] [sustaining archivists' right of access to presidential papers against individual president's privacy claim]; see also *Doe* v. *Attorney General* (9th Cir. 1991) 941 F.2d 780, 796 [in informational privacy cases, "courts balance the government's interest in having or using the information against the individual's interest in denying access"]; *Plante* v. *Gonzalez, supra,* 575 F.2d at p. 1134 [public official financial disclosure law case; court applies balancing test, confining strict scrutiny to serious intrusions of specific autonomy rights such as marriage, family, and contraception].)

When it is applied, strict scrutiny generally functions as a judicial "trump card," invalidating any attempt at state regulation because the state's interest is rarely sufficiently compelling to justify abridgement of the right. (See,

[9]The "privacy" protected by the Privacy Initiative is no broader in the area of search and seizure than the "privacy" protected by the Fourth Amendment or by article I, section 13 of the California Constitution. (*People* v. *Crowson* (1983) 33 Cal.3d 623, 629 [190 Cal.Rptr. 165, 660 P.2d 389].)

e.g., *First National Bank of Boston* v. *Bellotti* (1978) 435 U.S. 765, 786 [55 L.Ed.2d 707, 724, 98 S.Ct. 1407]; *Loving* v. *Virginia* (1967) 388 U.S. 1, 11 [18 L.Ed.2d 1010, 1017-1018, 87 S.Ct. 1817]; Gunther, *The Supreme Court, 1971 Term* (1972) 86 Harv.L.Rev. 1, 8 [strict scrutiny is " 'strict' in theory and fatal in fact"].) But the Supreme Court has not endorsed strict scrutiny for all privacy-based interests at all conceivable levels of intrusion. Even in specific fields of federal privacy protection, such as abortion rights, the high court has experienced difficulty articulating a consistent standard of review. (Compare, e.g., *Roe* v. *Wade, supra,* 410 U.S. at pp. 155-156 [35 L.Ed.2d at pp. 178-179] [reference to "compelling state interest"] with *Planned Parenthood of Southeastern Pennsylvania* v. *Casey, supra,* 505 U.S. at p. __ [120 L.Ed.2d at pp. 713-715, 742-743, 748-749, 112 S.Ct. at pp. 2820, 2842, 2847] [court unable to arrive at majority position regarding legal standard to measure burdens on abortion rights: three justices favor "undue burden" standard, one justice "strict scrutiny," five justices various other rules and standards].)

In summary, outside the separate context of Fourth Amendment searches and seizures, the "penumbral" federal constitutional right to privacy has been applied to intrusions by the government into a narrow and defined class of personal autonomy interests in contraceptive and reproductive decisions. There is at least some prospect that what have been regarded as "privacy" interests may henceforth be viewed as Fourteenth Amendment "liberty" interests in federal constitutional analysis. (See, e.g., *Cruzan* v. *Missouri, supra,* 497 U.S. 261.) But whatever predictions one might hazard, the murky character of federal constitutional privacy analysis at this stage teaches that privacy interests and accompanying legal standards are best viewed flexibly and in context.[10]

---

[10]While at least two of our cases decided before the Privacy Initiative referred in part to a constitutional right of privacy, a closer examination of those cases reveals a grounding in statutory or constitutional provisions not creating a "privacy" right. (*In re Lifschutz* (1970) 2 Cal.3d 415 [85 Cal.Rptr. 829, 467 P.2d 557, 44 A.L.R.3d 1] [no broad federal constitutional right of privacy in disclosures to psychotherapist under *Griswold*; court interprets psychotherapist-patient privilege as inapplicable to communications at issue]; *City of Carmel-by-the-Sea* v. *Young* (1970) 2 Cal.3d 259, 263, 267 [85 Cal.Rptr. 1, 466 P.2d 225, 37 A.L.R.3d 1313] [First Amendment right to participate in political activity infringed by financial disclosure law; cryptic reference to *Griswold* without mention of a distinct "right to privacy" in state Constitution].) Thus, appellate decisions inferring the creation of a "penumbral" *Griswold*-type state constitutional privacy right from our pre-Privacy Initiative cases represent an overbroad reading of the pertinent holdings. (See, e.g., *Luck* v. *Southern Pacific Transportation Co.* (1990) 218 Cal.App.3d 1, 17 [267 Cal.Rptr. 618] citing *Central Valley Chap. 7th Step Foundation* v. *Younger* (1979) 95 Cal.App.3d 212, 234-235 [157 Cal.Rptr. 117] & *People* v. *Porras* (1979) 99 Cal.App.3d 874, 879 [160 Cal.Rptr. 627].)

b. *Elements of a Cause of Action for Invasion of the State Constitutional Right of Privacy*

■■■■ Our cases do not contain a clear statement of the elements of a cause of action for invasion of the state constitutional right to privacy. Plaintiffs and Stanford succeeded in convincing the lower courts that the NCAA was required to justify any conceivable impact on plaintiffs' privacy interests by a "compelling interest" and to establish that its drug testing program was the "least restrictive" alternative furthering the NCAA's interests. The NCAA assails the "compelling interest/least restrictive alternative" test; plaintiffs and Stanford naturally come to its defense. We consider the positions of the parties in light of the history of the Privacy Initiative.

Our Privacy Initiative jurisprudence emanates from *White* v. *Davis, supra,* 13 Cal.3d 757. In *White,* we upheld against a general demurrer a taxpayer's complaint seeking to enjoin expenditures of public funds for a police department's covert surveillance of university classes at the University of California at Los Angeles. (*Id.* at p. 773.) The complaint alleged a level of "extensive, routine, covert police surveillance of university classes and organization meetings" that was "unprecedented in our nation's history." (*Id.* at p. 776.) According to plaintiff's allegations, police informants and undercover agents disguised themselves as students, attended university functions, and compiled dossiers of statements made by others in attendance, despite the absence of any illegal activity.

Because *White* arose on the pleadings, we necessarily assumed the truth of plaintiff's allegations and intimated no view regarding the ultimate question, i.e., whether plaintiff's state and federal constitutional rights had been violated by the challenged conduct of law enforcement authorities. (*White* v. *Davis, supra,* 13 Cal.3d at p. 776.) Focusing on plaintiffs' rights to academic freedom and freedom of expression, we held the facts as alleged revealed government conduct "likely to pose a substantial restraint upon the exercise of First Amendment rights" and observed that "the challenged surveillance activities can only be sustained if defendant can demonstrate a 'compelling' state interest which justifies the resultant deterrence of First Amendment rights and which cannot be served by alternative means less intrusive on fundamental rights." (*Id.* at p. 772.)

Commenting on the state constitutional right to privacy, we characterized the law enforcement conduct alleged in the complaint as inherently "intrusive," noting defendant would have the opportunity to "contest any of the allegations of the complaint as well as to designate the compelling governmental interests upon which they rely . . . ." (*White* v. *Davis, supra,* 13 Cal.3d at p. 776.)

Properly analyzed, our decision in *White* did not establish a blanket "compelling interest" test for all state constitutional right-to-privacy cases. According to the *White* plaintiffs' allegations, the government was spending taxpayer dollars to gather information and construct dossiers containing the surreptitious observations of academic speech by government agents. There was no legitimate government interest in this activity; its continuation threatened to harass and embarrass citizens in the exercise of their rights to free expression and association. Plaintiff's charge in *White* thus pertains to government invasion of one distinct set of privacy interests—those which overlap the First Amendment and relate to "our expressions," "our freedom of communion," and "our freedom to associate with the people we choose." (Ballot Argument, *supra*, at p. 27.)

This view of *White* is supported by an examination of the authority cited by the court. The *White* court refers without discussion to three cases in support of its "compelling governmental interests" language. None of the cases involves our state constitutional right of privacy.

Two of the three cases cited in *White* deal with freedom of expression and the concomitant right to hold public office. In *City of Carmel-by-the-Sea* v. *Young, supra*, 2 Cal.3d 259, plaintiffs attacked a sweeping conflict-of-interest law requiring "every public officer" and "each candidate" for state or local public office to file a statement disclosing all investments in excess of $10,000 owned by the officer, a spouse, or a minor child. (*Id.* at p. 262.) Drawing on state and federal cases recognizing a First Amendment right to participate in political activity, we emphasized that laws restraining political expression must be justified by a government showing of "compelling state purpose" as well as an absence of any "alternatives" that are " 'less offensive' " or " 'less subversive of constitutional rights.' " (*Id.* at pp. 264-265.) Finding the conflict-of-interest statute overbroad and not subject to a reasonable limiting construction, we held it unconstitutional. (*Id.* at p. 272.)

In *County of Nevada* v. *MacMillen* (1974) 11 Cal.3d 662, 670-672 [114 Cal.Rptr. 345, 522 P.2d 1345], we upheld a revision of the conflict-of-interest law designed to satisfy the demands of *City of Carmel-by-the-Sea*. Both of the conflict of interest cases make reference to a right to privacy, but in the context of the federal "penumbral" right. (*City of Carmel-by-the-Sea* v. *Young, supra*, 2 Cal.3d at pp. 266-268; *County of Nevada* v. *MacMillen, supra*, 11 Cal.3d at p. 672.)

The third case cited in *White*—the Supreme Court's *Griswold* decision—involves the federal "penumbral" right to privacy as applied to a married couple's right to use contraceptives. *White* refers to Justice Goldberg's

concurring opinion, which discusses a "compelling" state interest standard for a "significant encroachment on personal liberty." (*White* v. *Davis, supra*, 13 Cal.3d at p. 776, citing *Griswold* v. *Connecticut, supra*, 381 U.S. at p. 497 [14 L.Ed.2d at pp. 522-523] (conc. opn. of Goldberg, J.).) The standard is borrowed from *Bates* v. *City of Little Rock* (1959) 361 U.S. 516 [4 L.Ed.2d 480, 80 S.Ct. 412], a National Association for the Advancement of Colored People membership-list disclosure case involving "privacy" as an aspect of freedom of association protected by the First Amendment. Justice Goldberg's concurrence represented the views of three justices. The majority opinion, written by Justice Douglas, does not adopt a "compelling interest" standard. (*Griswold* v. *Connecticut, supra*, 381 U.S. at pp. 480-486 [14 L.Ed.2d at pp. 512-516].)

As we have observed in part 2(a)(2), *ante*, there is no clear or uniform "compelling interest" standard emanating from the federal penumbral "privacy" decisions. Based on its language and the authority it cites, our decision in *White* signifies only that some aspects of the state constitutional right to privacy—those implicating obvious government action impacting freedom of expression and association—are accompanied by a "compelling state interest" standard.

Some of our decisions following *White* use "compelling interest" language; others appear to rely on balancing tests giving less intense scrutiny to nonprivacy interests. The particular context, i.e., the specific kind of privacy interest involved and the nature and seriousness of the invasion and any countervailing interests, remains the critical factor in the analysis. Where the case involves an obvious invasion of an interest fundamental to personal autonomy, e.g., freedom from involuntary sterilization or the freedom to pursue consensual familial relationships, a "compelling interest" must be present to overcome the vital privacy interest. If, in contrast, the privacy interest is less central, or in bona fide dispute, general balancing tests are employed.[11]

For the reasons stated above, we decline to hold that every assertion of a privacy interest under article I, section 1 must be overcome by a "compelling

---

[11]See, e.g., *Schmidt* v. *Superior Court, supra*, 48 Cal.3d at pages 389-390 (right to familial privacy not violated by mobilehome park rule excluding persons under 25; no reference to "compelling interest;" court appears to balance privacy interest against competing interests); *Long Beach City Employees Assn.* v. *City of Long Beach, supra*, 41 Cal.3d at page 948, footnote 12 (polygraph testing of government employees by city; case decided on state equal protection grounds; "compelling governmental interest" reference in footnote dictum on constitutional right to privacy); *Doyle* v. *State Bar* (1982) 32 Cal.3d 12, 20 [184 Cal.Rptr. 720, 648 P.2d 942] (State Bar subpoena for trust account records; clients' privacy interest "is not absolute but must be balanced against the need for disclosure"); *Conservatorship of Valerie N.* (1985) 40 Cal.3d 143, 164 [219 Cal.Rptr. 387, 707 P.2d 760] (right to elect sterilization as method of contraception; restriction on exercise of fundamental constitutional right must be justified by "compelling interest that is within the police power of the state in regulating the

interest." Neither the language nor history of the Privacy Initiative unambiguously supports such a standard. In view of the far-reaching and multifaceted character of the right to privacy, such a standard imports an impermissible inflexibility into the process of constitutional adjudication.

There remains, however, the question of the correct legal standard to be applied in assessing plaintiffs' claims for invasion of privacy. Based on our review of the history of the Privacy Initiative, we will describe in the remainder of this part the elements of the cause of action for violation of the state constitutional right to privacy and the defenses that might be asserted against such a cause of action.

### (1) *A legally protected privacy interest*

The first essential element of a state constitutional cause of action for invasion of privacy is the identification of a specific, legally protected privacy interest. Whatever their common denominator, privacy interests are best assessed separately and in context. Just as the right to privacy is not absolute, privacy interests do not encompass all conceivable assertions of individual rights. Legally recognized privacy interests are generally of two classes: (1) interests in precluding the dissemination or misuse of sensitive and confidential information ("informational privacy"); and (2) interests in making intimate personal decisions or conducting personal activities without observation, intrusion, or interference ("autonomy privacy").

Informational privacy is the core value furthered by the Privacy Initiative. (*White* v. *Davis, supra,* 13 Cal.3d at p. 774.) A particular class of information is private when well-established social norms recognize the need to maximize individual control over its dissemination and use to prevent unjustified embarrassment or indignity. Such norms create a threshold reasonable expectation of privacy in the data at issue. As the ballot argument observes, the

---

subject"); *People* v. *Stritzinger* (1983) 34 Cal.3d 505, 511 [194 Cal.Rptr. 431, 668 P.2d 738] (patient's privacy interest in psychotherapy must yield to compelling state interests; detection and prevention of child abuse constitutes such an interest); *Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252 [172 Cal.Rptr. 866, 625 P.2d 779, 20 A.L.R.4th 1118] (invalidating restrictions on state funding of abortions; applying standard employed in *Bagley* v. *Washington Township Hosp. Dist.* (1966) 65 Cal.2d 499, 505-507 [55 Cal.Rptr. 401, 421 P.2d 409], a political speech case, to rights of privacy and equal protection); *City of Santa Barbara* v. *Adamson* (1980) 27 Cal.3d 123 [164 Cal.Rptr. 539, 610 P.2d 436, 12 A.L.R.4th 219] (right to live in an alternative family with persons not related by blood, marriage, or adoption; abridgement must be justified by compelling public need); *Loder* v. *Municipal Court* (1976) 17 Cal.3d 859, 864 [132 Cal.Rptr. 464, 553 P.2d 624] (no privacy right to expungement of arrest record; reference to common law interest in public reporting of crime; reference to "compelling interest"); *Valley Bank of Nevada* v. *Superior Court* (1975) 15 Cal.3d 652, 656-657 [125 Cal.Rptr. 553, 542 P.2d 977] (bank customer has reasonable expectation of privacy in bank records referring to customer's financial affairs; right of privacy must be balanced against civil litigant's right to discover facts).

California constitutional right of privacy "prevents government and business interests from [1] collecting and stockpiling unnecessary information about us and from [2] misusing information gathered for one purpose in order to serve other purposes or to embarrass us." (Ballot Argument, *supra*, at p. 27.)

Autonomy privacy is also a concern of the Privacy Initiative. The ballot arguments refer to the federal constitutional tradition of safeguarding certain intimate and personal decisions from government interference in the form of penal and regulatory laws. (Ballot Argument, *supra*, at p. 27.) But they do not purport to create any unbridled right of personal freedom of action that may be vindicated in lawsuits against either government agencies or private persons or entities.

Whether established social norms safeguard a particular type of information or protect a specific personal decision from public or private intervention is to be determined from the usual sources of positive law governing the right to privacy—common law development, constitutional development, statutory enactment, and the ballot arguments accompanying the Privacy Initiative.

(2) *Reasonable Expectation of Privacy*

■ The second essential element of a state constitutional cause of action for invasion of privacy is a reasonable expectation of privacy on plaintiff's part.

"The extent of [a privacy] interest is not independent of the circumstances." (*Plante* v. *Gonzalez, supra*, 575 F.2d at p. 1135.) Even when a legally cognizable privacy interest is present, other factors may affect a person's reasonable expectation of privacy. For example, advance notice of an impending action may serve to " 'limit [an] intrusion upon personal dignity and security' " that would otherwise be regarded as serious. (*Ingersoll* v. *Palmer, supra*, 43 Cal.3d at p. 1346 [upholding the use of sobriety checkpoints].)

In addition, customs, practices, and physical settings surrounding particular activities may create or inhibit reasonable expectations of privacy. (See, e.g., *Whalen, supra*, 429 U.S. at p. 602 [51 L.Ed.2d at p. 75] [reporting of drug prescriptions to government was supported by established law and "not meaningfully distinguishable from a host of other unpleasant invasions of privacy that are associated with many facets of health care"]; *Fraternal Order of Police, Lodge No. 5* v. *City of Philadelphia* (3d Cir. 1987) 812 F.2d 105, 114 [no invasion of privacy in requirement that applicants for promotion to special police unit disclose medical and financial information in part

because of applicant awareness that such disclosure "has historically been required by those in similar positions"].)

A "reasonable" expectation of privacy is an objective entitlement founded on broadly based and widely accepted community norms. (See, e.g., Rest.2d Torts, *supra*, § 652D, com. c ["The protection afforded to the plaintiff's interest in his privacy must be relative to the customs of the time and place, to the occupation of the plaintiff and to the habits of his neighbors and fellow citizens."]

Finally, the presence or absence of opportunities to consent voluntarily to activities impacting privacy interests obviously affects the expectations of the participant. (See pt. 2(a)(1), *ante.*)

### (3) *Serious invasion of privacy interest*

No community could function if every intrusion into the realm of private action, no matter how slight or trivial, gave rise to a cause of action for invasion of privacy. "Complete privacy does not exist in this world except in a desert, and anyone who is not a hermit must expect and endure the ordinary incidents of the community life of which he is a part." (Rest.2d Torts, *supra*, § 652D, com. c.) Actionable invasions of privacy must be sufficiently serious in their nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right. Thus, the extent and gravity of the invasion is an indispensable consideration in assessing an alleged invasion of privacy.

### c. *Defenses to a State Constitutional Privacy Cause of Action*

■ Privacy concerns are not absolute; they must be balanced against other important interests. (*Doyle* v. *State Bar, supra*, 32 Cal.3d at p. 20; *Wilkinson, supra*, 215 Cal.App.3d at p. 1046.) "[N]ot every act which has some impact on personal privacy invokes the protections of [our Constitution] . . . . [A] court should not play the trump card of unconstitutionality to protect absolutely every assertion of individual privacy." (215 Cal.App.3d at p. 1046.)

The diverse and somewhat amorphous character of the privacy right necessarily requires that privacy interests be specifically identified and carefully compared with competing or countervailing privacy and nonprivacy interests in a "balancing test." The comparison and balancing of diverse interests is central to the privacy jurisprudence of both common and constitutional law.

Invasion of a privacy interest is not a violation of the state constitutional right to privacy if the invasion is justified by a competing interest. Legitimate interests derive from the legally authorized and socially beneficial activities of government and private entities. Their relative importance is determined by their proximity to the central functions of a particular public or private enterprise. Conduct alleged to be an invasion of privacy is to be evaluated based on the extent to which it furthers legitimate and important competing interests. (See pt. 2(a), *ante*; Ballot Argument, *supra*, at pp. 26-27.)

Confronted with a defense based on countervailing interests, the plaintiff may undertake the burden of demonstrating the availability and use of protective measures, safeguards, and alternatives to the defendant's conduct that would minimize the intrusion on privacy interests. (*Whalen, supra,* 429 U.S. at pp. 600-602 [106 L.Ed.2d at pp. 498-500]; *Skinner* v. *Railway Labor Executives' Assn., supra,* 489 U.S. at p. 626, fn. 7 [103 L.Ed.2d at pp. 665-666].) For example, if intrusion is limited and confidential information is carefully shielded from disclosure except to those who have a legitimate need to know, privacy concerns are assuaged. On the other hand, if sensitive information is gathered and feasible safeguards are slipshod or nonexistent, or if defendant's legitimate objectives can be readily accomplished by alternative means having little or no impact on privacy interests, the prospect of actionable invasion of privacy is enhanced.

■■■ The NCAA is a private organization, not a government agency. Judicial assessment of the relative strength and importance of privacy norms and countervailing interests may differ in cases of private, as opposed to government, action.

*First,* the pervasive presence of coercive government power in basic areas of human life typically poses greater dangers to the freedoms of the citizenry than actions by private persons. "The government not only has the ability to affect more than a limited sector of the populace through its actions, it has both economic power, in the form of taxes, grants, and control over social welfare programs, and physical power, through law enforcement agencies, which are capable of coercion far beyond that of the most powerful private actors." (Sundby, *Is Abandoning State Action Asking Too Much of the Constitution?* (1989) 17 Hastings Const.L.Q. 139, 142-143 [hereafter Sundby].)

*Second,* "an individual generally has greater choice and alternatives in dealing with private actors than when dealing with the government." (Sundby, *supra,* 17 Hastings Const.L.Q. at p. 143.) Initially, individuals usually have a range of choice among landlords, employers, vendors and others with

whom they deal. To be sure, varying degrees of competition in the market-place may broaden or narrow the range. But even in cases of limited or no competition, individuals and groups may turn to the Legislature to seek a statutory remedy against a specific business practice regarded as undesirable. State and federal governments routinely engage in extensive regulation of all aspects of business. Neither our Legislature nor Congress has been unresponsive to concerns based on activities of nongovernment entities that are perceived to affect the right of privacy. (See, e.g., Lab. Code, § 432.2, subd. (a) ["No employer shall demand or require any applicant for employment or prospective employment or any employee to submit to or take a polygraph, lie detector or similar test or examination as a condition of employment or continued employment"]; 29 U.S.C. § 2001 [regulating private employer use of polygraph examination].)

*Third,* private conduct, particularly the activities of voluntary associations of persons, carries its own mantle of constitutional protection in the form of freedom of association. Private citizens have a right, not secured to government, to communicate and associate with one another on mutually negotiated terms and conditions. The ballot argument recognizes that state constitutional privacy protects in part "our freedom of communion and our freedom to associate with the people we choose." (Ballot Argument, *supra,* at p. 27.) Freedom of association is also protected by the First Amendment and extends to all legitimate organizations, whether popular or unpopular. (*Britt* v. *Superior Court* (1978) 20 Cal.3d 844, 854 [143 Cal.Rptr. 695, 574 P.2d 766]; see also Tribe, American Constitutional Law (2d ed. 1988) § 18-2, p. 1691 [noting rationale of federal constitutional requirement of state action protects "the freedom to make certain choices, such as choices of the persons with whom [one associates]" which is "basic under any conception of liberty"].)

These generalized differences between public and private action may affect privacy rights differently in different contexts. If, for example, a plaintiff claiming a violation of the state constitutional right to privacy was able to choose freely among competing public or private entities in obtaining access to some opportunity, commodity, or service, his or her privacy interest may weigh less in the balance. In contrast, if a public or private entity controls access to a vitally necessary item, it may have a correspondingly greater impact on the privacy rights of those with whom it deals.

### Summary of Elements and Defenses

Based on our review of the Privacy Initiative, we hold that a plaintiff alleging an invasion of privacy in violation of the state constitutional right to privacy must establish each of the following: (1) a legally

protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by defendant constituting a serious invasion of privacy.

Whether a legally recognized privacy interest is present in a given case is a question of law to be decided by the court. (Cf. *Gill* v. *Hearst Publishing Co., supra*, 40 Cal.2d at p. 229; *Johnson* v. *Harcourt, Brace, Jovanovich* (1974) 43 Cal.App.3d 880, 892 [118 Cal.Rptr. 370] [common law cases].) Whether plaintiff has a reasonable expectation of privacy in the circumstances and whether defendant's conduct constitutes a serious invasion of privacy are mixed questions of law and fact. If the undisputed material facts show no reasonable expectation of privacy or an insubstantial impact on privacy interests, the question of invasion may be adjudicated as a matter of law.

A defendant may prevail in a state constitutional privacy case by negating any of the three elements just discussed or by pleading and proving, as an affirmative defense, that the invasion of privacy is justified because it substantively furthers one or more countervailing interests. The plaintiff, in turn, may rebut a defendant's assertion of countervailing interests by showing there are feasible and effective alternatives to defendant's conduct which have a lesser impact on privacy interests. Of course, a defendant may also plead and prove other available defenses, e.g., consent, unclean hands, etc., that may be appropriate in view of the nature of the claim and the relief requested.

The existence of a sufficient countervailing interest or an alternative course of conduct present threshold questions of law for the court. The relative strength of countervailing interests and the feasibility of alternatives present mixed questions of law and fact. Again, in cases where material facts are undisputed, adjudication as a matter of law may be appropriate.

3. *Application of the Elements of Invasion of Privacy to This Case*

 The NCAA challenges the decision of the Court of Appeal upholding a permanent injunction against its drug testing program as a violation of the state constitutional right to privacy. We will therefore review the record, including the findings made by the trial court, in light of the elements of a cause of action for invasion of privacy as we have just discussed them.

Plaintiffs correctly assert that the NCAA's drug testing program impacts legally protected privacy interests. First, by monitoring an athlete's urination, the NCAA's program intrudes on a human bodily function that by law

and social custom is generally performed in private and without observers. (Cf. *Skinner v. Railway Labor Executives' Assn., supra,* 489 U.S. 602, 617 [103 L.Ed.2d 639, 659-660]; Pen. Code, § 653n [installation or maintenance of two-way mirror permitting observation of restroom is misdemeanor].) Second, by collecting and testing an athlete's urine and inquiring about his or her ingestion of medications and other substances, the NCAA obtains information about the internal medical state of an athlete's body that is regarded as personal and confidential. (*Board of Medical Quality Assurance v. Gherardini* (1979) 93 Cal.App.3d 669, 678 [156 Cal.Rptr. 55] ["A person's medical profile is an area of privacy infinitely more intimate, more personal in quality and nature than many areas already judicially recognized and protected."]; see also *Wilkinson, supra,* 215 Cal.App.3d at p. 1048.)

Observation of urination and disclosure of medical information may cause embarrassment to individual athletes. The first implicates autonomy privacy—an interest in freedom from observation in performing a function recognized by social norms as private. The second implicates informational privacy—an interest in limiting disclosure of confidential information about bodily condition. But, as we have noted, the identification of these privacy interests is the beginning, not the end, of the analysis.

a. *Freedom From Observation During Urination*

(1) *Reasonable expectations of privacy*

The observation of urination—a human excretory function—obviously implicates privacy interests.[12] But the reasonable expectations of privacy of plaintiffs (and other student athletes) in private urination must be viewed within the context of intercollegiate athletic activity and the normal conditions under which it is undertaken.

By its nature, participation in intercollegiate athletics, particularly in highly competitive postseason championship events, involves close regulation and scrutiny of the physical fitness and bodily condition of student athletes. Required physical examinations (including urinalysis), and special regulation of sleep habits, diet, fitness, and other activities that intrude significantly on privacy interests are routine aspects of a college athlete's life not shared by other students or the population at large. Athletes frequently disrobe in the presence of one another and their athletic mentors and

---

[12]In our culture, urination is generally regarded as private, but perhaps not absolutely private in all conceivable settings. "Men urinate side by side in public restrooms without embarrassment even though there is very little, and often no, attempt to partition the urinals. In hospitals and physicians' offices, urine samples of both men and women are generally taken by female nurses or technicians under conditions of privacy similar to those prescribed by [athletic drug testing rules]." (*Dimeo v. Griffin* (7th Cir. 1990) 943 F.2d 679, 682.)

assistants in locker room settings where private bodily parts are readily observable by others of the same sex. They also exchange information about their physical condition and medical treatment with coaches, trainers, and others who have a "need to know."

As a result of its unique set of demands, athletic participation carries with it social norms that effectively diminish the athlete's reasonable expectation of personal privacy in his or her bodily condition, both internal and external. In recognition of this practical reality, drug testing programs involving athletic competition have routinely survived Fourth Amendment "privacy" challenges.[13] Drug testing has become a highly visible, pervasive, and well-accepted part of athletic competition, particularly on intercollegiate and professional levels. (*Schaill, supra,* 864 F.2d at p. 1319.) It is a reasonably expected part of the life of an athlete, especially one engaged in advanced levels of competition, where the stakes and corresponding temptations are high.

The student athlete's reasonable expectation of privacy is further diminished by two elements of the NCAA's drug testing program—advance notice and the opportunity to consent to testing. A drug test does not come as a unwelcome surprise at the end of a postseason match. Full disclosure of the NCAA's banned substances rules and testing procedures is made at the beginning of the athletic season, long before the postseason competition during which drug testing may take place. Following disclosure, the informed written consent of each student athlete is obtained. Thus, athletes have complete information regarding the NCAA's drug testing program and are afforded the opportunity to consent or refuse before they may be selected for testing.

To be sure, an athlete who refuses consent to drug testing is disqualified from NCAA competition. But this consequence does not render the athlete's consent to testing involuntary in any meaningful legal sense. Athletic participation is not a government benefit or an economic necessity that society has decreed must be open to all. One aspect of the state constitutional right

---

[13]For example, in the leading case of *Schaill by Kross* v. *Tippecanoe County School Corp.* (7th Cir. 1988) 864 F.2d 1309, the federal court of appeals upheld a program consisting in part of random drug testing of high school athletes, noting the "element of 'communal undress' inherent in athletic participation" and central role of physical examinations in athletic training and evaluation. (*Id.* at p. 1318.) (See also *Dimeo* v. *Griffin, supra,* 943 F.2d at p. 682 [upholding drug testing of horse racing participants, noting generally reduced privacy expectations of athletes in general]; *Shoemaker* v. *Handel* (3d Cir. 1986) 795 F.2d 1136, 1141-1143 [86 A.L.R.Fed. 405] [same]; *O'Halloran* v. *University of Washington, supra,* 679 F.Supp. 997, 1005, revd. on other grounds (9th Cir. 1988) 856 F.2d 1375 [upholding the NCAA's drug testing program, noting "communal undress" and routine physical examinations].)

to privacy is "our freedom to associate with the people we choose." (Ballot Argument, *supra*, at p. 27.) Participation in any organized activity carried on by a private, nongovernment organization necessarily entails a willingness to forgo assertion of individual rights one might otherwise have in order to receive the benefits of communal association.

Plaintiffs and Stanford have no legal right to participate in intercollegiate athletic competition. (Cf. *Steffes* v. *California Interscholastic Federation* (1986) 176 Cal.App.3d 739 [222 Cal.Rptr. 355].) Their ability to do so necessarily depends upon their willingness to arrive at and adhere to common understandings with their competitors regarding their mutual sporting endeavor. The NCAA is democratically governed by its member institutions, including Stanford.[14] Acting collectively, those institutions, including Stanford, make the rules, including those regarding drug use and testing. If, knowing the rules, plaintiffs and Stanford choose to play the game, they have, by social convention and legal act, fully and voluntarily acquiesced in the application of those rules. To view the matter otherwise would impair the privacy and associational rights of *all* NCAA institutions and athletes.

### (2) *Seriousness of invasion*

Although diminished by the athletic setting and the exercise of informed consent, plaintiffs' privacy interests are not thereby rendered de minimis. Direct observation of urination by a monitor, an intrusive act, appears to be unique to the NCAA's program. Other decided cases, including those involving athlete drug testing, have involved less invasive testing methods, typically unobserved urination in a restroom stall. (See, e.g., *Dimeo* v. *Griffin*, *supra*, 943 F.2d at p. 682 [urine specimen given in "(relative) privacy" of toilet stall with representative standing by but not observing urination]; *Schaill by Kross* v. *Tippecanoe County School Corp.*, *supra*, 864 F.2d at p. 1311 [no direct visual observation of urination; monitor stands outside stall to listen for normal sounds of urination and to check temperature of sample by hand].) The NCAA's use of a particularly intrusive monitored urination procedure justifies further inquiry, even under conditions of decreased expectations of privacy.

### (3) *Competing interests*

To justify its intrusion on student athletes' diminished expectations of privacy, the NCAA asserts two countervailing interests: (1) safeguarding the

---

[14]The NCAA's drug testing program was adopted by, and has been continued with the overwhelming support of, the NCAA's member institutions, both public and private. Although Stanford has chosen to join plaintiffs in challenging the NCAA's drug testing program in court, the record does not reveal any Stanford-initiated opposition to the program through established NCAA channels, either at the NCAA's annual conventions or in any other NCAA setting.

integrity of intercollegiate athletic competition; and (2) protecting the health and safety of student athletes. The central purpose of the NCAA is to promote competitive athletic events conducted pursuant to "rules of the game" enacted by its own membership. In this way, the NCAA creates and preserves the "level playing field" necessary to promote vigorous, high-level, and nationwide competition in intercollegiate sports.

Plaintiffs and Stanford do not contend that the purpose or objectives of the NCAA are contrary to law or public policy. Nor do they attribute bad faith motives to the NCAA or challenge its important role as "the guardian of [the] important American tradition" of intercollegiate athletic competition. (*NCAA* v. *Board of Regents of Univ. of Okla., supra,* 468 U.S. at p. 101, fn. 23 [82 L.Ed.2d at p. 84].) The NCAA is, without doubt, a highly visible and powerful institution, holding, as it does, a virtual monopoly on high-level intercollegiate athletic competition in the United States. Although the NCAA, like other private businesses and organizations, is subject to numerous regulations, neither Congress nor our Legislature has seen fit to interfere with its general rulemaking functions, whether in the area of drug testing or in other fields. Therefore, we regard the NCAA's stated motives and objectives, not with hostility or intense skepticism, but with a "respectful presumption of validity." (*Ibid.*)

Considered in light of its history, the NCAA's decision to enforce a ban on the use of drugs by means of a drug testing program is reasonably calculated to further its legitimate interest in maintaining the integrity of intercollegiate athletic competition. As one author observed: "[Athletic] competition should be decided on the basis of who has done the best job of perfecting and utilizing his or her natural abilities, not on the basis of who has the best pharmacist." (Zemper, *Drug Testing in Athletics,* in Drug Testing: Issues and Options (Coombs & West, edits., 1991) p. 120.)

The NCAA began to study drug testing in response to a specific incident of probable drug ingestion by athletes at the Pan American Games. It followed other established and respected amateur sporting organizations—principally the USOC and the International Olympic Committee—in promulgating and enforcing its drug testing program. And, although the NCAA followed the lead of others, it did not do so blindly. Before beginning its testing program, the NCAA commissioned its own study—one that showed significant and widespread use of drugs by student athletes. Other studies included in the record, as well as testimony from physicians, trainers, and others, confirm substantial, if not extensive, drug use by student athletes. Despite advance notice and warnings to student athletes before the testing

program began, approximately 1 percent of the athletes tested in the first two years of operation were declared ineligible because of drug use.[15]

But whatever the provable incidence of drug use, perception may be more potent than reality. If particular substances are *perceived* to enhance athletic performance, student athletes may feel pressure (whether internal or external, subtle or overt) to use them. A drug testing program serves to minimize that pressure by providing at least some assurance that drug use will be detected and the user disqualified. As a result, it provides significant and direct benefits to the student athletes themselves, allowing them to concentrate on the merits of their athletic task without undue concern about loss of a competitive edge. These benefits offset the limited impact on privacy imposed by the prospect of testing.

There was ample evidence in the record that certain kinds of drugs—such as anabolic steroids and amphetamines—are perceived by some athletes to enhance athletic performance. Among other findings, the Michigan State University study showed that 69 percent of the student athletes who reported taking steroids and 37 percent of those taking amphetamines admitted doing so "to improve athletic performance." Plaintiffs' own expert, Dr. David Lowenthal, wrote in 1985: "In spite of physicians' efforts to provide rational and individual therapy for patients and despite warnings to healthy participants in sports, the consumption of caffeine, salicylates, nonsteroidal antiinflammatory drugs . . . alcohol, anabolic steroids, and amphetamines to improve athletic performance is rampant."

As to anabolic steroids, Dr. Lowenthal commented: "The use of these drugs by athletes has now reached alarming proportions. . . . In the United States, anabolic steroid use has spread from professional athletes to college and high school athletes. . . . It would be extremely difficult to determine the number of athletes who use anabolic steroids in different sports. Much of the information in this area comes from former users [and] from informal surveys. It has been suggested that between 80 and 100 per cent of male bodybuilders and weight lifters at the national and international level use these agents during training. Use among shotputters and discus, hammer and

---

[15]Contrary to plaintiffs' argument, we do not regard the results of drug testing after the NCAA announced and began its program as the *only* persuasive evidence of actual drug use by student athletes. Plaintiffs ignore the self-evident deterrent effect of the program itself, particularly in the context of highly competitive sports activity. Once a program of drug testing is formally announced and in effect, athletes who wish to avoid the disastrous effects of disqualification have a strong incentive to refrain from ingesting prohibited substances. Indeed, one possible yardstick of a drug testing program accompanied by advance consent and publicity is a percentage of positive drug test findings that starts low and continues either at the same level or downward. When so measured, the NCAA's program is successful.

javelin throwers is probably comparable. The use of anabolic steroids has spread rapidly to include football players, swimmers and other competitive athletes, as well as noncompetitive athletes."

Dr. Lowenthal confirmed his written findings and opinions in testimony given at trial. Although other experts expressed different views, the testimony, considered in light of the entire record, supplies uncontradicted evidence of a substantial, though perhaps not universal, perception that the use of certain drugs may enhance athletic performance.

Finally, the practical realities of NCAA-sponsored athletic competition cannot be ignored. Intercollegiate sports is, at least in part, a business founded upon offering for public entertainment athletic contests conducted under a rule of fair and rigorous competition. Scandals involving drug use, like those involving improper financial incentives or other forms of corruption, impair the NCAA's reputation in the eyes of the sports-viewing public. A well announced and vigorously pursued drug testing program serves to: (1) provide a significant deterrent to would-be violators, thereby reducing the probability of damaging public disclosure of athlete drug use; and (2) assure student athletes, their schools, and the public that fair competition remains the overriding principle in athletic events. Of course, these outcomes also serve the NCAA's overall interest in safeguarding the integrity of intercollegiate athletic competition. (Cf. *Dimeo* v. *Griffin, supra*, 943 F.2d at p. 685 [state's financial interest in horse racing revenues provides partial justification for drug testing of participants to preserve appearance and reality of fair competition]; *Shoemaker* v. *Handel, supra*, 795 F.2d at p. 1142 ["It is the public's perception, not the known suspicion, that triggers the state's strong interest in conducting warrantless [drug] testing [in the horse racing industry].")

The NCAA also has an interest in protecting the health and safety of student athletes who are involved in NCAA-regulated competition. Contrary to plaintiffs' characterization, this interest is more than a mere "naked assertion of paternalism." The NCAA sponsors and regulates intercollegiate athletic events, which by their nature may involve risks of physical injury to athletes, spectators, and others. In this way, the NCAA effectively creates occasions for potential injury resulting from the use of drugs. As a result, it may concern itself with the task of protecting the safety of those involved in intercollegiate athletic competition. This NCAA interest exists for the benefit of all persons involved in sporting events (including not only drug-ingesting athletes but also innocent athletes or others who might be injured by a drug user), as well as the sport itself.

Plaintiffs and Stanford attempt to undermine the strength of the NCAA's interests with a series of factual arguments based on the trial court's findings. However, as we have noted, those findings were premised on the legal

assumption that the NCAA bears the burden of establishing a "compelling interest" in its drug testing program that cannot be addressed by any alternative with a lesser impact on privacy interests. No such showing is required. Because the trial court's findings were premised on an erroneous view of the applicable legal standard, they cannot save the judgment. (*Lewis Food Co.* v. *Fireman's Fund Ins. Co.* (1962) 207 Cal.App.2d 515, 524 [24 Cal.Rptr. 557]; *Smith* v. *Fetterhoff* (1956) 140 Cal.App.2d 471, 473 [295 P.2d 474]; cf. *Bose Corp.* v. *Consumers Union of U.S., Inc.* (1984) 466 U.S. 485, 500, 501 [80 L.Ed.2d 502, 516-517, 104 S.Ct. 1949] [" 'clearly erroneous' " standard of review does not apply to a "finding of fact that is predicated on a misunderstanding of the governing rule of law"].) Although we could remand this case for reconsideration in light of the applicable rules of law, there is no reason to do so. Uncontradicted evidence in the record demonstrates as a matter of law the constitutional validity of the NCAA's program.

 Without reviewing all of the arguments advanced by plaintiffs and Stanford, it is sufficient to note that most, if not all, are based on matters that are immaterial in light of the elements of invasion of privacy described above. For example, plaintiffs seek to dismiss college athlete drug use as legally insignificant, pointing to a finding that "athletes do not use drugs any more than college students generally" and another that they "actually use drugs less during the athletic season than their peers." The purported comparison between student athletes and other college students is beside the point. Student athletes have set themselves apart from their nonathlete peers; as we have noted, they have different and diminished expectations of privacy in the athletic context. If student athletes' drug use is, or, in the absence of drug testing could be, substantial and detrimental to competition or to the health of student athletes, the NCAA has a significant interest in conducting a testing program.

Plaintiffs also point to trial court findings that none of the NCAA's banned drugs were "scientifically proven" to enhance athletic performance, noting some controversy among experts respecting certain substances. Plaintiffs cite no authority imposing a "scientific" burden of proof on a defendant in an invasion of privacy case; we have located none. Scientific proof of this nature would require actual drug use under competitive conditions. This kind of human experimentation would pose risks to life and limb of far greater magnitude than plaintiffs' asserted privacy interest in this case. Moreover, the existence of continuing scientific controversy about particular drugs or practices on perceptions in athletic settings can reasonably be viewed as dictating caution and prohibition, rather than total deregulation.

Finally, as we have noted, perception may well overpower reality in this area. Although the trial court found that coaches and athletes in general do

not perceive drugs as performance-enhancing or as a "major problem," there is clear evidence of a significant perception to the contrary on the part of *some* coaches and athletes. Plaintiffs' own expert confirmed the perception and opined that it was growing. Rules are often made and enforced to control the behavior of relatively small numbers of individuals whose conduct, if it became more widespread, would undermine a community goal or objective. If athletic drug use became widespread because of a growing perception that drug users thereby obtained a "competitive edge," the integrity and reputation of NCAA athletic competition could be seriously threatened. The NCAA is not required by state constitutional privacy principles to stay its hand until a "minor" problem becomes a "major" one. (Cf. *Dimeo* v. *Griffin, supra,* 943 F.2d at p. 684 ["[G]overnment is not limited to addressing public safety problems after serious accidents reveal its want of foresight."].)

Plaintiffs also challenge the NCAA's list of proscribed drugs, maintaining that it is overbroad because, as the trial court found, it "includes substances which do not enhance performance." Accepting the factual premise of plaintiffs' argument, it is not fatal to the NCAA's drug testing program. Initially, the NCAA's interests are not limited to banning so-called performance-enhancing drugs. It also prohibits street drugs—such as marijuana and cocaine—which are illegal to possess and which probably retard athletic performance. The NCAA's interests in maintaining the integrity of competitive conditions and protecting the health and safety of student athletes certainly extends to prohibiting the use of illegal and dangerous substances, as well as others that might potentially affect athletic performance, whether positively or negatively.

Moreover, the Privacy Initiative does not empower us to make an item-by-item review of the desirability of retaining each item in the NCAA's prohibited substance list. The privacy interests asserted by plaintiffs are impacted by the *manner* in which drug testing is carried out; assuming the list contains at least some substances that may potentially injure competitors or competition and thereby justify testing, the impact of monitored urine testing on plaintiffs' privacy interests does not wax or wane depending upon the number of such substances.

The ballot arguments in support of the Privacy Initiative impliedly caution against the kind of wholesale review of the rules and regulations of a private, voluntary organization advocated by plaintiffs and Stanford. The Privacy Initiative recognizes a specific privacy-related interest in "our freedom to associate with the people we choose" (Ballot Argument, *supra,* at p. 27). To undertake, under the guise of protecting a diminished privacy interest, a review of the merits of rules enacted by the democratic process of a private

organization would impair the associational freedom of organization members in a manner contrary to the purpose of the Privacy Initiative itself.

In accordance with the trial court's findings, plaintiffs also argue that the NCAA did not carry "its burden of proving that there are no less intrusive means available to further its asserted goals of assuring fair competition and protecting the health of student athletes." Plaintiffs submit that drug education and testing based on reasonable suspicion are feasible alternatives to random drug testing.

Initially, the trial court erred in imposing on the NCAA the burden of establishing that there were no less intrusive means of accomplishing its legitimate objectives. Like the "compelling interest" standard, the argument that such a "least restrictive alternative" burden must invariably be imposed on defendants in privacy cases derives from decisions that: (1) involve clear invasions of central, autonomy-based privacy rights, particularly in the areas of free expression and association, procreation, or government-provided benefits in areas of basic human need; or (2) are directed against the invasive conduct of government agencies rather than private, voluntary organizations.[16]

---

[16]See, e.g., *Committee to Defend Reproductive Rights* v. *Myers, supra,* 29 Cal.3d at page 270 (applying *Bagley* test, including its "no less offensive alternatives" element, to government discrimination against medical care benefits for abortions); *City of Carmel-by-the-Sea, supra,* 2 Cal.3d at pages 268-269 ("less drastic means" analysis derived from federal freedom of speech and association cases applied to financial disclosure by political candidates; no reference to burden of proof; need for balancing acknowledged); *Robbins* v. *Superior Court* (1985) 38 Cal.3d 199, 213-214 [211 Cal.Rptr. 398, 695 P.2d 695] (in-kind welfare benefits to recipients of general assistance); see also *City of Long Beach Employees Assn., supra,* 41 Cal.3d at page 948, footnote 12 ("less intrusive means" element referred to; issue not reached).

Both *Bagley* v. *Washington Towship, supra,* 65 Cal.2d at pages 506-507, and *City of Carmel-by-the-Sea* v. *Young, supra,* 2 Cal.3d at pages 268-269, rely principally on *Shelton* v. *Tucker* (1960) 364 U.S. 479, 488 [5 L.Ed.2d 231, 237-238, 81 S.Ct. 247], and similar First Amendment freedom of association and expression cases. In *Shelton,* public school teachers were required by law to disclose every organization they had joined or contributed money to—social, political, religious, professional, or other—over a five-year period. Recognizing the state's interest in occupational competence and fitness of teachers, the high court nonetheless struck down the law, observing that its scope far exceeded any legitimate state concern. (*Id.* at pp. 488-490 [5 L.Ed.2d at pp. 237-238].) It stated in part: "The breadth of legislative abridgement must be viewed in the light of less drastic means for achieving the same basic purpose." (*Id.,* at p. 488 [5 L.Ed.2d at p. 237].) It was careful, however, to observe that a "less drastic means" analysis might not be applicable in other constitutional contexts: "In other areas, involving different constitutional issues, more administrative leeway has been thought allowable in the interest of increased efficiency in accomplishing a clearly constitutional central purpose. [Citations.]." (*Id.* at p. 488, fn. 8 [5 L.Ed.2d at p. 237].)

Thus, at the roots of the "least restrictive alternative" burden lie cases of government infringement of fundamental freedoms of expression and association. Unlike this one, those

We have been directed to no case imposing on a private organization, acting in a situation involving decreased expectations of privacy, the burden of justifying its conduct as the "least offensive alternative" possible under the circumstances. Nothing in the language of history of the Privacy Initiative justifies the imposition of such a burden; we decline to impose it.

Moreover, the alternatives posited by plaintiffs—educational programs and suspicion-based drug testing—are different in kind and character from random drug testing. Education may have little effect on persons who are inclined not to listen; competitive pressures or addictive tendencies are likely to prevail over benign attempts at persuasion. Suspicion-based testing assumes reliable visible evidence of drug use and the availability of sufficient resources to make the necessary observations, neither of which finds substantial evidentiary support in the record. It also depends at least in part on the reporting of suspected athletes by their competitors, a situation fraught with conflicts of interest and other difficulties. In light of these factors, the NCAA was not constitutionally compelled to adopt educational or suspicion-based programs to further its interests in the integrity of athletic competition and the health and safety of student athletes.

The closest question presented by this case concerns the method used by the NCAA to monitor athletes as they provide urine samples. A tested athlete's urination is directly observed by an NCAA official of the same sex as the athlete who stands some five to seven feet away. Even the diminished expectations of privacy in a locker room setting do not necessarily include direct and intentional observation of excretory functions. Plaintiffs had a reasonable expectation of privacy under the circumstances; their privacy interest was impacted by the NCAA's conduct. The NCAA was therefore required to justify its use of direct monitoring of urination.

In support of direct monitoring, the NCAA introduced substantial evidence that urine samples can be altered or substituted in order to avoid positive findings and that athletes had actually attempted to do so. The NCAA's interest in preserving the integrity of intercollegiate athletic competition requires not just testing, but effective and accurate testing of unaltered and uncontaminated samples. If direct monitoring is necessary to accomplish accurate testing, the NCAA is entitled to use it.

cases do not involve: (1) broad-based assertions of autonomy privacy interests (i.e., freedom of action as opposed to freedom of expression and association), (2) in circumstances of diminished expectations of privacy on the part of participants in a voluntary extracurricular activity conducted by a private entity. Consistent with *Shelton*, and because the NCAA's stated purposes are legally valid and central to its function, the NCAA should be accorded the kind of "administrative leeway" necessary to accomplish those purposes with "increased efficiency." (*Shelton* v. *Tucker, supra*, 364 U.S. at p. 488, fn. 8 [5 L.Ed.2d at p. 237].)

The trial court rejected the NCAA's evidence, finding cryptically as follows: "Direct monitoring of an athlete urinating is not necessary to ensure a valid sample." No reasons were offered to support this conclusion. Plaintiffs point only to scant expert opinion—also unaccompanied by any credible line of reasoning—on the issue. More critically, plaintiffs did not offer any evidence (whether from experts or other sources) demonstrating that any alternative to direct monitoring with a significantly lesser impact on plaintiff's privacy interests would accomplish the NCAA's objective of ensuring a valid sample.

■■■ Trial court findings must be supported by substantial evidence on the record taken as a whole. Substantial evidence is not any evidence—it must be reasonable in nature, credible, and of solid value. (*Kroopf* v. *Guffey* (1986) 183 Cal.App.3d 1351, 1356 [228 Cal.Rptr. 807]; *Bowers* v. *Bernards* (1984) 150 Cal.App.3d 870, 873 [197 Cal.Rptr. 925].) ■■■ Because plaintiffs failed to demonstrate with substantial evidence the presence of fully viable alternatives to monitoring, they stopped short of proving their case.[17]

Notwithstanding plaintiffs' failure of proof in this case, direct monitoring remains a significant privacy issue in athletic and nonathletic drug testing cases. Social norms validate the distinction between the mere presence of another person in or around an area where urination takes place (such as a bathroom or locker room) and the direct and purposeful observation of urination act by someone specially commissioned to witness it. (See *Capua* v. *City of Plainfield* (D.N.J. 1986) 643 F.Supp. 1507, 1514 [urine test under close surveillance "embarrassing and humiliating"]; Decresce & Lifshitz, Drug Testing in the Workplace (1989) p. 143.)

---

[17]Justice Mosk's dissent charges us with disregarding the substantial evidence rule with respect to the trial court's finding that direct monitoring of athlete urination is unnecessary to ensure a valid sample. We plead not guilty. As Justice Mosk acknowledges, plaintiffs themselves offered no expert or other evidence offering or analyzing any viable alternative to direct monitoring. Rather, the testimony of the NCAA's own expert, Ronald Heitzinger, is the sole evidence on which the court purported to base its finding. Heitzinger testified unequivocally as follows: "I have not only heard of but seen where the athletes have tried to screw up their drug tests so they will not be caught. *So we really recommend that there should be observed testing*." (Italics added.) While he acknowledged performing testing without direct observation at the request of some of his clients, Heitzinger was not questioned regarding the feasibility of any specific alternatives or their impact on the accuracy of the testing process. In our view, Heitzinger's testimony, when read in context, acknowledges obliquely the mere possibility of testing without direct monitoring, while upholding at all times the vital importance of monitoring to ensure accuracy in the testing process. It does not satisfy plaintiff's burden of showing a practical, effective, and viable alternative. It is patently insufficient to permit a court to strike the balance in favor of the privacy right. The Privacy Initiative does not require the NCAA to settle for something less than a fully effective testing program.

Perhaps because of its greater impact on privacy interests, direct monitoring is not used in all drug testing programs. With two exceptions, no decided case has upheld direct monitoring, even in the diminished privacy context of athletic competition. The first exception—also in an NCAA drug testing context—is a later-vacated federal trial court decision containing virtually no analysis of the serious privacy issues. (*O'Halloran* v. *University of Washington, supra*, 479 F.Supp. at p. 1005.) The second involves testing of a probationary police officer after notice and consent. (*O'Connor* v. *Police Com'r of Boston* (1990) 408 Mass. 324 [557 N.E.2d 1146, 1149].) Neither case considers the possibility of less intrusive alternatives to direct monitoring.

There may indeed be less intrusive alternatives to direct monitoring that could nonetheless fully satisfy the tester's objective of insuring a valid sample. (See, e.g., *Dixon* v. *Department of Transp. F.A.A.* (Fed.Cir. 1993) 8 F.3d 798, 803-804 [describing color and temperature tests designed to verify integrity of urine sample]; see also *Treasury Employees* v. *Von Raab, supra*, 489 U.S. at p. 661 [103 L.Ed.2d at p. 669]; Decresce & Lifshitz, *supra*, Drug Testing in the Workplace, p. 144; Fay, Drug Testing (1991) pp. 227-230 [outlining similar procedures to safeguard privacy while insuring accuracy of testing].) Because we are limited to the record before us, we necessarily leave any further consideration of less intrusive alternatives to direct monitoring initially to the judgment and discretion of the NCAA, and then to future litigation, if any.

### b. *Interest in the Privacy of Medical Treatment and Information*

#### (1) *Reasonable expectation*

As discussed above, plaintiffs' interest in the privacy of medical treatment and medical information is also a protectable interest under the Privacy Initiative. However, the student athlete's reasonable expectation of privacy is similarly diminished because of the nature of competitive athletic activity and the norms under which it is conducted. Organized and supervised athletic competition presupposes a continuing exchange of otherwise confidential information about the physical (and medical) condition of athletes. Coaches, trainers, and team physicians necessarily learn intimate details of student athletes' bodily condition, including illnesses, medical problems, and medications prescribed or taken. Plaintiffs do not demonstrate that sharing similar information with the NCAA, in its capacity as a

regulator of athletic competition in which plaintiffs have voluntarily elected to participate, presents any greater risk to privacy.[18]

### (2) *Seriousness of invasion*

Directed and specific inquiries about personal medications (including questions about birth control pills) in the potentially stressful circumstances of a random drug test are undoubtedly significant from a privacy standpoint. Without a correspondingly important "reason to know," the NCAA would have no right to demand answers to these kinds of questions. Again, however, the extent of the intrusion on plaintiffs' privacy presented by the question must be considered in light of both the diminished expectations of privacy of athletes in such questions, which are routinely asked and answered in the athletic context.

### (3) *Competing interests*

Drug testing for multiple substances is a complex process. Although both parties acknowledge the NCAA has used and continues to use the best available methods of laboratory analysis, mistakes are possible and "false positives" can occur. The NCAA's inquiries to athletes about medications and drugs are designed to ensure accuracy in testing. The NCAA maintains that complete and accurate disclosure of these matters by athletes will, in certain instances and with respect to specified substances, serve to explain findings and prevent the embarrassment and distress occasioned by further proceedings. The record supports the NCAA's contentions. These kinds of disclosures are reasonably necessary to further the threshold purpose of the drug testing program—to protect the integrity of competition through the medium of accurate testing of athletes engaged in competition. The NCAA's interests in this regard adequately justify its inquiries about medications and other substances ingested by tested athletes.

The NCAA follows extensive procedures designed to safeguard test results, including: the numbering of urine specimens, chain of custody procedures, and control of disclosures regarding disqualified athletes. Plaintiffs

---

[18]The trial court also found that the NCAA's drug testing program "interferes with the athletes' right to treat themselves with appropriate over-the-counter medications as other students do." In view of the trial court's failure to weigh or consider the diminished expectations of privacy of student athletes when compared with "other students," this finding lacks significance. Moreover, following trial in this case, the NCAA eliminated from its list of banned substances the sympathiometic amines—the drugs contained in over-the-counter medications. Much of the issue regarding over-the-counter medications thus appears to be moot at this stage. Finally, our review of the portions of the record cited by the parties discloses no evidence that the NCAA has applied either its drug testing policy or its ban on the use of specified substances so as to preclude any athlete from obtaining medically necessary treatment for disease or injury. Plaintiffs have failed to establish an invasion of privacy in the form of interference with medical treatment.

and Stanford offer no serious criticism of the manner in which the NCAA protects the privacy interests of student athletes in the results or the process of drug testing. They point to no instances in which medical data or drug test results were disclosed to persons other than NCAA officials and the athlete's own college or university.

Although plaintiffs plausibly observe that media interest in positive test results is inevitable, the NCAA cannot be held responsible for public curiosity. Under established NCAA procedures, positive drug testing results are disclosed only to the athlete's school, which, in turn, informs the athlete. Only those with a "need to know" learn of positive findings. Plaintiffs fail to identify any other feasible precaution or safeguard. The uncontradicted evidence in the record thus points to a single conclusion: the NCAA carefully safeguards the confidentiality of athlete medical information and drug test data, using the same only to determine eligibility for NCAA athletic competition in accordance with its demonstrated interests. There is no invasion of privacy in the NCAA's procedure. (*Skinner* v. *Railway Labor Executives' Assn., supra,* 489 U.S. at p. 626, fn. 7 [103 L.Ed.2d at pp. 665-666].)

In sum, plaintiffs and Stanford did not prove that the NCAA is "collecting and stockpiling unnecessary information about [student athletes] [or] misusing information gathered for one purpose in order to serve other purposes or to embarrass [student athletes]." (Ballot Argument, *supra,* at p. 27.) The NCAA's information-gathering procedure (i.e., drug testing through urinalysis) is a method reasonably calculated to further its interests in enforcing a ban on the ingestion of specified substances in order to secure fair competition and the health and safety of athletes participating in its programs.

In generally upholding the NCAA's drug testing program against plaintiffs' privacy challenge, we intimate no views about the legality of blanket or random drug testing conducted by employers, whether of current employees or applicants for employment, or by other kinds of entities. Employment settings are diverse, complex, and very different from intercollegiate athletic competition. Reasonable expectations of privacy in those settings are generally not diminished by the emphasis on bodily condition, physical training, and extracurricular competition inherent in athletics.

In the government employment context, for example, the Fourth Amendment protection against unreasonable searches and seizures has generally been interpreted to require more than an employer interest in employee job performance or a "drug-free workplace" to justify drug testing without reasonable suspicion. Drug testing has been upheld when particular kinds of

employment settings—including prison guarding, train operations, or customs inspection—present extraordinary risks to employer or public interests from employee drug use.[19] As one federal court commented: "No one would want to live in an Orwellian world in which the government assured a drug-free America by randomly testing the urine of all its citizens." (*American Federation of Government Employees, AFL-CIO v. Roberts* (9th Cir. 1993) 9 F.3d 1464.)

What requirements are imposed on private employers by the California constitutional right to privacy will depend upon the application of the elements and considerations we have discussed to the employer's special interests and the employee's reasonable expectations prevailing in a particular employment setting. We are not called upon to decide any such issues here.[20]

---

[19]Compare *National Treasury Employees Union* v. *Von Raab*, *supra*, 489 U.S. at page 679 [103 L.Ed.2d at page 710-711] (customs workers whose performance "might endanger the integrity or our Nation's borders or the life of the citizenry"; drug testing upheld); *Skinner* v. *Railway Labor Executives' Assn.*, *supra*, 489 U.S. at page 628 [103 L.Ed.2d at pages 667] (railroad employees involved in accidents who "discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences"; drug testing upheld); and *Railway Labor Executives' Assn.* v. *Skinner* (9th Cir. 1991) 934 F.2d 1096, 1099-1100 ("safety-sensitive" railroad workers; urinalysis drug testing upheld); with *Taylor* v. *O'Grady* (7th Cir. 1989) 888 F.2d 1189 (urinalysis drug testing permissible for prison guards but impermissible for other prison employees with no access to firearms and no opportunity to smuggle drugs); *National Federation of Federal Employees* v. *Cheney* (D.C. Cir. 1989) 884 F.2d 603, 610-614 [280 App.D.C. 248] (urinalysis drug testing permissible for aviation workers, police guards, and drug counselors but impermissible for lab workers); *Harmon* v. *Thornburgh* (D.C. Cir. 1989) 878 F.2d 484, 490 [278 App.D.C. 382] (urinalysis drug testing permissible for Justice Department employees with top security clearance but impermissible for general employees).

[20]Three employment-related cases involving drug testing have arisen in our Courts of Appeal. In *Wilkinson*, *supra*, 215 Cal.App.3d 1034, the court held, consistent with the views we express here, that the state constitutional right to privacy applies to the conduct of nongovernmental entities. It applied a general "reasonableness" balancing test to uphold a urinalysis drug testing condition imposed on all applicants for employment at a publishing company. Applicants were given advance notice of the condition; testing was conducted as part of a pre-employment physical examination. (*Id.* at pp. 1044-1052.) In *Semore* v. *Pool* (1990) 217 Cal.App.3d 1087 [266 Cal.Rptr. 280], the court upheld against demurrer a complaint for wrongful discharge based on termination of an employee for refusal to submit to a pupillary reaction eye test designed to measure drug influence. Holding the employee's state constitutional right of privacy was a sufficient public policy to serve as the basis of a wrongful discharge suit, the court observed in part that: "The resolution of the dispute depends upon balancing an employee's expectations of privacy against the employer's needs to regulate the conduct of its employees at work." (*Id.* at p. 1097.) Noting the absence of any allegations in the complaint relating to the employee's duties, the testing procedure, or the employer's interest, the court declined to strike the required balance on the meager record before it. Finally, in *Luck* v. *Southern Pacific Transportation Co.* (1990) 218 Cal.App.3d 1 [267 Cal.Rptr. 618], the court upheld a verdict for wrongful discharge in favor of a nonsafety

### (4) *Response to concurring and dissenting opinions*

The three separate opinions filed by our colleagues reflect the diversity of views possible in a case of this magnitude and difficulty. In her concurring and dissenting opinion, Justice Kennard expresses agreement with our interpretation of the Privacy Initiative and the legal standard we articulate, but would remand this case for further proceedings rather than direct judgment for the NCAA. As a result, five justices of this court concur in the basic test defining the scope of our state constitutional right to privacy.

In contrast, both Justices George and Mosk would place on the NCAA the burden of showing a "compelling interest" to justify its drug testing program. But their radically different applications of the same preferred "compelling interest" test illustrate its inherently elusive character. Justice George finds the threshold imposed sufficiently low to allow the NCAA's drug testing program to pass through unimpeded, even as a matter of law. In essence, he finds the "compelling interest" test to require an interest of "some importance," but one that may be something less than vital or absolutely essential to an enterprise. Justice Mosk, on the other hand, believes the "compelling interest" step is such a high one that the NCAA is tripped up at the outset.

We prefer to avoid the continuing uncertainty and confusion inherent in the rigid application of a "compelling interest" test to a multi-faceted right to privacy. The NCAA lost this case in the lower courts because it could not, in the views of two superior court judges and three Court of Appeal justices, show a sufficiently "compelling" reason for its drug testing program. At least one other appellate court in our state has erroneously concluded in an employment drug testing case that a compelling interest test "places a heavier burden on [the defendant] than would a Fourth Amendment privacy analysis, in which the permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate government interests." (*Luck* v. *Southern Pacific Transportation Co., supra,* 218 Cal.App.3d 1, 20.) We will not

---

employee of a railroad (a computer installer and technician) after she refused to submit to a urinalysis drug test. It determined in part that generalized, nonsafety interests in employee efficiency and competence and in a drug free work environment were not sufficiently "compelling" to justify drug testing. (*Id.* at pp. 23-24.) In light of our general discussion of the elements of invasion of privacy (which differs from the approaches taken in these cases) and the fact-specific character of this drug testing case (which involves extracurricular sports activity rather than employment), we offer no analysis of the continuing vitality of these cases. Like other claims for invasion of the state constitutional right to privacy, future claims arising in the employment context will be subject to the elements and standards we announce here, which require careful consideration of reasonable expectations of privacy and employer, employee, and public interests arising in particular circumstances.

perpetuate this kind of error by continuing to say "compelling" when we mean merely "legitimate" or "important." There is enough confusion in the law. We should say what we mean and mean what we say.

Even at the risk of losing some degree of flexibility in decisionmaking, a constitutional standard that carefully weighs the pertinent interests at stake in an ordered fashion is preferable to one dominated by the vague and ambiguous adjective "compelling." Because, unlike Justices George and Mosk, we discern confusion rather than clarity in the language and history of the Privacy Initiative on this issue, we have restated the standard in a manner consistent with the voters' intent and amenable to application in constitutional adjudication. Our lower courts, as well as the individuals and institutions in our society, are entitled to some comprehensible guidance from this Court, even in areas as abstract as "the right to be let alone."

Justice Mosk's dissent assails our views on both the law and the facts. The reasons for our interpretations of the Privacy Initiative and the case law are fully discussed elsewhere in this opinion. Our differences regarding the record in this case are also explored in the preceding sections. The dissent studiously ignores student athletes' markedly diminished expectations of privacy and the NCAA's self-evident interests in protecting athletes and athletic competition from the nefarious influence of chemical substances. Despite the broad, elaborate, and plaintiff-prepared findings of the trial court, these were not matters of legitimate factual dispute in this case—they arise from uncontradicted evidence presented at trial. Drugs have no place in intercollegiate athletics, where human physical performance is at stake and small fractions of time or distance can spell the difference between victory and defeat. As a sponsor of athletic competition, the NCAA was well within its legal rights in adopting a drug testing program designed to eliminate the actual or potential influence of drugs in competitive sports. The dissent's view that the voters of the State of California somehow used the word "privacy" to prevent a private voluntary organization from regulating college sports in the interest of fair competition finds no support in logic, reason, or social reality, let alone in the language or history of the Privacy Initiative.

*Disposition*

The NCAA's drug testing program does not violate the state constitutional right to privacy. Therefore, the NCAA is entitled to judgment in its favor. As a result of our disposition, we do not decide whether the recognition of a state constitutional right to privacy in these circumstances would violate the commerce clause of the federal Constitution.

The judgment of the Court of Appeal affirming the permanent injunction against the NCAA's drug testing program is reversed. This case is remanded

with instructions to direct entry of a final judgment in favor of the NCAA. The NCAA shall recover its costs.

Panelli, J., Arabian, J., and Baxter, J., concurred.

**KENNARD, J.,** Concurring and Dissenting.—This case is a watershed event in the development of the law of privacy, and the majority opinion makes major contributions to the evolution of privacy jurisprudence. Most important, today this court firmly establishes that, in accordance with the will of the voters who enacted the Privacy Amendment to article I, section 1 of the California Constitution in 1972, the state constitutional right to privacy applies to nongovernmental as well as governmental invasions of fundamental privacy interests.

The majority provides a thorough and thoughtful exposition of the constitutional principles at issue here. I agree with the majority's basic legal analysis. I write separately to comment briefly on several of the most significant aspects of the majority opinion's legal discussion, and to explain why, after careful consideration, I cannot join the majority in its disposition of this case. As I shall discuss, in view of the principles set forth in the majority opinion, I would direct the Court of Appeal to remand this case for further consideration by the trial court.

I

When the voters enacted the Privacy Amendment to the California Constitution in 1972, they set in motion a new phase of constitutional adjudication. In the past 20 years, this court and the Courts of Appeal have been called upon to consider and apply the broad constitutional concept of privacy to a wide array of factual scenarios. (See, e.g., *Long Beach City Employees Assn.* v. *City of Long Beach* (1986) 41 Cal.3d 937, 943-948 [227 Cal.Rptr. 90, 719 P.2d 660] [polygraph examinations]; *White* v. *Davis* (1975) 13 Cal.3d 757, 773-776 [120 Cal.Rptr. 94, 533 P.2d 222] [police surveillance of university students]; *Luck* v. *Southern Pacific Transportation Co.* (1990) 218 Cal.App.3d 1, 15-16 [267 Cal.Rptr. 618] [collection and testing of urine]; *Porten* v. *University of San Francisco* (1976) 64 Cal.App.3d 825, 829-830 [134 Cal.Rptr. 839] [unauthorized disclosure of academic information].) Although this court has not previously addressed the question, the Courts of Appeal have concluded that the Privacy Amendment does indeed apply against nongovernmental actors as well as public entities. (See, e.g., *Wilkinson* v. *Times Mirror Corp.* (1989) 215 Cal.App.3d 1034 [264 Cal.Rptr. 194]; *Kinsey* v. *Macur* (1980) 107 Cal.App.3d 265 [165 Cal.Rptr. 608]; *Porten* v. *University of San Francisco, supra,* 64 Cal.App.3d 825.) But at least one

commentator has disagreed (Kelso, *California's Constitutional Right to Privacy* (1992) 19 Pepperdine L.Rev. 327), and the issue could not be considered settled until this court had spoken. We have not, however, until now been required to pass upon the question whether the Privacy Amendment grants a right of action against private actors. (See *Schmidt* v. *Superior Court* (1989) 48 Cal.3d 370, 389, fn. 14 [165 Cal.Rptr. 608] [open question].)

Today the majority opinion removes all doubt as to whether there is a state action requirement for lawsuits alleging a violation of the Privacy Amendment: there is none. (Maj. opn., *ante*, p. 20.) This conclusion is sound, and is consistent with the will of the electorate as revealed in the ballot pamphlet argument accompanying the Privacy Amendment when it was presented to the voters for their decision in 1972. The argument in favor of the Privacy Amendment in the official ballot pamphlet has numerous references to the application of the amendment to private parties. To give but one example, the argument says, "Each time we apply for a credit card or a life insurance policy, file a tax return, interview for a job, or get a drivers' license, a dossier is opened and an informational profile is sketched." (Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972) p. 27 [hereafter Ballot Argument].)

Yet, as the majority recognizes, although the Privacy Amendment reaches nongovernmental invasions of privacy interests as well as government action, this does not mean that asserted invasions of privacy are to be tested by an identical legal standard regardless of whether the defendant is a public or private actor. The majority properly insists that the courts of this state, in assessing alleged invasions of privacy, be guided above all by the context of the particular case. This necessarily means that the correct legal analysis will differ depending in part on the governmental or nongovernmental status of the defendant. Thus, the majority recognizes and accepts the existing law that in appropriate circumstances the compelling interest standard continues to be applicable to governmental invasions of privacy rights, and holds that the compelling interest test must be applied when the interest invaded is fundamental to personal autonomy. (Maj. opn., *ante*, pp. 34-35; see e.g., *Skinner* v. *Oklahoma* (1942) 316 U.S. 535, 541 [86 L.Ed. 1655, 1660, 62 S.Ct. 1110]; *Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252, 274-275 [172 Cal.Rptr. 866, 625 P.2d 779, 20 A.L.R.4th 1118]; *People* v. *Belous* (1969) 71 Cal.2d 954, 963, 964 [80 Cal.Rptr. 354, 458 P.2d 194].) This standard is also consistent with the Ballot Argument. (Ballot Argument, *supra*, at p. 27 [right to privacy "should be abridged only when there is compelling public need"].)

But when the actions of a nongovernmental entity or person are alleged to have invaded constitutional privacy rights, the majority opinion properly

demands an additional degree of judicial caution. Under the majority's approach, nongovernmental action that allegedly abridges privacy rights is not necessarily tested by a compelling interest standard; instead, a less rigorous but still heightened standard of scrutiny will often be proper. As the majority opinion makes plain, the use of different standards for governmental and nongovernmental intrusions on privacy interests is justified by the greater coercive power of government, by the generally wider range of choice available to individuals when dealing with private entities, and by our traditions of tolerance and associational freedom in the private sphere of conduct. (Maj. opn., *ante*, pp. 38-39; see generally *Roberts* v. *United States Jaycees* (1984) 468 U.S. 609 [82 L.Ed.2d 462, 104 S.Ct. 3244].)

The holding that the Privacy Amendment applies to nongovernmental actors is the most significant feature of the majority's opinion. But two additional aspects of the majority's exposition of the constitutional law of privacy deserve further comment.

First, the majority opinion correctly requires that a plaintiff who alleges invasion of the constitutional right to privacy must demonstrate a reasonable expectation of privacy in the circumstances, and it characterizes the expectation of privacy as founded on broadly based and widely accepted community norms. (Maj. opn., *ante*, pp. 36-37.) In so doing, the majority properly focuses on the context in which the invasion of the privacy interest occurs. It is important to emphasize, however, that the applicable social norms are those of society overall, not "social norms" created by an association or an industry practice. (See, e.g., *Smith* v. *Maryland* (1979) 442 U.S. 735, 740-741, fn. 5 [61 L.Ed.2d 220, 226-227, 99 S.Ct. 2577]; Rest.2d Torts, § 295A, com. c, p. 63; Prosser & Keaton on Torts (5th ed. 1984) § 33, pp. 194-195.) No association, industry, or other group or entity may establish the parameters of the reasonable expectation of privacy at the expense of society. For instance, an employer may not, simply by announcing in advance that all employees will be subject to periodic strip searches, thereby defeat the employees' otherwise reasonable expectation that such searches will not occur. Governing social norms, not the specific practices of an individual defendant or industry, define whether a plaintiff has a reasonable expectation of privacy.

Second, the majority opinion holds that once a plaintiff has shown an invasion of a legally cognizable privacy interest, a nongovernmental defendant may assert as an affirmative defense that its actions are justified because they substantively further a countervailing interest. (Maj. opn., *ante*, p. 40.) The interest, as I understand the majority opinion, must be more than an interest that is not itself illegal. It must be an interest that is necessary to a

proper and legitimate organizational purpose central to the organization's objective. In this case, the interest would be comparable to the "educational necessity" the high court has held is appropriate in assessing educational discrimination under title X. (See, e.g., *Board of Education, New York City* v. *Harris* (1979) 444 U.S. 130, 151 [62 L.Ed.2d 275, 290-291, 100 S.Ct. 363].) In other cases, the interest may be analogous to the "business necessity" justification applied under the Civil Rights Act. (*Dothard* v. *Rawlinson* (1977) 433 U.S. 321, 329 [53 L.Ed.2d 786, 797, 97 S.Ct. 2720]; 42 U.S.C. § 2000e-2(e).) In addition, the method used to advance the countervailing interest that results in the invasion of the plaintiff's privacy must be tailored to serve that interest. (Maj. opn., *ante*, p. 44; see *Treasury Employees* v. *Von Raab* (1989) 489 U.S. 656, 678-679 [103 L.Ed.2d 685, 710-711, 109 S.Ct. 1384]; *Skinner* v. *Railway Labor Executives' Assn.* (1989) 489 U.S. 602, 626-627 [103 L.Ed.2d 639, 665-666, 109 S.Ct. 1402].)

## II

Both the trial court and the Court of Appeal determined that the applicable legal standard for resolving this case was to place on the National Collegiate Athletic Association the burden of proving that a compelling interest justified the drug testing program; this case was tried on that basis. The judgments of the trial court and Court of Appeal, although not consistent with the ultimate decision of this court today, were based on existing decisional law (see, e.g., *White* v. *Davis, supra*, 13 Cal.3d 757, 775; *City of Santa Barbara* v. *Adamson* (1980) 27 Cal.3d 123, 131 [164 Cal.Rptr. 539, 610 P.2d 436, 12 A.L.R.4th 219]), and were reasoned and good faith efforts to address the very difficult issues presented by this case. Simply put, this matter was tried by the parties and the courts in good faith on a legal theory that this court now holds to be inapplicable.

The result of the majority's change in the governing legal standard here is that the parties and the trial court, sitting as finder of fact, have not been given a full opportunity to litigate this matter under the new test. The majority holds as a matter of law that plaintiffs have a legally recognized privacy interest (maj. opn., *ante*, pp. 39-40; accord, *Skinner* v. *Railway Labor Executives' Assn., supra*, 489 U.S. 602, 617 [103 L.Ed.2d 639, 659-660] ["collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable"]). Plaintiffs, however, have not been given a fair opportunity to offer evidence of their reasonable expectations of privacy and of feasible and effective alternatives having a lesser impact on privacy. Plaintiffs should be given the chance to present evidence and argue this case under the legal test announced today. Defendant too should be afforded the opportunity to show that its drug testing program is justified by countervailing interests.

Accordingly, in my view, this court should direct the Court of Appeal to remand this case to the trial court for further proceedings consistent with today's decision.

**GEORGE, J.,** Concurring and Dissenting.—I concur in the majority's initial conclusion that the privacy provision of article I, section 1, of the California Constitution affords protection to individuals with respect to the actions of a private entity, such as the National Collegiate Athletic Association (herein-after NCAA), as well as the actions of a governmental entity. I also concur in the majority's ultimate conclusion that, in view of the important interests served by the NCAA's athletic drug testing program, and the comparatively minor intrusion upon privacy interests that the program entails as applied in the context of competitive, intercollegiate athletics (where athletes routinely are required to submit to regular—and often repeated—medical examinations), the mandatory, random drug testing program here at issue is permissible and does not violate the provisions of article I, section 1.

I dissent, however, from the majority opinion insofar as it fashions a novel general legal standard for the evaluation of privacy claims arising under the California Constitution. The privacy provision of article I, section 1 (Privacy Initiative) was added to the California Constitution more than 20 years ago, and for the past 2 decades California judicial decisions generally have evaluated state constitutional privacy claims pursuant to the familiar and well-established constitutional analysis—applicable to other constitutional rights, such as freedom of speech and free exercise of religion, as well as to privacy—under which a court considers the extent to which a defendant's actions infringe or intrude upon the plaintiff's constitutionally protected interest and "balances" or "weighs" such infringement against the relative importance or "compelling" nature of the defendant's justifications for its actions (taking into account whether there are other, less intrusive means by which the defendant could achieve its objectives). I see no reason to abandon this established analytical framework and to replace it with the entirely new legal structure fashioned by the majority, a structure that appears, at least on its face, to weaken the protection afforded the California constitutional right of privacy in the past, by making it more difficult to prove a violation of this fundamental right.

## I

To begin with, I agree with the majority's conclusion that the privacy provision of the California Constitution was intended to protect an individual's constitutional interest in privacy against infringement at the hands of private, as well as governmental, entities. As the majority explains, the ballot

arguments accompanying the Privacy Initiative convincingly demonstrate that the drafters of the provision believed that the actions of both government and private entities may impinge significantly upon the privacy of individuals, and proposed that the amendment provide constitutional protection against private, as well as public, intrusions. The electorate, in enacting the measure, presumably relied upon the ballot statements and thus presumably intended to afford individuals a constitutional shield against all unjustified invasions of privacy, whether perpetrated by public or private entities. Over the past two decades, numerous Court of Appeal decisions have concluded, on this basis, that the privacy provision applies to intrusions from both types of sources (see cases cited, maj. opn., *ante*, p. 18), and I believe those decisions correctly resolved the issue. Accordingly, I agree with the majority that the NCAA cannot defeat plaintiffs' constitutional privacy claim simply on the basis of the NCAA's being a private rather than a public entity.

Although the majority holds that the constitutional privacy provision applies to private entities, it goes on to criticize the lower courts in this case for "assum[ing] that private entities were subject to the same legal standards as government agencies with respect to claims of invasion of privacy" (maj. opn., *ante*, p. 20), implying that the constitutional provision imposes a different, and less stringent, standard with regard to private parties than to governmental entities. On this point, I disagree with the majority.

The ballot argument in support of the Privacy Initiative demonstrates that the drafters of the provision believed that overreaching actions by private entities frequently will pose as significant a risk to an individual's privacy as actions by a governmental entity, and intended that the constitutional guaranty protect an individual's privacy equally against both types of threats. Although in some circumstances the private status of a defendant may cause its conduct to pose less of a danger to privacy interests than would the conduct of a public entity—for example, when there are many other private entities, offering the identical service, that do not condition their service on the same intrusive requirement—in other circumstances the threat to privacy interests posed by private and public entities will be comparable. In the present case, for example, the impingement upon the privacy interest of the student athletes would be no different if the drug testing program, instead of being instituted and administered by the NCAA, had been established and run by an adjunct of the state Department of Education. In my view, the significant consideration is not whether the actor is a private or public entity, but rather the nature and extent of the intrusion upon privacy resulting from the challenged conduct and the nature and strength of the justifications supporting that conduct.

## II

The majority suggests that the issue of the applicable legal standard for evaluation of a state constitutional privacy claim is a question "of first impression in this court" (maj. opn., *ante*, p. 15), and, perhaps for that reason, the majority undertakes a lengthy exposition of the common law development of the invasion-of-privacy tort and discussion of the federal privacy decisions as a prelude to its promulgation of an entirely unprecedented legal framework for the resolution of claims under the state constitutional privacy provision.

In my view, the majority, in maintaining that the legal standard governing state constitutional privacy claims is a question of first impression, has misread the prior decisions of this court. In *White* v. *Davis* (1975) 13 Cal.3d 757, 775 [120 Cal.Rptr. 94, 533 P.2d 222], the first decision of this court to address a claim under the state constitutional privacy provision, our court specifically held that the ballot statement of the Privacy Initiative "makes clear that the amendment does not purport to prohibit all incursion into individual privacy but rather that *any such intervention must be justified by a compelling interest.*" (Italics added.) Subsequent cases, over the past 20 years, have relied upon this interpretation of the privacy provision in referring repeatedly to the compelling interest standard as the applicable basis for evaluating the constitutionality of various measures under the California privacy clause. (See, e.g., *Long Beach City Employees Assn.* v. *City of Long Beach* (1986) 41 Cal.3d 937, 948, fn. 12 [227 Cal.Rptr. 90, 719 P.2d 660]; *Conservatorship of Valerie N.* (1985) 40 Cal.3d 143, 163-164 [219 Cal.Rptr. 387, 707 P.2d 760]; *People* v. *Strizinger* (1983) 34 Cal.3d 505, 511 [194 Cal.Rptr. 431, 668 P.2d 738]; *City of Santa Barbara* v. *Adamson* (1980) 27 Cal.3d 123, 131 [164 Cal.Rptr. 539, 610 P.2d 436, 12 A.L.R.4th 219]; *Loder* v. *Municipal Court* (1976) 17 Cal.3d 859, 864 [132 Cal.Rptr. 464, 553 P.2d 624].) In view of the rather clear language of the ballot pamphlet, the applicability of the compelling interest standard in evaluating alleged infringements of other constitutional rights (see, e.g., *City of Carmel-by-the-Sea* v. *Young* (1970) 2 Cal.3d 259, 263-266 [85 Cal.Rptr. 1, 466 P.2d 225, 37 A.L.R.3d 1313] [right to engage in political activities]; *People* v. *Woody* (1964) 61 Cal.2d 716, 718 [40 Cal.Rptr. 69, 394 P.2d 813] [freedom of religion]), and the repeated reference to this standard in this court's constitutional privacy decisions over the past two decades, I believe there is no justification for jettisoning the compelling interest standard at this late date.

Furthermore, in my view the majority's abandonment of the compelling interest standard is not only unwarranted, but unnecessary to achieve the majority's apparent objectives. The majority's decision to cast aside the

compelling interest standard appears to have arisen from its concern with the lower courts' application of that standard in the present case; as the majority notes, the lower courts interpreted the compelling interest standard as imposing an extraordinarily heavy burden of proof and justification upon the NCAA to establish the validity of its drug testing program. I agree with the majority that the lower courts erred in imposing such a heavy burden upon the NCAA, but, in my view, the error lies in those courts' understanding and application of the compelling interest standard, not in the viability of the standard itself.

Contrary to the suggestion of the majority (maj. opn., *ante*, p. 31), the compelling interest standard, as articulated and applied in our past decisions on the right to privacy, is *not* a standard that is " ' "strict" in theory and fatal in fact.' " (See, e.g., *Loder* v. *Municipal Court, supra*, 17 Cal.3d 859 [upholding legislative scheme permitting retention of record of an arrest that did not result in conviction]; *Doyle* v. *State Bar* (1982) 32 Cal.3d 12 [184 Cal.Rptr. 720, 648 P.2d 942] [upholding State Bar subpoena of attorney's financial records]; accord, *County of Nevada* v. *MacMillen* (1974) 11 Cal.3d 662 [114 Cal.Rptr. 345, 522 P.2d 1345] [upholding financial disclosure statute].) Although the standard does require that a defendant have a "compelling," i.e., important, reason for engaging in conduct that intrudes upon a constitutionally protected privacy interest, numerous decisions—both in the courts of California and in other jurisdictions—demonstrate that the standard does not place an insuperable or unreasonable burden upon a defendant to justify any intrusion on privacy, but rather contemplates that a court, in applying the standard, will employ a balancing test that takes into account the nature and the degree of the intrusion: the greater the intrusiveness of the defendant's conduct, the more "compelling" the interest required in order to justify the intrusion. (See, e.g., *Doyle, supra*, 32 Cal.3d at pp. 19-21; *McCloskey* v. *Honolulu Police Dept.* (1990) 71 Hawaii 568 [799 P.2d 953, 957-958]; *Fla. Bd. of Examiners Re: Applicant* (Fla. 1983) 443 So.2d 71, 74-76; *Montana Human Rights Div.* v. *City of Billings* (1982) 199 Mont. 434 [649 P.2d 1283, 1288-1290]; *State Emp. Union* v. *Dept. of Mental Health* (Tex. 1987) 746 S.W.2d 203, 205.) Thus, application of the compelling interest standard to a state constitutional privacy claim simply calls upon a court to undertake the familiar constitutional task of determining the extent or degree to which a defendant's actions infringe or intrude upon the plaintiff's constitutionally protected interest, and of weighing or balancing that intrusion against the relative importance or compelling nature of the defendant's justifications for its actions. Properly interpreted, the "compelling interest" standard does not impose impossible or unrealistic requirements but merely calls for an inquiry that is sensitive to the various competing interests.

The majority, however, rejects application of the traditional constitutional balancing test as the standard for evaluating state constitutional privacy claims and instead fashions an entirely new legal framework that, from all appearances, has no precedent in any past constitutional decision of this state or any other jurisdiction. The new legal framework consists of (1) three distinct "elements," which a plaintiff must establish as a threshold matter (see maj. opn., *ante*, pp. 39-40), (2) a variety of "affirmative defenses" that a defendant may plead and prove (see maj. opn., *ante*, p. 40), and (3) a showing that the plaintiff may make in rebuttal (see maj. opn., *ante*, p. 40). Although the substantive content of the elements, defenses, and rebuttal material incorporated into the new "cause of action" devised by the majority all relate to considerations that courts traditionally have taken into account in determining whether a challenged practice or course of conduct violates the state constitutional right of privacy, I believe that the rigid legal structure set forth by the majority is ill-suited to the resolution of constitutional issues and, if faithfully applied, inevitably will reduce the protection that has been (and, in my view, should continue to be) afforded the constitutional right of privacy.

The majority initially sets forth three separate "elements" that a plaintiff must establish before a defendant is required to demonstrate any justification for its actions: "(1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by defendant constituting a serious invasion of privacy." (See maj. opn., *ante*, pp. 39-40.) Past state constitutional privacy decisions always have required a plaintiff to demonstrate, as a threshold matter, that the defendant's conduct has intruded or infringed upon a "legally protected"—indeed a *constitutionally* protected —privacy interest, and thus the first "element" of the majority's new cause of action is unobjectionable. In elevating the considerations embodied in the second and third "elements" of the new cause of action—whether the plaintiff under the circumstances had a "reasonable expectation of privacy," and the "seriousness" of the defendant's invasion of the plaintiff's privacy— into independent requirements that always must be established before a defendant ever is required to provide a justification for its actions, however, the majority has, in my view, introduced an undesirable and unfortunate inflexibility into the constitutional analysis that, if faithfully applied, is likely to bar privacy claims that properly should be permitted to go forward.

With regard to the "reasonable expectation of privacy" factor, it is unquestionably true that a defendant, by giving advance notice of a proposed course of conduct, generally will decrease the degree of intrusion upon the plaintiff's privacy that would result were no such notice given, and it is also true that, in many contexts, a plaintiff's consent to a given course of conduct may

eliminate any potential privacy concern. Thus, for example, were the NCAA to announce in advance that any athlete who wished to be considered for a place on a "Drug-Free All-American" team must consent to undergo a urine drug test, an athlete who chose to seek such recognition and consented to the announced drug testing regimen presumably would have no basis for subsequently asserting a violation of his or her constitutional right of privacy.

In other instances, however, even when a defendant announces in advance its intent to engage in conduct that potentially infringes upon a privacy interest protected by the state constitutional provision, and elicits the plaintiff's consent with regard to such conduct, it will not follow necessarily that a constitutional challenge to the conduct properly should be dismissed out of hand. For example, even if a university provides advance notice to applying students that it intends to disclose (or perhaps even to sell) to business entities unaffiliated with the university the confidential information provided by students in their application forms, and requires students to consent to such disclosure as a condition of having their applications considered by the university, it is not at all clear that a student who submits an application should be barred from challenging the university's use of the information for a purpose unrelated to the application process on the ground that, under the circumstances, the student has no reasonable expectation of privacy. (Cf. *Porten* v. *University of San Francisco* (1976) 64 Cal.App.3d 825 [134 Cal.Rptr. 839].) Similarly, even if an employer discloses before hiring an employee that it intends to engage in visual surveillance of the employee restrooms and requires all employees to consent to such surveillance as a condition of employment, a state constitutional privacy challenge to such conduct would not necessarily founder on the ground that, in view of the explicit warnings and consent, the employees had no reasonable expectation of privacy. Thus, although the issues of advance notice and consent unquestionably are relevant to a consideration of the nature and severity of the intrusion upon privacy resulting from a defendant's conduct, the "reasonable expectation of privacy" factor should not, in my view, be transformed into a distinct "element" that a plaintiff invariably must establish before a defendant can be required to proffer a justification for its conduct.

Additionally, I believe the third element of the new cause of action, in like manner, imposes a novel and unjustified burden upon a plaintiff that, if faithfully applied, would defeat legitimate state constitutional privacy claims. I have no quarrel with the majority's observation that the state constitutional privacy provision does not signify that "every intrusion into the realm of private action, no matter how slight or trivial, [gives] rise to a cause of action for invasion of privacy." (See maj. opn., *ante*, p. 37.) Under the first element of the newly fashioned cause of action, however, the

plaintiff already is required to demonstrate that the defendant's conduct infringes upon a *constitutionally protected* privacy interest—a requirement sufficient to demonstrate that a serious, rather than a trivial, privacy interest is at stake. Under the third element adopted by the majority, a plaintiff is not entitled even to put a defendant to the burden of presenting a justification for its conduct unless the plaintiff can establish not only that the defendant's conduct infringes upon a constitutionally protected privacy interest, but that the invasion of privacy is "sufficiently serious in [its] nature, scope, and actual or potential impact to constitute an *egregious* breach of the social norms underlying the privacy right." (See maj. opn., *ante*, p. 37, italics added.) In my view, no justification exists for limiting the reach of the state constitutional privacy provision only to those breaches of privacy that are "egregious." The collection of unnecessary information by a business entity or government agency, or the use of properly obtained information for a purpose unrelated to its collection, would not necessarily rise to the level of an "egregious" breach of privacy, but, as the election pamphlet argument demonstrates, the Privacy Initiative clearly was intended to prohibit such conduct. Thus, although the extent or severity of the intrusion into the plaintiff's constitutionally protected privacy interest always is a key component of the constitutional analysis—the more serious the intrusion upon the constitutionally protected privacy interest, the more important or compelling the defendant's countervailing interest must be to sustain the challenged course of conduct—I believe the majority errs in adopting a legal standard that, at least on its face, purports to afford *no* protection to an invasion of a constitutionally protected privacy interest that does not rise to the level of an "egregious" breach of privacy, even when the defendant is unable to provide *any* justification for an intrusion upon the plaintiff's constitutionally protected privacy interest.[1]

In addition *to increasing the plaintiff's burden* in establishing a prima facie violation of the state constitutional privacy right—i.e., the showing the plaintiff must make in order to warrant requiring the defendant to proffer, some justification for its actions—the majority's new legal standard appears *to reduce the defendant's burden* to justify an infringement upon a constitutionally protected privacy interest, by explicitly declining to embrace the

---

[1]In discussing the second and third elements set forth by the majority, I have added the qualifying comments that "on their face," and "if faithfully applied," the elements appear to impose inflexible requirements that improperly may bar some valid privacy claims. Such qualification appears appropriate because, in applying these elements in the present case, the majority does not in fact treat these considerations as independent requirements that must be established before there is any need to consider defendant's justifications for its conduct, but rather undertakes an analysis that closely parallels the traditional balancing approach. (See maj. opn., *ante*, pp. 40-43, 52-53.) In light of the analytical process actually utilized by the majority to resolve the constitutional privacy issue presented here, it is all the more difficult to understand the reason for the majority's adoption of a novel general legal framework to govern resolution of state constitutional privacy claims.

well-established principle that requires any such infringement to be justified by a "compelling" interest. Rather than require the defendant to demonstrate the existence of a compelling interest, the majority suggests that any simply "competing" or "legitimate" interest may suffice to justify an infringement upon the constitutional right of privacy. (See maj. opn., *ante*, p. 38.) In my view, such an approach essentially ignores *the constitutionally protected status* that the Privacy Initiative clearly intended to afford the right of privacy. By incorporating that right into our state Constitution, the Privacy Initiative clearly sought to provide individuals with assurance that privacy interests would be taken seriously and would be abridged only for a "compelling" need.[2] In my view, if the constitutional status of the right of privacy is to have any significance, conduct that intrudes or impinges upon such a right cannot be sanctioned merely because there exists a minimally "competing" or "legitimate" interest that might be sufficient to justify conduct impinging only upon a *non*constitutional right. Rather, to justify the infringement upon a constitutionally protected privacy interest, the defendant must demonstrate that the intrusion is warranted by an interest of some importance.

As noted earlier, the majority's reluctance to adopt a test embodying the "compelling interest" terminology appears to be based upon a concern that such a standard would impose an inordinately high burden upon defendants. As numerous cases—including the United States Supreme Court's recent employment-drug-testing decisions—demonstrate, however, the courts have recognized a wide variety of interests that are sufficiently important to be characterized properly as "compelling." (See, e.g., *Treasury Employees* v. *Von Raab* (1989) 489 U.S. 656, 677 [103 L.Ed.2d 685, 709, 109 S.Ct. 1384] ["In sum, we believe the Government has demonstrated that its *compelling interests* in safeguarding our borders and the public safety outweigh the privacy expectations of employees who seek to be promoted to positions that directly involve the interdiction of illegal drugs or that require the incumbent to carry a firearm." (Italics added.)]; *Skinner* v. *Railway Labor Executives' Assn.* (1989) 489 U.S. 602, 633 [103 L.Ed.2d 639, 670, 109 S.Ct. 1402] ["In view of our conclusion that, on the present record, the toxicological testing contemplated by the regulations is not an undue infringement on the justifiable expectations of privacy of covered employees, the Government's *compelling interests* outweigh privacy concerns." (Italics added.)].) These cases provide ample evidence that application of the compelling interest standard

---

[2]The relevant passage of the election brochure argument stated in this regard: "The right of privacy is an important American heritage and essential to the fundamental rights guaranteed by the First, Third, Fourth, Fifth and Ninth Amendments to the U.S. Constitution. *This right should be abridged only when there is compelling public need.*" (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972) p. 27, italics added.)

need not impose an unreasonably or unrealistically high burden upon a defendant, but rather calls for an inquiry that is, at once, sensitive to the constitutionally protected interests of the plaintiff and the significant interests of the defendant.

In sum, I believe the majority errs in adopting a new legal framework to govern claims brought under the state constitutional privacy provision. In my view, such claims should be evaluated under the traditional constitutional approach that inquires initially whether the plaintiff has demonstrated that the defendant's action intrudes upon a constitutionally protected privacy interest, and, if it does, inquires further whether the extent of the intrusion is justified by a sufficiently compelling interest served by the intrusive action.

### III

For the reasons discussed hereafter, I conclude that, under a proper application of the traditional constitutional balancing test, the NCAA athletic drug testing program at issue in this case is valid. Accordingly, I concur in the majority's determination that the lower courts erred in enjoining the program.

With respect to the initial step of the traditional constitutional analysis, I agree with the majority that the NCAA's drug testing program significantly infringes upon plaintiffs' constitutionally protected privacy interests in two respects: (1) it intrudes upon plaintiffs' interest in "informational privacy" (the examination of the urine sample may reveal significant information concerning the athletes' health or illnesses, as well as what medications or drugs have been ingested), and (2) it intrudes upon plaintiffs' interest in the privacy of excretory functions, by requiring the athletes to urinate in the presence of another person. (Accord, *Skinner* v. *Railway Labor Executives' Assn.*, *supra*, 489 U.S. 602, 617 [103 L.Ed.2d 639, 659-660] [mandatory testing of urine sample constitutes search for Fourth Amendment purposes].)

By establishing that the NCAA drug testing program significantly intrudes upon these constitutionally protected privacy interests, plaintiffs made out a prima facie case, requiring defendant to demonstrate that, under the circumstances, the degree of the intrusion upon plaintiffs' privacy interests was justified by a sufficiently compelling interest. Contrary to the conclusions of the lower courts, however, I conclude that the NCAA satisfied its burden in this case.

First, with regard to the extent or degree of the intrusion upon privacy that occurred in this context, I believe there are numerous factors, discussed by

the majority, that demonstrate that the athletic drug testing program here at issue is less intrusive upon privacy interests than drug testing in many other settings. To begin with, by choosing to participate in a varsity sport, athletes invariably relinquish a great deal of privacy with regard to their physical condition and health, since school teams routinely require athletes to undergo frequent medical examinations to ensure that they are in good health. Thus, by seeking to participate in a varsity sport, an athlete necessarily surrenders a significant degree of privacy in health matters, particularly matters bearing some relation to his or her involvement in the sport. Moreover, unlike an individual subjected to drug testing programs imposed upon all employees in a given work setting or upon all students in a particular institution or educational program—where the option of quitting one's job or leaving school usually would impose a very significant hardship—an athlete for whom the drug testing procedure would constitute a serious invasion of privacy can avoid the intrusion by not participating in a varsity sport or in postseason competition. Although there undeniably is a "cost" imposed upon a student for exercising his or her interest in privacy in this manner— particularly for student athletes who will lose needed scholarships if they choose not to participate—the coercion is not nearly as great as it would be in many other contexts. In past decisions, we have held that a plaintiff who brings a personal injury action and seeks special damages for unusual mental suffering necessarily relinquishes the right to maintain the confidentiality of past medical or psychiatric records that are relevant to such a claim (see, e.g., *Vinson* v. *Superior Court* (1987) 43 Cal.3d 833, 842-844 [239 Cal.Rptr. 292, 740 P.2d 404]), and I believe a similar "consent" rationale is applicable here.

Second, with respect to the significance of the interests served by the NCAA's program, I believe that the organization has identified two "compelling interests" served by the drug testing program. First, in light of the competitive nature of sports and the hazard that performance-enhancing drugs pose to the fairness of the competition, I believe that the NCAA has a very strong interest in ensuring that no competitor has an unfair advantage over another. Second, in view of the strenuous nature of varsity athletic activity, and the unusual risks to the health and safety of the student athlete (and possibly of competing athletes) if he or she engages in such activity while taking certain medications or drugs, the NCAA also has a compelling interest in protecting the well-being of student athletes.

Indeed, in my view, a drug testing program serves particularly compelling interests in the context of highly competitive intercollegiate athletics. Such a program may, of course, be useful in deterring individuals who otherwise would be tempted to utilize drugs to attempt to gain an unfair competitive

advantage over their adversaries. A drug testing program also serves the equally important purpose of assuring other athletes, who on their own would not seek an unfair advantage, that their competitors are not utilizing drugs to attain such an advantage. Without a reliable, mandatory testing program to provide such assurance, many athletes—fearing they may be at a disadvantage if their competitors use drugs—might well feel pressured to use drugs, despite knowledge of the potential long-term harmful effects, simply to ensure that they will not be at a competitive disadvantage at the time of an important championship event. The latter rationale for athletic drug testing explains the justification for including within the list of drugs for which athletes are tested not only drugs that are known definitely to have performance-enhancing qualities, but also drugs—suspected or rumored to have such qualities—with which some athletes consequently might be tempted to experiment.

Thus, although the trial court apparently placed great significance upon what it viewed as the NCAA's failure to prove that the drugs for which it was testing *in fact* are performance enhancing, or that student-athletes are more likely to use illegal drugs than other students, I believe the NCAA clearly had several compelling interests that justified the implementation of a testing program aimed at detecting the presence of drugs and medications, even in the absence of a showing that such substances actually are performance enhancing or that a particular athlete was violating the rules. Just as officials at a car racing event routinely may inspect the engines or equipment of all competing vehicles to ensure that their components comply with the applicable regulations, and just as a referee routinely may search the gloves and trunks of boxers to assure that they contain no foreign objects or substances that might injure an opponent, I believe it is permissible, in the context of highly competitive intercollegiate athletics, for a sponsoring organization routinely to test all competitors for drugs that unfairly may enhance their performance or pose particular risks to the health and safety of athletes.

Finally, although the "visual monitoring" aspect of the drug testing program does pose an additional intrusion upon an athlete's privacy interest, I am persuaded that the NCAA properly could conclude that any *equally effective* alternative testing procedure (one that, for example, permitted the athlete to provide a urine sample in private, but only after a full body search to ensure that the athlete was not bringing a false sample into the private room) would be just as intrusive of the athlete's privacy, if not more so. (Accord, *O'Connor* v. *Police Com'r of Boston* (1990) 408 Mass. 324 [557 N.E.2d 1146, 1149] [upholding drug testing program utilizing monitored urination "to ensure the integrity of the urine sample"].)

Accordingly, taking into account the nature and extent of the drug testing program's intrusion upon the athletes' privacy, and the strength of the NCAA's interests served by the program, I conclude that the organization's compelling interests justify the limited intrusion upon the privacy concerns of the plaintiffs. I note, in this regard, that a number of courts in other jurisdictions that have considered constitutional challenges to comparable athletic drug testing programs have concluded similarly that the important interests served by such a program in furthering athletic competition out-weigh the intrusion upon privacy imposed by such testing. (See, e.g., *Schaill by Kross* v. *Tippecanoe County School Corp.* (7th Cir. 1988) 864 F.2d 1309, 1318-1322; *Shoemaker* v. *Handel* (3d Cir. 1986) 795 F.2d 1136, 1141-1144 [86 A.L.R.Fed. 405]; *O'Halloran* v. *University of Washington* (W.D.Wn. 1988) 679 F.Supp. 997, 1002-1007, revd. on other grounds (9th Cir. 1988) 856 F.2d 1375.)

IV

For the reasons discussed above, I concur in the majority's opinion insofar as it concludes that the NCAA drug testing program here at issue does not violate the privacy clause of article I, section 1, of the California Constitution. Accordingly, I concur in the majority's conclusion that the judgment of the Court of Appeal must be reversed.

**MOSK, J.**—I dissent.

Article I, section 1 of the California Constitution declares a right of privacy. Its pronouncement is express. Nothing is left to implication. "All people" have an "inalienable right[]" to "pursu[e] and obtain[]" "privacy."

Before proceeding a sentence further, we must make one point pellucidly clear.

This is not a case about the "policy" this court may think it best to formulate and implement with regard to privacy.

Rather, it is a case about the California Constitution and the role of the judiciary within the order it establishes.

The majority all but abrogate the right of privacy. They plainly consider it "bad policy." What of their "policy" assessment? Is the right of privacy "good policy"? Is it "bad policy"? It simply does not matter. To be sure, the right of privacy reflects a choice of policy. But it is a choice that has already been made—by the people, in their capacity as sovereign, in the California

Constitution. It is therefore a choice that we as judges must accept and respect, regardless of personal beliefs or predilections. (See, e.g., *In re Anderson* (1968) 69 Cal.2d 613, 634-635 [73 Cal.Rptr. 21, 447 P.2d 117] (conc. opn. of Mosk, J.); *People* v. *Frierson* (1979) 25 Cal.3d 142, 188-189 [158 Cal.Rptr. 281, 599 P.2d 587] (conc. opn. of Mosk, J.).) Regrettably, in this case the majority have not so conducted themselves with regard to the people's constitutional policy declaring a right of privacy.

## I

Article I, section 1 of the California Constitution declares: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, *and privacy.*" (Italics added.)

The right of privacy was added to the California Constitution when the voters at the November 7, 1972, General Election approved a proposed legislative constitutional amendment that was designated on the ballot as Proposition 11.

In construing the right of privacy, we must determine and adhere to the intent underlying Proposition 11. Of course, the intent that controls is that of the people who voted for the measure. (*County of Fresno* v. *State of California* (1991) 53 Cal.3d 482, 488 [280 Cal.Rptr. 92, 808 P.2d 235].)

The intent of the people must be discerned from two sources.

The first is the language of Proposition 11, to wit, the single substantive term "privacy." Since the word does not define itself, we must press on.

The second is the arguments presented in the ballot pamphlet for and against Proposition 11. Those arguments offer relevant extrinsic evidence. (*White* v. *Davis* (1975) 13 Cal.3d 757, 775, fn. 11 [120 Cal.Rptr. 94, 533 P.2d 222].) Indeed, they offer, in essence, the only such evidence. (*Id.* at p. 775.)[1]

The argument in favor of Proposition 11 states: "The proliferation of government snooping and data collecting is threatening to destroy our

---

[1]To the contrary is Professor J. Clark Kelso. He asserts that the "premise" that the "ballot argument is an important part of the legislative history of" Proposition 11 "is bad law . . . ." (Kelso, *California's Constitutional Right to Privacy* (1992) 19 Pepperdine L.Rev. 327, 433.) He is incorrect. His point is without adequate support in reason. Moreover, as he himself is compelled to admit, it is against the overwhelming weight of authority as expressed in a "long line of supreme court decisions." (*Ibid.*) He also asserts that the "premise" that the "ballot argument is the only piece of significant legislative history for" the measure "is simply wrong as a matter of fact . . . ." (*Ibid.*) He is again incorrect. What he seeks to create can only be called a "secret legislative history," which is "stored in the state archives" and "not easy to come by" (*id.* at p. 333). It embraces "fragments" of the "legislative history" of what was to

traditional freedoms. Government agencies seem to be competing to compile the most extensive sets of dossiers of American citizens. Computerization of records makes it possible to create 'cradle-to-grave' profiles on every American.

*"At present there are no effective restraints on the information activities of government and business. This amendment creates a legal and enforceable right of privacy for every Californian.*

"The right of privacy is the right to be left alone. It is a fundamental and compelling interest. It protects our homes, our families, our thoughts, our emotions, our expressions, our personalities, our freedom of communion, and our freedom to associate with the people we choose. It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us.

*"Fundamental to our privacy is the ability to control circulation of personal information.* This is essential to social relationships and personal freedom. The proliferation of government and business records over which we have no control limits our ability to control our personal lives. Often we do not know that these records even exist and we are certainly unable to determine who has access to them.

"Even more dangerous is the loss of control over the accuracy of government and business records on individuals. Obviously, if the person is unaware of the record, he or she cannot review the file and correct inevitable mistakes. Even if the existence of this information is known, few government agencies or private businesses permit individuals to review their files and correct errors.

"The average citizen also does not have control over what information is collected about him. Much is secretly collected. We are required to report some information, regardless of our wishes for privacy or our belief that there is no public need for the information. *Each time we apply for a credit card or a life insurance policy, file a tax return, interview for a job, or get a drivers' license, a dossier is opened and an information profile is sketched.* Modern technology is capable of monitoring, centralizing and computerizing this information which eliminates any possibility of individual privacy.

"The right of privacy is an important American heritage and essential to the fundamental rights guaranteed by the First, Third, Fourth, Fifth and

---

become Proposition 11. (*Ibid.*) This "secret legislative history" has no conceivable bearing on the crucial issue of the intent of the people who voted for the measure. In Professor Kelso's view, however, it speaks to the question of coverage. I shall turn to that question in due course. (See fn. 8, *post.*)

Ninth Amendments to the U.S. Constitution. This right should be abridged only when there is compelling public need. Some information may remain as designated public records but only when the availability of such information is clearly in the public interest. . . ." (Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, pp. 26-27, italics added in place of underscoring in original.)

The rebuttal to the argument in favor of Proposition 11 states: "To say that there are at present no effective restraints on the information activities of government and business is simply untrue. In addition to literally hundreds of laws restricting what use can be made of information, every law student knows that the courts have long protected privacy as one of the rights of our citizens.

"Certainly, when we apply for credit cards, life insurance policies, drivers' licenses, file tax returns or give business interviews, it is absolutely essential that we furnish certain personal information. Proposition 11 does not mean that we will no longer have to furnish it and provides no protection as to the use of the information that the Legislature cannot give if it so desires.

"What Proposition 11 can and will do is to make far more difficult what is already difficult enough under present law, investigating and finding out whether persons receiving aid from various government programs are truly needy or merely using welfare to augment their income.

"Proposition 11 can only be an open invitation to welfare fraud and tax evasion and for this reason should be defeated." (Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), rebuttal to argument in favor of Prop. 11, p. 27.)

The argument against Proposition 11 states: "Proposition 11, which adds the word 'privacy' to a list of 'inalienable rights' already enumerated in the Constitution, should be defeated for several reasons.

"To begin with, the present Constitution states that there are certain inalienable rights 'among which are those' that it lists. Thus, our Constitution does not attempt to list *all* of the inalienable rights nor as a practical matter, could it do so. It has always been recognized by the law and the courts that privacy is one of the rights we have, particularly in the enjoyment of home and personal activities. So, in the first place, the amendment is completely unnecessary.

"For many years it has been agreed by scholars and attorneys that it would be advantageous to *remove* much unnecessary wordage from the Constitution, and at present we are spending a great deal of money to finance a

Constitution Revision Commission which is working to do this. Its work presently is incomplete and we should not begin to lengthen our Constitution and to amend it piecemeal until at least the Commission has had a chance to finish its work.

"The most important reason why this amendment should be defeated, however, lies in an area where possibly privacy should *not* be completely guaranteed. Most government welfare programs are an attempt by California's more fortunate citizens to assist those who are less fortunate; thus, today, millions of persons are the beneficiaries of government programs, based on the *need* of the recipient, which in turn can only be judged by his revealing his income, assets and general ability to provide for himself.

"If a person on welfare has his privacy protected to the point where he need not reveal his assets and outside income, for example, how could it be determined whether he should be given welfare at all?

". . . . . . . . . . . . . . . . . . . . . . . . . .

"Our government is helping many people who really need and deserve the help. Making privacy an inalienable right could only bring chaos to all government benefit programs, thus depriving all of us, including those who need the help most.

"And so because it is unnecessary, interferes with the work presently being done by the Constitution Revision Commission and would emasculate all government programs based on recipient need, I urge a 'no' vote on Proposition 11." (Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), argument against Prop. 11, pp. 27-28, italics added in place of underscoring in original.)

The rebuttal to the argument against Proposition 11 states: "The right to privacy is much more than 'unnecessary wordage[.'] It is fundamental in any free society. Privacy is not now guaranteed by our State Constitution. This simple amendment will extend various court decisions on privacy to insure protection of our basic rights.

"The work of the Constitution Revision Commission cannot be destroyed by *adding two words* [i.e., "and privacy"] to the State Constitution. The Legislature actually followed the Commission's guidelines in drafting Proposition 11 by keeping the change simple and to the point. Of all the proposed constitutional amendments before you, this is the simplest, the most understandable, and one of the most important.

"The right to privacy will not destroy welfare nor undermine any important government program. It is limited by 'compelling public necessity' and

the public's need to know. Proposition 11 will not prevent the government from collecting any information it legitimately needs. It will only prevent misuse of this information for unauthorized purposes and preclude the collection of extraneous or frivolous information." (Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), rebuttal to argument against Prop. 11, p. 28, italics added in place of underscoring in original.)

In view of the foregoing, we are able to say this about the right of privacy.

First, the *status* of the right of privacy is variously declared to be "fundamental," "compelling," and "basic." (Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, p. 27 ["fundamental" and "compelling"]; *id.*, rebuttal to argument against Prop. 11, p. 28 ["fundamental" and "basic"].) The same is implied in the statement that the "right of privacy is an important American heritage and essential to the fundamental rights guaranteed by the First, Third, Fourth, Fifth and Ninth Amendments to the U.S. Constitution." (*Id.*, argument in favor of Prop. 11, p. 27; cf. *Olmstead* v. *United States* (1928) 277 U.S. 438, 478 [72 L.Ed. 944, 956, 48 S.Ct. 564, 66 A.L.R. 376] (dis. opn. of Brandeis, J.) [stating that the right of privacy is "the most comprehensive of rights and the right most valued by civilized men"].)

It follows that the right of privacy "should be abridged only when there is compelling public need." (Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, p. 27.) What is demanded is a "need" on the part of the intruding party that is both "compelling" and "public." "Compelling" means that the "need" is one in the strict sense, denoting something actually required by the intruding party under all the circumstances and not simply "useful" or "desirable." (Webster's Third New Internat. Dict. (3d ed. 1961) p. 1512.) "Public," for its part, means that the "need" is one that the community at large deems valid and not merely the intruding party. The "need" in question must extend to the means used as well as the interests furthered. Otherwise, any interests, so long as they were "compelling," would always justify every means, no matter how offensive. This is, in substance and effect, a kind of "balancing" test. Its scales, however, do not start out in equipoise, but rather verge in favor of the right of privacy.

The "compelling public need" standard, it must be noted, is not contradicted or qualified by the statement in the rebuttal to the argument against Proposition 11: "The right to privacy will not destroy welfare nor undermine any important government program. It is limited by 'compelling public necessity' and the public's need to know. Proposition 11 will not prevent the

government from collecting any information it legitimately needs. It will only prevent misuse of this information for unauthorized purposes and preclude the collection of extraneous or frivolous information." (Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), rebuttal to argument against Prop. 11, p. 28.) This statement reaffirms the "compelling public need" standard by means of the virtual quotation, " 'compelling public necessity,' " and the paraphrase, "the public's need to know." Neither does it depart from that test by asserting that "Proposition 11 will not prevent the government from collecting any information it *legitimately needs*." The implication is that the requirement of a "compelling public need" is satisfied by a "legitimate need." The further implication is that a "legitimate need" is one that is actually required by the intruding party—it is a *need*—and is deemed valid by the community at large—it is *legitimate*.

That the right of privacy "should be abridged only when there is compelling public need" (Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, p. 27) does not mean that this standard must be applied to justify any interference with any asserted right of privacy. Apparently, conduct adversely affecting, but not abridging, an established right of privacy may be allowed if reasonable. Of course, conduct bearing on a fictive "right of privacy" is not subject to any scrutiny at all.[2]

---

[2]Generally in accord on the status of the right of privacy are, for example, *White v. Davis, supra*, 13 Cal.3d at page 761 ("[t]hough the amendment does not purport to invalidate all . . . information gathering, it does require that the government establish a compelling justification for such conduct"); *id.* at page 775 ("the amendment does not purport to prohibit all incursion into individual privacy but rather . . . any such intervention must be justified by a compelling interest"); *Valley Bank of Nevada* v. *Superior Court* (1975) 15 Cal.3d 652, 656-658 [125 Cal.Rptr. 553, 542 P.2d 977] (the need for balancing); *Loder* v. *Municipal Court* (1976) 17 Cal.3d 859, 864 [132 Cal.Rptr. 464, 553 P.2d 624] (expressly recognizing the requirement of a " 'compelling interest' " to justify an " 'intervention' " as to the right of privacy and impliedly recognizing the need for balancing); *People* v. *Privitera* (1979) 23 Cal.3d 697, 702 [153 Cal.Rptr. 431, 591 P.2d 919, 5 A.L.R.4th 178] (when a "right of privacy" claimed against a governmental actor is not established but only "asserted," i.e., when it "is *not* encompassed by the right of privacy embodied in . . . the state Constitution[ ]," it is not subject to the "compelling state interest test" (italics in original)); *id.* at pages 709-710 (to similar effect); *City of Santa Barbara* v. *Adamson* (1980) 27 Cal.3d 123, 131 [164 Cal.Rptr. 539, 610 P.2d 436, 12 A.L.R.4th 219] (" 'the amendment does not purport to prohibit all incursion into individual privacy but rather . . . any such intervention must be justified by a compelling [public] interest' " (brackets and bracketed material in *Adamson*, ellipsis added)); *id.* at page 133 (implying that the means used are not actually required when "less restrictive" means are available); *Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252, 275 [172 Cal.Rptr. 866, 625 P.2d 779, 20 A.L.R.4th 1118] (plur. opn.) (the right of privacy is "clearly among the most intimate and fundamental of all constitutional rights"); *Doyle* v. *State Bar* (1982) 32 Cal.3d 12, 19-20 [184 Cal.Rptr. 720, 648 P.2d 942] (*per curiam*) (impliedly acknowledging that a " 'compelling interest' [is] required to justify invasion of

Second, the *source* of the right of privacy is "our traditional freedoms" and our "American heritage," evidently as reflected in the common law,

---

privacy" and expressly acknowledging that balancing is needed); *People* v. *Stritzinger* (1983) 34 Cal.3d 505, 511 [194 Cal.Rptr. 431, 668 P.2d 738] ("[i]t is . . . well established . . . that the right of privacy is not absolute, but may yield [to governmental intrusion] in the furtherance of compelling state interests"); *Conservatorship of Valerie N.* (1985) 40 Cal.3d 143, 164 [219 Cal.Rptr. 387, 707 P.2d 760] (a governmental "restriction" on the right of privacy "must be justified by a compelling state interest"); *Long Beach City Employees Assn.* v. *City of Long Beach* (1986) 41 Cal.3d 937, 948 & fn. 12 [227 Cal.Rptr. 90, 719 P.2d 660] (governmental intrusion "upon the constitutionally protected zone of individual privacy" "must be justified by a compelling governmental interest") (dictum); *Vinson* v. *Superior Court* (1987) 43 Cal.3d 833, 842 [239 Cal.Rptr. 292, 740 P.2d 404] (the need for balancing); *Schmidt* v. *Superior Court* (1989) 48 Cal.3d 370, 389-390 [256 Cal.Rptr. 750, 769 P.2d 932] (implying that conduct adversely affecting, but not abridging, an established right of privacy may be allowed if reasonable); *Schnabel* v. *Superior Court* (1993) 5 Cal.4th 704, 712 [21 Cal.Rptr.2d 200, 854 P.2d 1117] (the need for balancing); *Porten* v. *University of San Francisco* (1976) 64 Cal.App.3d 825, 832 [134 Cal.Rptr. 839] (an intruding nongovernmental party must show a "compelling public interest" to justify the intrusion); *Cutter* v. *Brown-bridge* (1986) 183 Cal.App.3d 836, 843 [228 Cal.Rptr. 545] (recognizing both the "compelling interest" requirement and the need for balancing); *Wilkinson* v. *Times Mirror Corp.* (1989) 215 Cal.App.3d 1034, 1046 [264 Cal.Rptr. 194] (same); *id.* at page 1047 ("even if challenged conduct has some impact on the right of privacy, as long as that right is not substantially burdened or affected, justification by a compelling interest is not required"; "[i]nstead, the operative question is whether the challenged conduct is reasonable"); *Semore* v. *Pool* (1990) 217 Cal.App.3d 1087, 1096 [266 Cal.Rptr. 280] ("privacy, like the other inalienable rights listed first in our Constitution, is . . . fundamental"); *Luck* v. *Southern Pacific Transportation Co.* (1990) 218 Cal.App.3d 1, 20 [267 Cal.Rptr. 618] (holding that any "incursion into individual privacy . . . must be justified by a compelling interest," and that the "compelling interest test" constitutes "existing precedent"); *Miller* v. *Murphy* (1983) 143 Cal.App.3d 337, 343-346 [191 Cal.Rptr. 740] (to the effect that conduct adversely affecting, but not abridging, an established privacy right may be allowed if reasonable).

In *Committee to Defend Reproductive Rights* v. *Myers, supra,* 29 Cal.3d 252, the plurality opinion articulates a test, derived from the pre-Proposition 11 case of *Bagley* v. *Washington Township Hospital Dist.* (1966) 65 Cal.2d 499, 505-507 [55 Cal.Rptr. 401, 421 P.2d 409], under which "the state must demonstrate (1) 'that the imposed conditions relate to the purposes of the legislation which confers the benefit or privilege'; (2) that 'the utility of imposing the conditions . . . manifestly outweigh[s] any resulting impairment of constitutional rights'; and (3) that there are no 'less offensive alternatives' available for achieving the state's objective." (*Committee to Defend Reproductive Rights* v. *Myers, supra,* 29 Cal.3d at p. 258 (plur. opn.).) The plurality opinion does not purport to substitute this test for the "compelling public need" standard. Rather, it simply uses it as a "framework for judicial analysis of restrictions . . . which exclude from government benefit programs potential recipients solely on the basis of their exercise of constitutional rights." (*Id.* at p. 265 (plur. opn.); accord, *Robbins* v. *Superior Court* (1985) 38 Cal.3d 199, 213 [211 Cal.Rptr. 398, 695 P.2d 695].)

The familiar observation of Professor Gerald Gunther, that the Warren Court's "aggressive 'new' equal protection" involved "scrutiny that was 'strict' in theory and fatal in fact" (Gunther, *The Supreme Court, 1971 Term—Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection* (1972) 86 Harv.L.Rev. 1, 8), is without import here. It does not bear on the right of privacy. Moreover, it was circulated in published form only after the November 7, 1972, General Election.

federal and state statutes, and federal and state constitutional law generally, including, of course, the guaranties against unreasonable searches and seizures contained in the Fourth Amendment to the United States Constitution and article I, section 13 of the California Constitution. (Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, pp. 26, 27.) Strictly speaking, the right of privacy is not *granted* by the state charter. Rather, it is *guaranteed.* (See Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), rebuttal to argument against Prop. 11, p. 28 ["Privacy is not now guaranteed by our State Constitution."].)[3]

Third, the *definition* of the right of privacy is simply the "right to be left alone." (Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, p. 27; cf. *Olmstead* v. *United States, supra,* 277 U.S. at p. 478 [72 L.Ed. at p. 956] (dis. opn. of Brandeis, J.) [calling the right of privacy the "right to be let alone"]; Warren & Brandeis, *The Right to Privacy* (1890) 4 Harv. L.Rev. 193, 193 [to similar effect].)[4]

Fourth, the *substance* of the right of privacy has three major aspects.

To begin with, there is a protectible interest against an intruding party's obtaining and/or publishing of private information belonging to the party intruded upon—"informational privacy." This is the value that is threatened by "government snooping and data collecting"; the "compil[ing]" of "extensive sets of dossiers of American citizens" by "[g]overnment agencies"; the "[c]omputerization of records," which "makes it possible to create 'cradle-to-grave' profiles on every American"; the "collecting and stockpiling [of] unnecessary information about us" by "government and business interests" and the "misusing" of "information gathered for one purpose in order to serve other purposes or to embarrass us"; the "proliferation of government and business records over which we have no control"; the fact that "[o]ften we do not know that these records even exist and we are certainly unable to

---

[3]Generally in accord on the source of the right of privacy are, for example, *People* v. *Porras* (1979) 99 Cal.App.3d 874, 879 [160 Cal.Rptr. 627] (the "adoption of the amendment was intended to strengthen the right of privacy"); *Cutter* v. *Brownbridge, supra,* 183 Cal.App.3d at page 842 (implying that the right of privacy embraces the "interests protected by the common law" but also "reaches beyond" them).

[4]Generally in accord on the definition of the right of privacy are, for example, *White* v. *Davis, supra,* 13 Cal.3d at page 774 (" 'The right of privacy is the right to be left alone.' "); *City of Santa Barbara* v. *Adamson, supra,* 27 Cal.3d at page 130 (same); *Robbins* v. *Superior Court, supra,* 38 Cal.3d at page 212 (same); *Long Beach City Employees Assn.* v. *City of Long Beach, supra,* 41 Cal.3d at page 943 (same); *People* v. *Porras, supra,* 99 Cal.App.3d at page 879 (same); *Wilkinson* v. *Times Mirror Corp., supra,* 215 Cal.App.3d at page 1040 (same).

determine who has access to them"; the "loss of control over the accuracy of government and business records on individuals"; the fact that the "average citizen . . . does not have control over what information is collected about him"; the "open[ing]" of a "dossier" and the "sketch[ing]" of an "information profile" for each "credit card," "life insurance policy," "tax return," "job" "interview," and "drivers' license"; and the fact that "[m]odern technology is capable of monitoring, centralizing and computerizing [personal] information which eliminates any possibility of individual privacy." (Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, pp. 26-27, underscoring deleted.)

There is also a protectible interest against an intruding party's interference with private conduct by the party intruded upon—"autonomy privacy." This is the value that is indicated by reference to "social relationships and personal freedom" and to "our homes, our families, our thoughts, our emotions, our expressions, our personalities, our freedom of communion, and our freedom to associate with the people we choose." (Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, p. 27.)

Underlying each of these two protectible interests is a third, viz., a protectible interest against an intruding party's very act of invading the solitude of the party intruded upon—"privacy" properly so called. This is the value basic to the definition of the right of privacy as the "right to be left alone." (Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, p. 27.) It is also the value that is threatened by "snooping," the "monitoring" of personal conduct, and the "collecting" and "gather[ing]" of personal information. (*Ibid.*)

Each of the three protectible interests referred to above is of equal stature the one to the other. None is more "protectible" than another; none is less.[5]

Fifth, the *scope* of the right of privacy is broad. The fact is established by the range of the protectible interests it embraces. It is confirmed by the

[5]Generally in accord on the substance of the right of privacy are, for example, *White* v. *Davis*, *supra*, 13 Cal.3d at page 774 (the "general concept of privacy relates . . . to an enormously broad and diverse field of personal action and belief"; the "moving force behind the new constitutional provision was" informational privacy); *City of Santa Barbara* v. *Adamson*, *supra*, 27 Cal.3d at page 129 (same as to former point); *id.* at page 130 (autonomy privacy: the "right of privacy" in "one's family" and also in "one's home"); *Committee to Defend Reproductive Rights* v. *Myers*, *supra*, 29 Cal.3d at pages 275, 284 (plur. opn.) (autonomy privacy: a woman's "right to decide for herself whether to parent a child," and "whether to bear a child or to have an abortion"); *Robbins* v. *Superior Court*, *supra*, 38 Cal.3d at page 213 (the "right to privacy has been held to protect a diverse range of personal freedoms"); *Conservatorship of Valerie N.*, *supra*, 40 Cal.3d at p. 163 (autonomy privacy: the

evident intent not simply to adopt "various court decisions on privacy," but actually to "extend" them beyond their four corners. (Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), rebuttal to argument against Prop. 11, p. 28.)[6]

---

"right of a woman to choose whether or not to bear a child and thus to control her social role and personal destiny" is a "fundamental right protected by" the right of privacy); *Long Beach City Employees Assn.* v. *City of Long Beach, supra,* 41 Cal.3d at page 948 (informational privacy and privacy properly so called: the "coercive collection of mental thoughts, conditions and emotions" "inherently intrude[s] upon the constitutionally protected zone of individual privacy") (dictum); *Cutter* v. *Brownbridge, supra,* 183 Cal.App.3d at page 842 (informational privacy: the " 'zones of privacy' created by article I, section 1, extend to the details of one's medical history"); *Miller* v. *National Broadcasting Co.* (1986) 187 Cal.App.3d 1463, 1489-1493 [232 Cal.Rptr. 668, 69 A.L.R.4th 1027] (stating that the " 'right to privacy has been held to protect a diverse range of personal freedoms' "; suggesting that both informational privacy and privacy properly so called are implicated in the intrusion by a television news camera into a residence in order to film the efforts of paramedics to save the life of a heart attack victim); *Wilkinson* v. *Times Mirror Corp., supra,* 215 Cal.App.3d at page 1046 (the "general concept of privacy can be viewed as encompassing a broad range of personal action and belief"); *Luck* v. *Southern Pacific Transportation Co., supra,* 218 Cal.App.3d at pages 15-17 (rejecting a claim that the right of privacy protects only informational privacy, with the observation that " 'the right to privacy has been held to protect a diverse range of personal freedoms[ ]' "; suggesting that both informational privacy and privacy properly so called are implicated in the collection and testing of urine); *Chico Fem. Women's Hlth. Cr.* v. *Butte Glenn Med. S.* (E.D.Cal. 1983) 557 F.Supp. 1190, 1202 ("there is simply no indication that certain privacy rights were intended to be afforded greater protection than others").

[6]Generally in accord on the scope of the right of privacy are, for example, *Porten* v. *University of San Francisco, supra,* 64 Cal.App.3d at page 829 (the "elevation of the right to be free from invasions of privacy to constitutional stature was apparently intended to be an expansion of the privacy right"); *Luck* v. *Southern Pacific Transportation Co., supra,* 218 Cal.App.3d at page 17 (same); *Chico Fem. Women's Hlth. Cr.* v. *Butte Glenn Med. S., supra,* 557 F.Supp. at page 1203 (same). See also Kelso, *California's Constitutional Right to Privacy, supra,* 19 Pepperdine L.Rev. at page 376 (observing that "[a]lthough privacy was clearly identified as an interest worthy of some legal protection [at common law], courts generally did not give privacy a privileged place or undue weight"); *id.* at page 423 (stating that the "secret legislative history" (see fn. 1, *ante*) "suggest[s] that the privacy clause was intended to do more than simply codify existing constitutional and common law doctrines").

Since the "right of privacy [under the United States Constitution] in general appears to be narrower than" the right of privacy under the California Constitution (*City of Santa Barbara* v. *Adamson, supra,* 27 Cal.3d at p. 130, fn. 3; accord, *Committee to Defend Reproductive Rights* v. *Myers, supra,* 29 Cal.3d at pp. 263, 280-281 (plur. opn.)), the Fourth Amendment in general appears to be narrower still. That is because the "federal constitutional right of privacy" is broader than the Fourth Amendment. (See *Luck* v. *Southern Pacific Transportation Co., supra,* 218 Cal.App.3d at p. 20 ["The constitutional right to privacy does not prohibit all incursion into individual privacy, but provides that any such intervention must be justified by a compelling interest. [Citations.] This test places a heavier burden on [the intruding party] than would a Fourth Amendment privacy analysis, in which the permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests."].) In *People* v. *Crowson* (1983) 33 Cal.3d 623, 629 [190 Cal. Rptr 165, 660 P.2d 389], the lead opinion states: *"In the search and seizure context,* the article I, section 1 'privacy' clause has never been held to establish a broader protection than that provided by the Fourth Amendment of the United States

Sixth, the *nature* of the right of privacy is dynamic. Its contours change with the contours of the protectible interests it embraces.[7]

Seventh, the *coverage* of the right of privacy is unlimited. That is to say, it reaches both governmental and nongovernmental actors. Intrusion is what matters, not the identity of the intruder. For example, informational privacy is guaranteed against the "collecting and stockpiling [of] unnecessary information about us" by "government *and* business interests"; the "proliferation of government *and* business records over which we have no control"; the "loss of control over the accuracy of government *and* business records on individuals"; and the "open[ing]" of a "dossier" and the "sketch[ing]" of an "information profile" by government for each "tax return," "job" "interview," and "drivers' license" *and* the "open[ing]" of a "dossier" and the "sketch[ing]" of an "information profile" by business for each "credit card," "life insurance policy," and "job" "interview." (Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, p. 27, italics added.)

The "compelling public need" standard is applicable to both governmental and nongovernmental actors. As stated, intrusion is what matters, not the identity of the intruder. No distinction is drawn between types of actors. None need be. Certainly, the "compelling public need" standard can be satisfied by both. For example, there may be such a need for information about an individual's income on the part of a taxing body: the need seems one that is actually required by the agency under all the circumstances in order to determine tax liability, and is deemed valid by the community at large because of the importance of raising revenue. There may be a similar need for similar information on the part of a consumer credit-card company: the need seems one that is actually required by the firm under all the circumstances in order to assess financial condition, and is deemed valid by the community at large because of the importance of extending credit where appropriate.[8]

Eighth, the *character* of the right of privacy is justiciable. That means that it is "legal and enforceable" in the courts. (Ballot Pamp., Proposed Stats. and

Constitution or article I, section 13 of the California Constitution." (Italics added.) Because it is qualified by the italicized phrase, the unitalicized clause is unremarkable. (See *Wilkinson* v. *Times Mirror Corp.*, *supra*, 215 Cal.App.3d at p. 1043, fn. 4.)

[7]See *People* v. *Prather* (1990) 50 Cal.3d 428, 437 [267 Cal.Rptr. 605, 787 P.2d 1012] (per Lucas, C. J.) (speaking specifically of popular initiatives but with applicability to legislative proposals as well: "In construing constitutional . . . enactments, we must give the language of the enactment 'a liberal, practical common-sense construction which will meet changed conditions and the growing needs of the people.' ").

[8]Generally in accord on the coverage of the right of privacy are, for example, *Porten* v. *University of San Francisco*, *supra*, 64 Cal.App.3d at pages 829-830 (the right of privacy reaches governmental and nongovernmental actors); *Kinsey* v. *Macur* (1980) 107 Cal.App.3d 265, 272 [165 Cal.Rptr. 608] (following the foregoing authority in what may, or may not, be

Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, p. 26, underscoring omitted.)

Hence, it is clear that a right of action is implicit in the right of privacy.

It is less clear that this right of action imposes any fixed requirements of pleading and proof.

In determining such requirements, one would perhaps do best to cleave close to the analysis set out above.

Recall that the right of privacy may be abridged only when there is compelling public need; conduct adversely affecting, but not abridging, an established right of privacy may be allowed if reasonable; conduct bearing on a fictive "right of privacy" is not subject to any scrutiny at all.

Accordingly, the plaintiff must plead that he has a right of privacy and that it was interfered with by the defendant. The defendant may then plead, beyond simple denial, that any conduct on his part adversely affecting the right of privacy was justified by a compelling public need if it rose to the level of abridgment or that it was allowed as reasonable if it did not. The plaintiff must prove his right of privacy and the defendant's interference

dictum); *Cutter* v. *Brownbridge, supra,* 183 Cal.App.3d at page 842 (the right of privacy reaches governmental and nongovernmental actors); *Wilkinson* v. *Times Mirror Corp., supra,* 215 Cal.App.3d at pages 1040-1044 (same); *Luck* v. *Southern Pacific Transportation Co., supra,* 218 Cal.App.3d at pages 17-19 (same); *id.* at page 20 ("we see no reason to depart from existing precedent applying the compelling interest test" even when the intruding party is a nongovernmental actor); *Chico Fem. Women's Hlth. Cr.* v. *Butte Glenn Med. S., supra,* 557 F.Supp. at pages 1202-1203 (the right of privacy reaches governmental and nongovernmental actors). To similar, if qualified, effect is *Semore* v. *Pool, supra,* 217 Cal.App.3d at pages 1093-1094 ("the courts and commentators agree that the constitutional provision provides at least some protection against nongovernmental action"; "we have no doubt that at least some types of nongovernmental conduct can interfere with the right granted by the constitutional provision").

In *Schmidt* v. *Superior Court, supra,* 48 Cal.3d 370, we assumed, but did not decide, that the right of privacy reaches nongovernmental as well as governmental actors (*id.* at p. 389), noting that "we ha[d] no occasion in th[at] case to consider under what circumstances, if any, purely private action . . . would constitute a violation of the state constitutional privacy provision" (*id.* at p. 389, fn. 14).

Professor Kelso reads the "secret legislative history" of what was to become Proposition 11 (see fn. 1, *ante*) to demonstrate that the right of privacy reaches governmental actors and nongovernmental actors *cooperating with governmental actors,* but not nongovernmental actors in and of themselves. (Kelso, *California's Constitutional Right to Privacy, supra,* 19 Pepperdine L.Rev. at pp. 416-433.) As stated, this "secret legislative history" has no conceivable bearing on the crucial issue of the intent of the people who voted for the measure. In any event, it cannot reasonably be read as it is by Professor Kelso. At best, it shows that governmental actors are included within the provision. It does not even suggest that nongovernmental actors are excluded.

therewith by shouldering the generally applicable burden of proof by a preponderance of the evidence (Evid. Code, § 115). The defendant must prove under the same burden the justification or allowance of his conduct.[9]

## II

The subject of this proceeding is the "NCAA Drug-Testing Program" as it stood in 1987-1988. Also before the court as background is the program in its initial year of 1986-1987. The NCAA is, of course, the National Collegiate Athletic Association. It is an unincorporated association of over 1,000 colleges, universities, and other educational organizations.[10]

The objectives of the NCAA drug testing program, in the organization's own words, are the promotion of "fair and equitable competition at [its] championships and postseason certified events" (i.e., football bowl games) and the "protection of the health and safety of the student-athletes therein competing" who do, or might, ingest drugs. "So that no one participant might have an artificially induced advantage, so that no one participant might be pressured to use chemical substances in order to remain competitive and to safeguard the health and safety of participants, this NCAA drug-testing program has been created." This statement relates to the program in 1987-1988; it is in accord with a statement relating to the program in 1986-1987: the "goal . . . is to provide clean, equitable competition for student-athletes competing in NCAA championships and NCAA-certified postseason football bowl games."

To meet the stated objectives, the NCAA drug testing program, according to the organization's declaration, "involves urine collection on specific occasions . . . ." In individual and team championships, student athletes may be selected at random, by position of finish, or on suspicion. In team

---

[9]Generally in accord on the character of the right of privacy are, for example, *White* v. *Davis, supra,* 13 Cal.3d at page 776 (in the face of allegations in a complaint "stat[ing] a prima facie violation of the state constitutional right of privacy," the governmental defendants are "free to contest any of the allegations of the complaint as well as to designate the compelling governmental interests upon which they rely for their intrusive conduct"); *Long Beach City Employees Assn.* v. *City of Long Beach, supra,* 41 Cal.3d at page 948, footnote 12 (to "decide . . . whether [a] right of privacy was improperly violated . . . , we would inquire whether the [intruding governmental party] had demonstrated a compelling governmental interest") (dictum); *Porten* v. *University of San Francisco, supra,* 64 Cal.App.3d at page 832 (in the face of allegations in a complaint "stat[ing] a prima facie violation of the state constitutional right of privacy," the nongovernmental defendant "may contest any of the allegations of the complaint as well as show some compelling public interest justifying" its intrusion).

[10]All the evidence admitted below related to the NCAA drug testing program in 1987-1988 and 1986-1987. None concerned subsequent changes. It is true that the NCAA moved the Court of Appeal to receive such evidence. The Court of Appeal, however, denied the request.

championships and postseason football bowl games, student athletes may be selected at random, by position, by playing time, or on suspicion. The student athletes thus selected are required to provide urine specimens, and are "monitor[ed] . . . by observation" by NCAA representatives—denominated "urine validators"—as they do so. They are also questioned as to the identity of "each medication used recently," including "over-the-counter as well as prescription drugs." Women are specifically asked about their use of contraceptive medications. These procedures belong to the program in 1987-1988; they follow similar procedures belonging to the program in 1986-1987. The central mechanism of the program is suspicionless selection for visually monitored urine collection.

The NCAA drug testing program, again according to the organization's declaration, also "involves . . . laboratory analyses [of the urine collected] for substances on a list of banned drug classes," entitled simply "NCAA Banned Drug Classes." These procedures, too, belong to the program in 1987-1988; they follow similar procedures belonging to the program in 1986-1987.

"NCAA Banned Drug Classes" "is comprised of substances generally purported to be performance enhancing and/or potentially harmful to the health and safety of the student-athlete. The drug classes specifically include stimulants (such as amphetamines and cocaine) and anabolic steroids as well as other drugs." To wit: (1) certain "[p]sychomotor and central nervous system stimulants . . . AND RELATED COMPOUNDS"; (2) certain "[s]ympathomimetic amines . . . AND RELATED COMPOUNDS"; (3) CERTAIN "[A]NABOLIC STEROIDS . . . AND RELATED COMPOUNDS"; (4) certain "[s]ubstances banned for specific sports . . . AND RELATED COMPOUNDS"; (5) certain "[d]iuretics . . . AND RELATED COMPOUNDS"; and (6) certain "[s]treet drugs" and "OTHERS[.]" "NCAA Banned Drug Classes" is found in the program in 1987-1988; it succeeds a "NCAA Banned Drugs List," which was found in the program in 1986-1987 and was essentially identical. The drugs and other substances in question are almost all of them lawful.

"NCAA Banned Drug Classes" is given detail in the "NCAA Prohibited Drug Reference List." The latter fills 59 single-spaced, typewritten pages. By its own declaration, it "represent[s] the majority of the drugs found in the United States . . . ." It contains 55 pages registering the brand and generic names of various substances. On each of these pages (and one other) it states, "CAUTION: THIS IS NOT CONSIDERED A COMPLETE LIST! RELATED SUBSTANCES ARE BANNED!" Again, almost all of the drugs and other substances in question are lawful.

The NCAA drug testing program provides that a "student-athlete who is found to have utilized (in preparation for or participation in an NCAA

championship or certified postseason football contest) a substance on the list of banned drugs . . . shall not be eligible for further participation in postseason competition," and "shall remain ineligible for postseason competition for a minimum of 90 days after the test date. If the student-athlete tests positive after being restored to eligibility, he or she shall be charged with the loss of one season of postseason eligibility in all sports and shall remain ineligible for postseason competition at least through the succeeding academic year." The program allows for an expedited and limited appeal from a declaration that a student athlete is ineligible; the right to appeal belongs to the NCAA member institution and not to the student athlete. These procedures belong to the program in 1987-1988; they follow similar procedures belonging to the program in 1986-1987.

The NCAA drug testing program requires that "[e]ach year, student-athletes will sign a consent form demonstrating their understanding of the . . . program and their willingness to participate. This consent statement is part of a total Student-Athlete Statement required of all student-athletes prior to participation in intercollegiate competition during the year in question. Failure to complete and sign the statement annually shall result in the student-athlete's ineligibility for participation in all intercollegiate competition." The quoted statement appears in the program in both 1986-1987 and 1987-1988. The NCAA does not itself exact signed consent forms. Rather, it requires its member institutions to do so as its agents.

At the relevant time, Jennifer Hill and J. Barry McKeever were student athletes at the Leland Stanford Junior University (hereafter Stanford), a member institution of the NCAA.[11] In conformity with NCAA mandate, Stanford apparently attempted to exact signed consent forms from Hill and McKeever for the NCAA drug testing program in 1987-1988, but each refused. Stanford had exacted such a form from McKeever in 1986-1987; he was selected for drug testing without suspicion, and submitted under protest.

On the complaint of Hill and McKeever against the NCAA and following the intervention of Stanford on the former's side, the superior court conducted a lengthy bench trial, made extensive findings of fact and conclusions of law, and rendered judgment issuing a permanent injunction prohibiting

---

[11] It may be noted in passing that "[f]or the inaugural issue of College Sports Magazine, 110 sports information directors (SID's) were asked what three college athletic programs they admired most. The magazine asked the SID's to take into account athletes' competitive and academic success, facilities, men's teams and women's teams, major and non-revenue sports, and all other aspects of a well-rounded program." (*Stanford Athletics #1* (Nov. 1993) College Sports Magazine, at p. 6.) Stanford finished first with 26 first-place votes and 164 total points. The institution that came in second was far behind, with only seven first-place votes and only seventy total points. (*Ibid.*)

the NCAA from applying its drug testing program against Stanford student athletes and/or Stanford itself, or taking any adverse action against Stanford student athletes and/or Stanford itself with regard thereto, on the ground that the program violated Stanford student athletes' right of privacy under article I, section 1 of the California Constitution and was not immunized by the commerce clause of article I, section 8 of the United States Constitution.

In a detailed opinion, the Court of Appeal affirmed, being of the view that the superior court's findings and conclusions were supported by the evidence and in accordance with the law.[12]

Having considered the record in its entirety, I am compelled to agree.

The superior court's findings of fact and conclusions of law survive scrutiny under the appropriate standards of review.

"Questions of fact concern the establishment of historical or physical facts; their resolution is reviewed under the substantial-evidence test. Questions of law relate to the selection of a rule; their resolution is reviewed independently. Mixed questions of law and fact concern the application of the rule to the facts and the consequent determination whether the rule is satisfied. If the pertinent inquiry requires application of experience with human affairs, the question is predominantly factual and its determination is reviewed under the substantial-evidence test. If, by contrast, the inquiry requires a critical consideration, in a factual context, of legal principles and their underlying values, the question is predominantly legal and its determination is reviewed independently." (*Crocker National Bank* v. *City and County of San Francisco* (1989) 49 Cal.3d 881, 888 [264 Cal.Rptr. 139, 782 P.2d 278].)

Crucial in this proceeding is the superior court's "establishment of historical or physical facts." Each of its findings was supported by either conflicting or unconflicting evidence of substance. If by unconflicting, it must be obviously sustained. But even if by conflicting, the same is true. (See, e.g., *People* v. *McPeters* (1992) 2 Cal.4th 1148, 1176 [Cal.Rptr.2d 834, 832 P.2d 146] (per Lucas, C. J.) [implying that a trial court's finding based on conflicting evidence "is binding upon an appellate court" (internal quotation marks omitted)].)

The question here is whether the NCAA drug testing program violates the right of privacy of Stanford student athletes. The answer, as will appear, is affirmative.

---

[12]It should be noted that in conducting its analysis, the Court of Appeal applied the "compelling public need" standard through the test of *Bagley* v. *Washington Township Hospital Dist., supra,* 65 Cal.2d 499, 505-507. (See fn. 2, *ante.*) The latter is not apposite. But its use is not fatal.

To begin with, there exists a right of privacy on the part of Stanford student athletes that is implicated in the NCAA drug testing program. It is established beyond peradventure and not at all fictive. The superior court's determination to this effect is sound.

First, there is informational privacy, the protectible interest against an intruding party's obtaining and/or publishing of private information belonging to the party intruded upon. Manifestly, such information is contained in an individual's urine. It is also revealed in the identification of medications that the individual has recently used, including especially those of a contraceptive nature. The superior court found that "[t]his is confidential medical information which may reveal sensitive medical conditions . . . ." Implicit therein is a determination that is in line with the observation in *Board of Medical Quality Assurance* v. *Gherardini* (1979) 93 Cal.App.3d 669, 678 [156 Cal.Rptr. 55]: "A person's medical profile is an area of privacy infinitely more intimate, more personal in quality and nature than many areas already judicially recognized and protected." It bears emphasis that almost all of the banned drugs and other substances are lawful.

In *Skinner* v. *Railway Labor Executives' Assn.* (1989) 489 U.S. 602 [103 L.Ed.2d 639, 109 S.Ct. 1402] (hereafter sometimes *Railway Labor Executives*), a Fourth Amendment case, the majority declared: "It is not disputed . . . that chemical analysis of urine . . . can reveal a host of private medical facts about an [individual], including whether he or she is epileptic, pregnant, or diabetic. . . . [I]t is clear that the . . . testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable . . . ." (*Id.* at p. 617 [103 L.Ed.2d at pp. 659-660]; accord, *Luck* v. *Southern Pacific Transportation Co., supra*, 218 Cal.App.3d at pp. 15-17 [holding to the same effect under the right of privacy of Cal. Const., art. I, § 1].)

In his dissent in *Railway Labor Executives*, Justice Marshall expanded on the point. "[T]he chemical analysis . . . perform[ed] upon . . . urine samples implicates strong privacy interests . . . . Technological advances have made it possible to uncover, through analysis of chemical compounds in [this] fluid[], not only drug or alcohol use, but also medical disorders such as epilepsy, diabetes, and clinical depression. [Citations.] . . . '[S]uch tests may provide [intruding parties] with a periscope through which they can peer into an individual's behavior in [his or] her private life, even in [his or] her own home.' " (*Skinner* v. *Railway Labor Executives' Assn., supra*, 489 U.S. at p. 647 [103 L.Ed.2d at pp. 679-680] (dis. opn. of Marshall, J.).)

Second, there is autonomy privacy, the protectible interest against an intruding party's interference with private conduct by the party intruded

upon. Such conduct includes an individual's medical treatment of himself with lawful drugs and other substances, both on his own and under the direction of his physician. The Legislature itself has expressly found that an "adult person has the fundamental right to control the decisions relating to the rendering of his or her own medical care . . . ." (Health & Saf. Code, § 7185.5, subd. (a); accord, *id.*, former § 7186, Stats. 1976, ch. 1439, § 1, p. 6478.) Hence, words that Judge Cardozo wrote 80 years ago while a member of the New York Court of Appeals are vital in California today: "Every human being of adult years and sound body has a right to determine what shall be done with his own body . . . ." (*Schloendorff* v. *New York Hospital* (1914) 211 N.Y. 125, 129 [105 N.E. 92], overruled on other grounds, *Bing* v. *Thunig* (1957) 2 N.Y.2d 656, 667 [163 N.Y.S.2d. 3, 143 N.E.2d. 3]; accord, *Thor* v. *Superior Court* (1993) 5 Cal.4th 725, 731 [21 Cal.Rptr.2d 357, 855 P.2d 375].)

Third, there is privacy properly so called, the protectible interest against an intruding party's very act of invading the solitude of the party intruded upon. The mere presence of a stranger when an individual urinates is deeply invasive of the latter's solitude. (Cf. *Caruso* v. *Ward* (1988) 72 N.Y.2d 432, 438-439 [534 N.Y.S.2d. 142, 530 N.E.2d. 850] [concluding under provisions including the Fourth Amendment that "[u]rine testing 'in the presence of a government official or agent[]' . . . 'is at least as intrusive as a strip search' and involves a great 'intrusion on individual privacy and dignity' "].) The stranger's visual monitoring of the individual's act of urination is more irruptive still. (Cf. *Capua* v. *City of Plainfield* (D.N.J. 1986) 643 F.Supp. 1507, 1514 [concluding under the Fourth Amendment that a "urine test done under close surveillance of a government representative, regardless of how professionally or courteously conducted, is likely to be a very embarrassing and humiliating experience"].)

In *Railway Labor Executives*, the majority declared: It cannot "be disputed that the process of collecting . . . [a urine] sample . . . implicates privacy interests. . . . 'There are few activities in our society more personal or private than the passing of urine. Most people describe it by euphemisms if they talk about it at all. It is a function traditionally performed without public observation; indeed, its performance in public is generally prohibited by law as well as social custom.' [Citation.] . . . [I]t is clear that the collection . . . of urine intrudes upon expectations of privacy that society has long recognized as reasonable . . . ." (*Skinner* v. *Railway Labor Executives' Assn.*, *supra*, 489 U.S. at p. 617 [103 L.Ed.2d at p. 676]; accord, *Luck* v. *Southern Pacific Transportation Co.*, *supra*, 218 Cal.App.3d at pp. 15-17 [holding to the same effect under the right of privacy of Cal. Const., art. I, § 1].)

In his dissent in *Railway Labor Executives,* Justice Marshall expanded on this point as well. He asked rhetorically: "Who among us is not prepared to consider reasonable a person's expectation of privacy with respect to . . . the collection of his urine . . . ?" *(Skinner* v. *Railway Labor Executives' Assn., supra,* 489 U.S. at p. 642 [103 L.Ed.2d at p. 676] (dis. opn. of Marshall, J.).) He went on: "Compelling a person to produce a urine sample on demand . . . intrudes deeply on privacy and bodily integrity. Urination is among the most private of activities. It is generally forbidden in public, eschewed as a matter of conversation, and performed in places designed to preserve this tradition of personal seclusion. . . . That the privacy interests offended by compulsory and supervised urine collection are profound is the overwhelming judgment of the lower courts and commentators. . . . '[I]n our culture the excretory functions are shielded by more or less absolute privacy, so much so that situations in which this privacy is violated are experienced as extremely distressing, as detracting from one's dignity and self esteem.' " *(Id.* at pp. 645-646 [103 L.Ed.2d at pp. 678-679] (dis. opn. of Marshall, J.); cf. *People v. Melton* (1988) 44 Cal.3d 713, 739, fn. 7 [244 Cal.Rptr. 867, 750 P.2d 741] ["[w]hile the taking of a urine sample does not involve physical invasion of the body's interior, it does invoke privacy and dignitary interests protected by the due process and search and seizure clauses" of the United States and California Constitutions].)

It cannot be said that the right of privacy of Stanford student athletes is somehow qualified or reduced as a result of their status as athletes.

It appears that, as a general matter, athletes like the student athletes here are subject to relatively strict regulation and close supervision in their lives and activities, with regard to medical concerns and others. It also appears that, as a general matter, they function in a relatively communal environment, both on the field of play and in the locker room.

Such observations, however, bear little weight on the point under consideration.

Informational privacy remains undiminished. The fact that student athletes are regulated and supervised and function in a communal environment does not open them to urinalysis and questioning covering much of the pharmacopoeia. Remember the "NCAA Prohibited Drug Reference List": it fills 59 single-spaced, typewritten pages; "represent[s] the majority of the drugs found in the United States"; contains 55 pages registering the brand and generic names of various substances; and states on each one of the 55 (and on one more), "CAUTION: THIS IS NOT CONSIDERED A COMPLETE LIST! RELATED SUBSTANCES ARE BANNED!" Remember too that almost all of the drugs and other substances in question are lawful.

Autonomy privacy also remains undiminished. The fact that student athletes are regulated and supervised and function in a communal environment does not withdraw their authority to control their own medical treatment with lawful drugs and other substances.

Privacy properly so called remains undiminished as well. The fact that student athletes are regulated and supervised and function in a communal environment does not prepare them to be watched by a stranger as they urinate.

Next, there is an abridgment of the right of privacy of Stanford student athletes that is effected by the NCAA drug testing program. The interference with the right arising from the program is significant. The superior court's determination to this effect is sound.

First, as to informational privacy there is a substantial adverse effect. Through its drug testing program, the NCAA obtains private information belonging to Stanford student athletes. As stated, such information is contained in an individual's urine and in his or her identification of recently used medications, including especially those of a contraceptive nature. The NCAA requires both. As to the urine, the superior court found that the "NCAA drug testing can detect very low levels of metabolites of drugs in urine, down to a few parts per billion . . . . The type of urinalysis performed by the NCAA reveals many personal details about a person, including medical conditions, birth control methods and whether the person ingested certain substances weeks, months or even a year prior to the drug test." As to the identification: "Athletes are required to indicate to an NCAA official all medications taken for a couple of weeks prior to giving a urine sample. This is confidential medical information which may reveal sensitive medical conditions of the athlete. Women athletes are specifically asked whether they use a birth control medication."

Second, as to autonomy privacy there is also a substantial adverse effect. The superior court's finding is this: "The NCAA drug testing program . . . interferes with the athletes' right to treat themselves . . . and interferes with their doctor's ability to treat them." This result follows ineluctably from the fact that the banned drugs and other substances "represent the majority of the drugs found in the United States" and that almost all of them are lawful.

Third, as to privacy properly so called there is a substantial adverse effect, perhaps the most substantial adverse effect of all. The superior court found: "The NCAA drug testing program . . . invades privacy by requiring that an NCAA monitor watch the partially disrobed athlete during the act of urination. . . . Urinating under the watchful eye of an NCAA monitor is degrading to both men and women."

Some of the evidence that the superior court cited in support deserves mention.

McKeever testified that an "NCAA official" whom he did not know "went into the bathroom with" him; he "led" him "to the urinal there" and "wouldn't let" him "go in the stall"; he "stood back approximately five to, five to seven feet" and "watch[ed]" him "the whole time" "as" he was "urinating."

Asked, "How did it feel . . . to have a stranger watching you while you are urinating?," McKeever answered: "It is kind of hard to explain because it's really difficult. I mean, obviously, you know, I—everyday I take a shower with the guys and everything, but the hardest part about it is because it is not voluntary; it is something that you know you are sitting there and a guy is watching you, and you say—they are saying you need a hundred milliliters for the sample. And you know, you are sitting there. You are knowing that you have to give a hundred milliliters. Knowing you have to do it right then . . . . It is really difficult to say, do it now and give me a hundred milliliters." He went on: "It is very embarrassing because he is standing behind you and . . . you know . . . that he is watching you. . . . [I]t is just kind of hard being there with a beaker in your hand and watching someone, you know, make you give the [sample]. It is very uncomfortable. It is very embarrassing."

To the further question, "[W]hat is the difference between urinating in a public restroom with people and urinals beside you and urinating during the NCAA drug testing program with the monitor watching you?," McKeever provided this response: "I think the main difference is it is voluntary. When you go into a public bathroom you have to go to the bathroom. That is why you are going to go to a bathroom. When you are sitting there with a beaker in your hand and saying we want you to give the sample . . . and having a person sit there watching you and . . . you know . . . that the only reason he is there [is] to watch you[;] when you are in a public bathroom, the guy next to you is not there to watch you. That is just more—makes it that much more degrading and humiliating."

Testimony similar to McKeever's was given by Ruth M. Berkey, Assistant Executive Director of the NCAA. "[A]s part of [her] training," she "had to urinate in front of a monitor" and "found that embarrassing . . . ." She stated that there had been some "discussion" within the organization "about how embarrassing it would be for a woman athlete, particularly, someone having her period to give a urine sample[.]" That discussion was apparently without effect. Asked, "If a woman athlete has her period, is she still required to give a urine sample?," she answered, "Yes, she is."

The superior court's finding as to the substantial adverse effect of the NCAA drug testing program on "privacy" properly so called should cause no surprise. Indeed, any other would have been remarkable. Apparently, only one court has found to the contrary in a reported decision. In *O'Halloran v. University of Washington* (W.D.Wn. 1988) 679 F.Supp. 997, a federal district court denied a student athlete's application for a preliminary injunction, based on the Fourth Amendment, to prohibit the University of Washington from enforcing the NCAA drug testing program. With virtually no analysis, it trivialized the student athlete's "complaint" by asserting unsupportedly that "[m]onitored urination . . . is a relatively small intrusion . . . ." (*Id.* at p. 1005.) The decision, however, did not long survive. About six months after it was filed, it was reversed. (*O'Halloran v. University of Washington* (9th Cir. 1988) 856 F.2d 1375.)[13]

It goes without saying that the abridgment of the right of privacy of Stanford student athletes by the NCAA drug testing program is not nullified as a result of their status as athletes. As noted above, the fact that student athletes are regulated and supervised and function in a communal environment does not open them to urinalysis and questioning covering much of the pharmacopoeia; does not withdraw their authority to control their own medical treatment with lawful drugs and other substances; and does not prepare them to be watched by a stranger as they urinate. That same fact does not remove or even reduce the substantial adverse effect of the program.

Finally, there is no compelling public need that justifies the abridgment of the right of privacy of Stanford student athletes that is effected by the NCAA drug testing program. The superior court's determination to this effect is sound.

Recall that what is demanded to satisfy the standard is a "need" on the part of the intruding party that is both "compelling" and "public." It must extend to the means used as well as the interests furthered. It is "compelling" if it is actually required by the intruding party under all the circumstances. It is "public" if it is deemed valid by the community at large.

There are accordingly two questions that raise themselves in the analysis. Is there a "compelling" need by the NCAA for its drug testing program? If so, is there a "public" need? Since, as will appear, the first question must be answered in the negative, the second question need not be resolved.

---

[13]Compare *O'Connor v. Police Com'r of Boston* (1990) 408 Mass. 324, 328 [557 N.E.2d. 1146] (drug testing of police cadets: "[W]e do not take lightly the intrusiveness of collecting a urine sample . . . . We accept as true, too, that the intrusiveness is increased by cadets' being monitored in the act of urinating (a practice that helps to ensure the integrity of the urine sample).")

There must be some doubt that the *interests* furthered by the NCAA drug testing program are "compelling."

The stated objectives of the program, as quoted above, are two in number. One is to promote "fair and equitable competition." The other is to protect the "health and safety of the student-athletes" who do, or might, ingest drugs.

In the abstract, the interests underlying the goal of "fair and equitable competition" may be asserted to be "compelling." For competition is the very "product" that the NCAA markets. (*NCAA* v. *Board of Regents of Univ. of Okla.* (1984) 468 U.S. 85, 101-102 [82 L.Ed.2d 70, 84, 104 S.Ct. 2948].)

So too the interests underlying the goal of the "health and safety of the student-athletes" who do, or might, ingest drugs. It is they who actually turn out the "product" in question.

The question, however, proves to be debatable.

On closer examination, the promotion of "fair and equitable competition" does not seem "compelling." (Cf. *University of Colorado* v. *Derdeyn* (Colo. 1993) 863 P.2d 929, 945-946 [holding that "although the integrity of" a state university's "athletic program is . . . a valid and commendable [interest], it does not seem to be very significant for Fourth Amendment purposes"].) If it were, there would be a "compelling" interest for every actor in making or doing whatever it happens to make or do.

Neither does the "health and safety of the student-athletes" who do, or might, ingest drugs seem "compelling." Otherwise, reasoned the superior court, "all students and all people could be drug tested for their own good, even if they were not suspected of drug use." It matters not that the student athletes are *student* athletes. Their status as such cannot weigh in the balance. (Cf. *University of Colorado* v. *Derdeyn, supra,* 863 P.2d 929, 938-939 [concluding, with authorities cited, that "it cannot be said that university students, simply because they are university students, are entitled to less protection than other persons under the Fourth Amendment"].)

In accord is the discussion in the very recent decision in *University of Colorado* v. *Derdeyn, supra,* 863 P.2d 929 (hereafter sometimes *Derdeyn*).

In *Derdeyn,* the Colorado Supreme Court struck down a drug testing program of the University of Colorado (hereafter CU) covering its own student athletes—a program similar to the NCAA's, but if anything less

intrusive (because of the absence of a strict requirement of visual monitoring during urine collection). The court held, inter alia, that CU's program violated the Fourth Amendment's right against unreasonable searches and seizures—a right similar to the right of privacy, but if anything more tolerant (see fn. 6, *ante*).

The *Derdeyn* court's analysis of the interests furthered by CU's drug testing program is as follows.

"We begin our consideration of these interests by observing that suspicionless urinalysis-drug-testing by the government has been upheld in numerous cases, and in many of those cases, courts have characterized the relevant government interests as 'compelling.' *E.g., Skinner* [v. *Railway Labor Executives' Assn.*] 489 U.S. [602,] 628 [(1989)] [103 L.Ed.2d 639, 667, 109 S.Ct. 1402] (government has 'compelling' interest in testing railroad employees whose 'duties [are] fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences'); [*Treasury Employees* v.] *Von Raab*, 489 U.S. [656,] 670 [(1989)] [103 L.Ed.2d 685, 705, 109 S.Ct. 1384] (government has 'compelling interest in ensuring that front-line [drug] interdiction personnel [in the United States Customs Service] are physically fit, and have unimpeachable integrity and judgment'); *id.* at 677 [130 L.Ed.2d at page 702] (government has a compelling interest in protecting truly sensitive information from those who might compromise such information); *id.* at 679 [103 L.Ed.2d at pages 710-711] (government has 'compelling interests in preventing the promotion of drug users to positions where they might endanger the integrity of our Nation's borders or the life of the citizenry'); [*National Federation of Federal Employees* v.] *Cheney*, 884 F.2d [603,] 610 [280 App.D.C. 164] [(D.C. Cir. 1989)] (government has a 'compelling safety interest in ensuring that the approximately 2,800 civilians who fly and service its airplanes and helicopters are not impaired by drugs'). However, the Supreme Court has not held that only a 'compelling' interest will suffice, *see Skinner*, 489 U.S. at 624 [103 L.Ed.2d at pages 664-665]; *cf. Von Raab*, 489 U.S. at 666 [103 L.Ed.2d at pages 702-703], and some courts have upheld suspicionless urinalysis-drug-testing by the government without finding a compelling interest. *E.g., Dimeo* [v. *Griffin*] 943 F.2d [679,] 681, 683, 685 [(7th Cir. 1991) (en banc)] (explaining that decreasing levels of intrusiveness require decreasing levels of government justification, declining to characterize as compelling the government's interest in protecting professional jockeys, starters, and outriders from injuring one another at the race track, characterizing the state's financial interest as 'substantial,' and holding that these two interests outweigh 'the very limited privacy interest[s]' of professional jockeys, starters, and outriders); *International Bhd. of Elec. Workers, Local*

*1245* v. *Skinner*, 913 F.2d 1454, 1462, 1463, 1464 (9th Cir. 1990) (finding that the government has a 'great' interest in the safety of the natural gas and hazardous liquid pipeline industry, and holding that this 'strong' interest is sufficient to justify random urinalysis testing of pipeline workers). Hence, rather than trying to characterize CU's interests as 'compelling,' 'strong,' 'substantial,' or of some lesser degree of importance, we think it is more instructive simply to compare them with other types of commonly asserted interests that have been held sufficient or insufficient to justify similar intrusions.

"Our review of the cases in this area supports the conclusion of the Ninth Circuit Court of Appeals in *Local 1245* v. *Skinner*, a case involving a program for random drug testing of employees, absent individualized suspicion, that 'the concern for public safety animates the general acceptance of drug testing by courts.' *Local 1245* v. *Skinner*, 913 F.2d at 1462 (citing as support for this proposition *Skinner*, *Von Raab*, and cases from the Third, Fourth, Eighth, and District of Columbia Circuits); see also *O'Keefe* v. *Passaic Valley Water Comm'n*, 253 N.J.Super. 569, 602 A.2d 760, 763 (A.D. 1992) (reading *Skinner* and *Von Raab* as holding that 'the government may nevertheless require drug testing [absent reasonable suspicion] without running afoul of the proscriptions of the Fourth Amendment in those circumstances in which the government's special and compelling need to protect the public safety outweighs the employee's privacy interest'). For example, courts have upheld suspicionless urinalysis-drug-testing of Army-employed civilian air traffic controllers, pilots, aviation mechanics, aircraft attendants, police, and guards, *Cheney*, 884 F.2d at 610-11, 612-13; civilian employees of a chemical weapons plant who 'have access to areas . . . in which experiments are performed with highly lethal chemical warfare agents,' *Thomson* v. *Marsh*, 884 F.2d 113, 114 (4th Cir. 1989) (per curiam); drivers, mechanics and attendants whose primary duty is the daily transportation of handicapped children on school buses, *Jones* v. *Jenkins*, 878 F.2d 1476, 1477 [279 App.D.C. 19] (D.C. Cir. 1989) (per curiam), *modifying Jones* v. *McKenzie*, 833 F.2d 335 [266 App.D.C. 85] (D.C. Cir. 1987); bus or commercial truck drivers who operate 'enormous' trucks such that 'a single mistake in judgment or momentary lapse in attention can have devastating consequences for other travelers,' *International Bhd. of Teamsters* v. *Department of Transp.*, 932 F.2d 1292, 1304 (9th Cir. 1991); 'scrub techs' in public hospitals whose duties include bringing patients to the operating room, setting up the sterile field, laying out the proper instruments, and assisting during surgery, *Kent* v. *Claiborne County Hosp.*, 763 F.Supp. 1362, 1364, 1367 (S.D. Miss. 1991); employees holding top secret national security clearances, *Harmon* v. *Thornburgh*, 878 F.2d 484, 491-92 [278 App.D.C. 382] (D.C. Cir. 1989); county correctional employees with regular

access to prisoners or weapons, *Taylor* v. *O'Grady*, 888 F.2d 1189, 1199, 1901 (7th Cir. 1989); and police officers who carry firearms or participate in drug interdiction efforts, *Guiney* v. *Roache*, 873 F.2d 1557, 1558 (1st Cir. 1989) (per curiam). At the same time, courts have found insufficient governmental interests to uphold suspicionless urinalysis-drug-testing of high-school students who participate in extracurricular activities, *Brooks* [v. *East Chambers Consol. Ind. School Dist.*] 730 F.Supp. [759,] 764-66 [(S.D. Tex. 1989)]; United States Department of Justice employees who are prosecutors in criminal cases and other employees who have access to grand jury proceedings, *Harmon*, 878 F.2d at 496; county correctional employees who have no reasonable opportunity to smuggle narcotics to prisoners and no access to firearms, *Taylor*, 888 F.2d at 1201; civilian laboratory workers at the Army's forensic Drug Testing Laboratories, *Cheney*, 884 F.2d at 613, 615; civilian employees in the chain of custody process for biochemical testing at the Army's forensic Drug Testing Laboratories, *id.*; and water meter readers who must enter customers' homes in order to read the meters, *O'Keefe*, 602 A.2d at 764. In addition, courts have questioned the propriety of suspicionless testing of secretaries, engineering technicians, research biologists, and animal caretakers who work at chemical and nuclear facilities, *Cheney*, 884 F.2d at 611; police department personnel who do not carry firearms or participate in drug interdiction efforts, *Guiney*, 873 F.2d at 1558; heads of purchasing departments in hospitals who have 'vital and important responsibility essential to the proper supply of medical materials,' *Kemp*, 763 F.Supp. at 1367; and United States Customs Service employees who are required to handle classified material, *Von Raab*, 489 U.S. at 677 [103 L.Ed.2d at p. 703].

". . . [Thus,] the great majority of cases following *Skinner* and *Von Raab* clearly militate[s] against the conclusion that CU's program is a reasonable exercise of state power under the Fourth Amendment. This is so despite the fact that CU's interest in protecting the health and safety of its intercollegiate athletes . . . is unquestionably significant." (*University of Colorado* v. *Derdeyn*, *supra*, 863 P.2d at pp. 943-945, fn. omitted.)[14]

Let us now go back to the case at bar and the NCAA drug testing program.

It must be emphasized that whether or not interests are "compelling" is determined not in the abstract but *under all the circumstances.*

---

[14]The *Derdeyn* court found "of only marginal relevance" (*University of Colorado* v. *Derdeyn*, *supra*, 863 P.2d at p. 939) the decision in *Schaill by Kross* v. *Tippecanoe County School Corp.* (7th Cir. 1988) 864 F.2d 1309, which upheld against a Fourth Amendment claim of unreasonableness a drug testing program covering student athletes and cheerleaders. Its reason was that the drug testing program in *Schaill* was directed against minors, who are assertedly entitled to a lower level of protection under the Fourth Amendment. Another reason is apparent. Simply put, the analysis in *Schaill* seems dubious. How else to explain the sustaining of a drug testing program reaching beyond student athletes *to cheerleaders?*

When, as here, the interests go to avoiding or minimizing a certain harm, the issue must be resolved with an eye thereto. Accordingly, it may be stated as a rule of thumb that if the harm is very grave, the interests may be considered "compelling," and if it is insubstantial, they may not.

The interests underlying the NCAA drug testing program go to avoiding or minimizing the harm threatened by the use of drugs by student athletes, both for their own good and for the good of competition.

The superior court expressly found that the "amount of drug abuse by student-athletes in the United States is insignificant to virtually non-existent." "The minimal evidence of drug use is almost entirely limited to anabolic steroid use by certain football players . . . ." That means, of course, that there was no significant drug abuse to be deterred by any drug testing program to be established by the NCAA. The superior court impliedly found that the NCAA was, or should have been, aware of the foregoing when it established its drug testing program: The NCAA "voted to adopt the program. The reports upon which the NCAA relied were introduced here. They do not support the action taken." Because there was no significant drug abuse to be deterred before any NCAA drug testing program was established, the absence of such abuse cannot be attributed to the NCAA drug testing program that was later established. *Ante hoc, ergo non propter hoc.*

The superior court found: "[T]here is no evidence that drug use in athletic competition is endangering the health and safety of student-athletes." Further, "[t]here was no evidence that any student-athlete has ever injured anyone else as a result of drug use."

The superior court also found: "The evidence does not establish that any of the drugs on the banned list will actually enhance the performance of an athlete in the NCAA sports." "At best, the possible performance enhancement of steroids is a scientific controversy which will not be resolved in the foreseeable future. . . . [I]t is clear that steroids do not enhance aerobic performance." "The evidence is that, with the possible exception of steroid use in football, drugs are not perceived by college athletes and coaches to enhance college athletic performance . . . . Even for steroid use, the 'perception' is that it might only help certain types of positions in football."

In view of these findings, the interests underlying the NCAA drug testing program in avoiding or minimizing the harm threatened by the use of drugs by student athletes cannot be held to be "compelling." (Cf. *National Treasury Employees Union* v. *Watkins* (D.D.C. 1989) 722 F.Supp. 766, 770

[concluding under the Fourth Amendment that a government employer's "interest in randomly testing [certain] employees" for drug use "is sharply undercut by the complete absence of any history of drug-related" incidents].)

Even if the *interests* furthered by the NCAA drug testing program could be considered "compelling," the same cannot be said of the *means* used.

As stated, the central mechanism of the NCAA drug testing program is suspicionless, visually monitored urine collection.

Is *visually monitored* urine collection actually required? The superior court found that it was not. It could not have been clearer on the point: "Direct monitoring of an athlete urinating is not necessary to ensure a valid sample." And again: "It is not necessary to scrutinize the athletes while urinating." The finding was squarely based on the testimony of Ronald Heitzinger, one of the NCAA's expert witnesses. Heitzinger stated that he had heard of a collection device "which is basically a beaker or some kind of receptacle into which the urine sample is placed which contains a thermometer so that you can detect whether or not someone is using their own urine as opposed to trying to cheat [with] someone else's urine[.]" Indeed, he admitted that he himself had "develop[ed] a method for checking [a] urine sample that did not require actually monitoring the person giving urine . . . ."

Is *suspicionless* urine collection actually required? The superior court found that it was not.

Note the superior court's findings, quoted above, that the "amount of drug abuse by student-athletes in the United States is insignificant to virtually non-existent"; that the "minimal evidence of drug use is almost entirely limited to anabolic steroid use by certain football players"; and that the only "possible exception" to the general perception among "college athletes and coaches" that drugs do "not . . . enhance college athletic performance" is the case of "steroid use in football."

The reasoning underlying the superior court's finding against suspicionless urine collection is this: "A drug testing program for anabolic steroids based on reasonable suspicion would accurately detect many of those using steroids . . . ." "There are factors which can give rise to a clinical suspicion of use of anabolic steroids, including large increases in weight in a short period of time, aggressive behavior, pimples, body odor, changing hair patterns and others." These "factors" would surely be noticed. As was generally observed, student athletes are subject to relatively strict regulation and close supervision in their lives and activities, and function in a relatively communal environment.

One additional comment. It seems plain that the means used to further any given interests cannot be deemed to be "compelling" if they are ineffective. (See *City of Santa Barbara* v. *Adamson, supra,* 27 Cal.3d at p. 132 [implying that the means used must "truly and substantially help effect" the interests in question]; cf. *Delaware* v. *Prouse* (1979) 440 U.S. 648, 659 [59 L.Ed.2d 660, 671, 99 S.Ct. 1391] [implying that under the Fourth Amendment the "mechanism" must be "productive" in order "to justify the intrusion"].) The superior court found the means here to be such. Its very words are these: "The NCAA's drug testing program is not effective in reaching its stated goals of clean and equitable postseason competition and protecting the health and safety of student-athletes."

To summarize: The record in this proceeding "will be searched in vain for real evidence of a real problem [among student athletes] that will be solved by" the NCAA drug testing program. (*Treasury Employees* v. *Von Raab* (1989) 489 U.S. 656, 681 [103 L.Ed.2d 685, 712, 109 S.Ct. 1384] (dis. opn. of Scalia, J.).)[15]

---

[15]The party intruded upon, of course, may consent to the conduct of the intruding party. In such a case, the former may be said to have "waived" his right of privacy or the latter may be said to have effected no intrusion. Under the Fourth Amendment, consent is valid only if it "was, in fact, freely and voluntarily given." (*Schneckloth* v. *Bustamonte* (1973) 412 U.S. 218, 222 [36 L.Ed.2d 854, 859-860, 93 S.Ct. 2041], internal quotation marks omitted.) It was so given only if it was not the "product of duress or coercion, express or implied . . . ." (*Id.* at p. 227 [36 L.Ed.2d at pp. 862-863].) The issue of consent "is a question of fact to be determined from the totality of the circumstances." (*Ibid.*) The burden rests on the intruding party to prove consent (*id.* at p. 222 [36 L.Ed.2d at pp. 859-860]) by a preponderance of the evidence (*United States* v. *Matlock* (1974) 415 U.S. 164, 177-178, fn. 14 [39 L.Ed.2d 242, 253-254, 94 S.Ct. 988]; *People* v. *James* (1977) 19 Cal.3d 99, 106 & fn. 4 [137 Cal.Rptr. 447, 561 P.2d 1135]). Principles no less favorable to the party intruded upon should govern here. That is because the right of privacy provides no less protection than the Fourth Amendment. (See fn. 6, *ante.*)

In this case, neither Hill nor McKeever even purported to consent to the NCAA drug testing program in 1987-1988. Indeed, each refused to do so.

All the same, the superior court proceeded: " 'Consent' to drug testing in these circumstances is a fiction."

Responding to a "contract law" argument urged by the NCAA, the superior court reasoned: "[The] NCAA is a monopoly albeit a lawful one. It . . . regulate[s] intercollegiate athletic competition. A student who has any desire to participate in intercollegiate athletics is not free to compete under another regulatory body. The facts here show that the testing policy was unilaterally formulated by the NCAA and that student athletes have little or no means of negotiating changes or the elimination of the testing program. . . . There is no equal bargaining between the athletes and the NCAA. Without free and equal bargaining the theoretical underpinnings of contract law are vitiated."

Implicit in the superior court's reasoning seems a view similar to that expressed by the *Derdeyn* court: "It is, to be sure, only a very small percentage of college athletes whose college 'careers' are essential as stepping stones to lucrative contracts—or to any contract—as professional athletes. On the other hand, however, we must also recognize that many intercollegiate athletes who otherwise could not afford a college education receive athletic

The only question remaining pertains not to the right of privacy under the California Constitution but to the commerce clause of the United States Constitution. With careful analysis, the superior court determined that the NCAA drug testing program was not immunized by the federal constitutional provision. After independent review, the Court of Appeal agreed. Having brought the same scrutiny to bear, I come to the same conclusion.

### III

In conducting an analysis that is completely novel, the majority adopt what must be termed a balanced approach: they do equal violence to both the law and the facts.

As to the law. The majority appear to take a position to the following effect: "The 'compelling public need' standard does not exist. If it does exist, it does not apply to nongovernmental actors. If it does apply to such actors, it operates as to them only with regard to autonomy privacy." As will appear, this is not mere "revisionism," but creation *ex nihilo*.

Is it true that the "compelling public need" standard does not exist? No.

The ballot arguments on Proposition 11 establish the "compelling public need" standard. The argument in favor of the measure declares: "The right of privacy . . . should be abridged only when there is compelling public need." (Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments

---

scholarships that enable them to obtain a college degree and thereby increase their earning potential. Continuation of such scholarships . . . is dependent upon continued participation in the intercollegiate athletic program, which in turn requires consent to the drug-testing program. Furthermore, many intercollegiate athletes pursue professional careers as high school or college coaches, or as administrators in athletic or recreational programs. . . . While having participated in intercollegiate athletics may not be a formal requirement for such jobs, it is commonplace that applicants with experience at the intercollegiate athletic level will not be disadvantaged in seeking such jobs in comparison with those who lack such experience." (*University of Colorado* v. *Derdeyn, supra*, 863 P.2d at p. 942.)

Under the Fourth Amendment, a finding on consent is reviewed for substantial evidence (e.g., *People* v. *James, supra*, 19 Cal.3d at p. 107), apparently as the resolution of a question of fact. Under the same constitutional provision, a determination on the possibility of valid consent may arguably be subject to independent review as the resolution of a predominantly legal mixed question of law and fact. It appears that these standards are applicable to the right of privacy as well.

Whether the superior court's statement—" 'Consent' to drug testing in these circumstances is a fiction"—is construed to embody a finding on consent or a determination on the possibility of valid consent would not matter. Such a finding would be supported by substantial evidence; such a determination would survive independent review. (Compare *Luck* v. *Southern Pacific Transportation Co., supra*, 218 Cal.App.3d at pp. 24-25 [on the facts therein, no valid consent] with *Wilkinson* v. *Times Mirror Corp., supra*, 215 Cal.App.3d at pp. 1046-1052 [on the facts therein, valid consent].)

to voters, Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, p. 27.) The rebuttal to the argument against the measure acknowledges that the right of privacy is "limited," but "limited [only] by 'compelling public necessity' . . . ." (*Id.*, rebuttal to argument against Prop. 11, p. 28.)

The case law is in accord. (See fn. 2, *ante*; see especially *Long Beach City Employees Assn.* v. *City of Long Beach, supra*, 41 Cal.3d at p. 948 & fn. 12 (dictum); *Conservatorship of Valerie N., supra*, 40 Cal.3d at p. 164; *People* v. *Stritzinger, supra*, 34 Cal.3d at p. 511; *Doyle* v. *State Bar, supra*, 32 Cal.3d at pp. 19-20 (*per curiam*); *City of Santa Barbara* v. *Adamson, supra*, 27 Cal.3d at pp. 131-134; *Loder* v. *Municipal Court, supra*, 17 Cal.3d at p. 864; *White* v. *Davis, supra*, 13 Cal.3d at pp. 761, 775; *Luck* v. *Southern Pacific Transportation Co., supra*, 218 Cal.App.3d at p. 20; *Wilkinson* v. *Times Mirror Corp., supra*, 215 Cal.App.3d at p. 1046; *Cutter* v. *Brownbridge, supra*, 183 Cal.App.3d at p. 843; *Porten* v. *University of San Francisco, supra*, 64 Cal.App.3d at p. 832.)

In a word, far from nonexistent, the "compelling public need" standard is actually "existing precedent." (*Luck* v. *Southern Pacific Transportation Co., supra*, 218 Cal.App.3d at p. 20.)

It is altogether remarkable that the majority attempt to deny the existence of the "compelling public need" standard. They are defeated by their own words.

Concerning the coverage of the right of privacy as revealed in the ballot arguments on Proposition 11, the majority conclude: "Reading this language, a reasonable voter would most likely have concluded he or she was casting a ballot to safeguard his or her personal privacy against private as well as government entities. After the case was so presented, the voters were persuaded. To remove by judicial construction a significant part of what the voters desired would amount to an electoral 'bait and switch.' " (Maj. opn., *ante*, at p. 20, fn. omitted.)

By parity of reasoning, the majority should have arrived at a similar conclusion concerning the "compelling public need" standard as revealed in the ballot arguments on Proposition 11. "Reading this language, a reasonable voter would most likely have concluded he or she was casting a ballot to safeguard his or her personal privacy from abridgment except for compelling public need. After the case was so presented, the voters were persuaded. To remove by judicial construction a significant part of what the voters desired would amount to an electoral 'bait and switch.' "

Next, is it true that the "compelling public need" standard does not apply to nongovernmental actors? Again, no.

The ballot arguments on Proposition 11 suggest a single standard for use against all abridgments of the right of privacy, that of "compelling public need." That is shown above. Further, they make plain that such abridgments may be effected by nongovernmental actors as well as governmental actors. Although they speak much of "government," "tax return[s]," and "drivers' license[s]," they also speak much of "business," "credit card[s]," and "life insurance polic[ies]." (Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, p. 27.)

Here too, the case law is in accord. (See fn. 2, *ante*; see especially *Luck* v. *Southern Pacific Transportation Co., supra*, 218 Cal.App.3d at p. 20; *Porten* v. *University of San Francisco, supra*, 64 Cal.App.3d at p. 832.)

The majority fabricate three reasons to support a standard for nongovernmental actors lower than that of "compelling public need." None is substantial.

"*First*, the pervasive presence of coercive government power in basic areas of human life typically poses greater dangers to the freedoms of the citizenry than actions by private persons." (Maj. opn., *ante*, at p. 38, italics in original.)

The people who voted for Proposition 11 did not share that view. To judge from the ballot arguments on the measure, they deemed nongovernmental actors to be no less threatening than governmental actors. To quote, informational privacy is guaranteed against the "collecting and stockpiling [of] unnecessary information about us" by "government *and* business interests"; the "proliferation of government *and* business records over which we have no control"; the "loss of control over the accuracy of government *and* business records on individuals"; and the "open[ing]" of a "dossier" and the "sketch[ing]" of an "information profile" by government for each "tax return," "job" "interview," and "drivers' license" and the "open[ing]" of a "dossier" *and* the "sketch[ing]" of an "information profile" by business for each "credit card," "life insurance policy," and "job" "interview." (Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, p. 27, italics added.)

But even if the people who voted for Proposition 11 considered governmental actors to be more threatening than nongovernmental actors, such a fact would not matter for purposes here. The "compelling public need" standard is applied against *actual abridgments* of the right of privacy, not against *the power to abridge.* Let us assume for argument's sake that

nongovernmental actors possess less of that power. Is that a reason to scrutinize their conduct more tolerantly when they successfully wield whatever power they have to effect an actual abridgment? The question answers itself.

"*Second,* 'an individual generally has greater choice and alternatives in dealing with private actors than when dealing with the government.' " (Maj. opn., *ante,* at p. 38, italics in original.)

That may be. But so what? The fact that an individual may have more freedom with regard to nongovernmental actors may mean that he can more readily consent to conduct on their part that would otherwise have amounted to an abridgment of his right of privacy. But it does *not* mean that the individual should be forced to bear an actual abridgment of his right of privacy with more tolerance simply because it was effected by a nongovernmental actor.

"*Third,* private conduct, particularly the activities of voluntary associations of persons, carries its own mantle of constitutional protection in the form of freedom of association." (Maj. opn., *ante,* at p. 39, italics in original.)

What this means is hard to say. It seems to suggest that each and every nongovernmental actor has a "right of privacy" to deny any individual his right of privacy in any circumstance. That cannot be. As a general matter, the recognition of such a "right of privacy" in nongovernmental actors would bestow on them a "right" to conduct themselves with impunity. More particularly, it would grant the NCAA a "right" to watch Stanford student athletes while they urinate. To so transmogrify the right of privacy into a "right of voyeurism" is absurd. (See maj. opn., *ante,* at pp. 35-36 [stating that the "ballot arguments" "do not purport to create any unbridled right of personal freedom of action"].)

Finally, is it true that the "compelling public need" standard operates as to nongovernmental actors only with regard to autonomy privacy? Yet again, no.

As stated, the ballot arguments on Proposition 11 suggest a single standard for use against all abridgments of the right of privacy, that of "compelling public need," and make plain that such abridgments may be effected by nongovernmental actors as well as governmental actors. That is shown above. Further, they demonstrate that such abridgments may involve not only autonomy privacy but also informational privacy and privacy properly

so called. For privacy properly so called, they refer simply to the "right to be left alone." (Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, p. 27.) For informational privacy, they speak again and again of "data," "dossiers," "records," "profiles," "information," etc. (*Id.*, pp. 26-27.) Indeed, it was informational privacy that was the "moving force behind" the measure. (*White* v. *Davis, supra,* 13 Cal.3d at p. 774.)

Here too, the case law is in accord. (See fn. 5, *ante*; see especially *Luck* v. *Southern Pacific Transportation Co., supra,* 218 Cal.App.3d at pp. 15-20.)

It is plain that the majority's refusal to follow the law is driven by a fear that the "compelling public need" standard is always applicable whenever any right of privacy is asserted and that it is always fatal whenever it is applied. Of course, even if the test were such, it would still have to be employed. But it is not. As explained above, the "compelling public need" standard is triggered only when an *established* right of privacy is *abridged.* Apparently, a test of reasonableness may be used when such a right is adversely affected short of abridgment. (*Schmidt* v. *Superior Court, supra,* 48 Cal.3d at pp. 389-390; *Wilkinson* v. *Times Mirror Corp., supra,* 215 Cal.App.3d at pp. 1046-1048; *Miller* v. *Murphy, supra,* 143 Cal.App.3d at pp. 343-346.) And obviously, no scrutiny at all is called for when the "right of privacy" is merely fictive. (See *People* v. *Privitera, supra,* 23 Cal.3d at pp. 709-710; but see *id.* at p. 702 [stating that the "appropriate standard of review . . . is the rational basis test"].) Last, and perhaps most important, it must be noted that even within its proper sphere, the "compelling public need" standard is not always fatal. (See *Loder* v. *Municipal Court, supra,* 17 Cal.3d at pp. 864-877.)

The majority's refusal to follow the law does not simply result in the rejection of the "compelling public need" standard, which was intended to make the right of privacy a "legal and enforceable right" (Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, p. 26, underscoring omitted) and, unsurprisingly, constituted "existing precedent" until this very day (*Luck* v. *Southern Pacific Transportation Co., supra,* 218 Cal.App.3d at p. 20). But even worse, it leads to the stitching together of a kind of "rational basis" test. Such a test is contrary to authority, being appropriate for an interest that is merely legitimate as opposed to a "right" that is truly "fundamental," like the right of privacy. (Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, p. 27.) Moreover, since it is almost infinitely

tolerant of any intrusion no matter how great, it all but renders the right of privacy nugatory.[16]

Let us turn from the law to the facts. As the majority eye the goal they have selected, viz., the validation of the NCAA drug testing program, they recognize that the superior court's findings form an insuperable obstacle in their course. Only one thing to do: remove the findings by any and every means.

To begin with, say the majority, the superior court's findings fall of their own weight because they are based on an erroneous view of the law.

That is wrong.

We may assume for argument's sake that the superior court's view of the law was in fact erroneous. Of course, in fairness to the superior court we should hasten to add that its error was in adhering to the law as it then stood instead of foreseeing the novelties the majority have today put in its place.

Be that as it may, it is difficult to discern how any error on the part of the superior court could have affected its crucial findings. These concern the establishment of historical or physical facts which underlie such questions as whether there exists a right of privacy on the part of Stanford student athletes that is implicated in the NCAA drug testing program and, if so, whether the right is abridged by the program. On these issues, Hill and McKeever and Stanford bore the burden of proof at trial.

Next, say the majority, even if the superior court's findings do not fall of their own weight as based on an erroneous view of the law, they lack the support of substantial evidence.

That is wrong as well.

To avoid extending our discussion beyond need, let us select a single example.

The superior court found: "Direct monitoring of an athlete urinating is not necessary to ensure a valid sample." "It is not necessary to scrutinize the

---

[16]It may be noted in passing that among the "sources of privacy rights" at the time of Proposition 11 (maj. opn., *ante*, at p. 16) the majority do *not* include the right of privacy that we had found implied in the California Constitution in decisions such as *People* v. *Belous* (1969) 71 Cal.2d 954, 963-964 [80 Cal.Rptr. 354, 458 P.2d 194]. That right embraces the "fundamental right of [a] woman to choose whether to bear children." (*Id.* at p. 963.) I fear that the majority's omission may intimate a willingness on their part to turn back the clock in this regard.

athletes while urinating." The NCAA had apparently borne the burden of proof on this question. No error there. Even the majority concede that "[t]he NCAA was . . . required to justify its use of direct monitoring of urination." (Maj. opn., *ante*, at p. 50.)

How then can the majority assert that this finding was not supported by substantial evidence? Ronald Heitzinger, *one of the NCAA's expert witnesses*, testified that he had heard of a collection device "which is basically a beaker or some kind of receptacle into which the urine sample is placed which contains a thermometer so that you can detect whether or not someone is using their own urine as opposed to trying to cheat [with] someone else's urine[.]" Heitzinger further testified that he himself had "develop[ed] a method for checking [a] urine sample that did not require actually monitoring the person giving urine . . . ." Any claim that evidence of "hearing" is insufficient must fall in the face of evidence of "doing." If Heitzinger's testimony had been open to question, it would surely have been challenged by the NCAA. For at trial the NCAA bore a burden of proof to the contrary.

But even if the superior court's findings lacked the support of substantial evidence—which they do not—the majority are not justified in reversing the judgment of the Court of Appeal with directions to remand to the superior court *with directions to render judgment in favor of the NCAA.*

The majority state: "Although we could remand this case for reconsideration in light of the applicable rules of law, there is no reason to do so. Uncontradicted evidence in the record demonstrates as a matter of law the constitutional validity of the NCAA's program." (Maj. opn., *ante*, at p. 47.)

According to the majority, the "evidence in the record" was developed under burdens of proof that they now hold erroneous, burdens of proof that they now conclude call for too much from the NCAA and too little from Hill and McKeever and Stanford.

In such a situation, how can the "evidence in the record" be relied on to the detriment of Hill and McKeever and Stanford? Without any fault on their part, they satisfied the demands placed on them by the superior court. Why do the majority not give them an opportunity to meet the much greater requirements they now impose on them for the first time? It must be that they recognize this controlling fact: under what they today make the "applicable rules of law," privacy claims are practically doomed to fail. Nevertheless, fairness insists on an opportunity. It should not be denied.

## IV

Today, the majority take away from Stanford student athletes—and all other Californians—the right of privacy guaranteed by the California Constitution. At the same time, they grant to the NCAA—and any other intruding party—a "right of publicity" based on nothing more than their own views of "good" and "bad" "policy."

The NCAA is now free to use in California the weapons it had chosen for its "war on drugs." "What better way to show that" it "is serious about its 'war on drugs' than to subject" student athletes "to this invasion of their privacy and affront to their dignity? To be sure, there is only a slight chance that it will prevent some serious . . . harm resulting from" student athlete "drug use, but it will show to the world that" it "is 'clean,' and—most important of all—will demonstrate" its "determination . . . to eliminate this scourge of our society! I think it obvious that this justification is unacceptable; that the impairment of individual liberties cannot be the means of making a point; that symbolism, even symbolism for [a] worthy . . . cause . . . , cannot" justify an abridgment of the right of privacy. (*Treasury Employees* v. *Von Raab, supra,* 489 U.S. at pp. 686-687 [103 L.Ed.2d at pp. 715-716] (dis. opn. of Scalia, J.).)

Accordingly, I dissent.